UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

COLUMBUS DIVISION

**Christina Littler**, on behalf of herself and all others similarly situated,

Plaintiff,

v.

**Ohio Association of Public School Employees**,

Defendant.

Case No. 2:18-cv-01745-GCS-CMV

**MOTION TO EXCLUDE REPORT OF DAVID A. MACPHERSON**

Defendant Ohio Association of Public School Employees hereby moves under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590-92 (1993), and its progeny, to exclude the expert report of David A. Macpherson, PhD, submitted by Plaintiff as Exhibit A in support of her motion for class certification. *See* ECF No. 35-2.

Dated: December 6, 2019

By: *<u>/s/ Richard F. Griffin, Jr.</u>*
Richard F. Griffin, Jr. (admitted *pro hac vice*)
Georgina Yeomans (admitted *pro hac vice*)
Bredhoff & Kaiser PLLC
805 Fifteenth St NW, Suite 1000
Washington, DC 20005
Tel: 202-842-2600

Robert J. Walter
Ohio Bar No. 0009491
Lane Alton
Two Miranova Place, Suite 220
Columbus, OH 43215
Tel: 614-228-6885

*Counsel for Defendant Ohio Association of Public School Employees*

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendant OAPSE hereby moves to exclude the expert report of David A. Macpherson, PhD, submitted by Plaintiff in support of her motion for class certification. Dr. Macpherson's report is directed solely to the issue of whether class certification is permissible under Federal Rule of Civil Procedure 23, and therefore consists entirely of inadmissible legal analysis. Moreover, Dr. Macpherson's report suffers from several other flaws, including that it offers no actual expertise, it engages in improper extrapolation, it confuses correlation with causation, and it engages in improper credibility weighing. Accordingly, Dr. Macpherson's expert report does not meet the requirements of Federal Rule of Evidence 702 and must be excluded.

**ARGUMENT**

Rule 702 provides that an expert witness may offer testimony "in the form of an opinion or otherwise if" certain criteria are met. *See* Fed. R. Evid. 702(a)-(d). Relevant to this motion, expert testimony is admissible only if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 293 (6th Cir. 2007) (quoting Fed. R. Evid. 702). The party proffering expert testimony has the burden to demonstrate that the testimony meets Rule 702's requirements. *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000).

The district court should admit only expert testimony that is both relevant and reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). And it is within the district court's discretion to apply a more rigorous review pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), when the expert opinion was developed solely for purposes of litigation. *See Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 435 (6th Cir. 2007); *see also* Ex. 1, Transcript of Deposition of David Macpherson (Sept. 27, 2019) ("Macpherson Tr.")

at 49 (acknowledging that opinions set forth in report were created for litigation); *see also id*. at 14 (acknowledging that Dr. Macpherson has no legal expertise).

**I. Dr. Macpherson's Report Is an Inadmissible Legal Opinion**

Expert testimony setting forth a legal conclusion is not admissible. *Berry v. City of Detroit*, 25 F.3d 1342, 1353-54 (6th Cir. 1994); *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997). This evidentiary rule is founded on the principle that it is the court's role, not a witness', to apply the law to the facts of a case—or in a jury trial, to instruct the jury on the legal standard guiding the jury's analysis. *Torres v. City of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) (quoting *FAA v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983)); *see also United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984) ("Expert testimony on the law is excluded because the trial judge does not need the judgment of witnesses."). Where an expert's testimony quotes from the language of a statute or rule of procedure and applies the facts to the law, it is inadmissible. *See Torres*, 758 F.2d at 151; *see also United States v. Gordon*, 493 Fed. App'x 617, 626-27 (6th Cir. 2012) ("Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." (quoting *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998)).

Dr. Macpherson's entire report purports to apply his understanding of the record to Rule 23's requirements. The report's introduction says, "I was asked to analyze whether this case meets the requirements for class action qualification," Ex. 2, Report of David A. Macpherson ("Rpt.") at 2—in other words, Dr. Macpherson was asked to perform the exact analysis that this Court is tasked with under Rule 23, *see, e.g.*, Fed. R. Civ. P. 23(c)(1)(A) ("[T]he court must determine by order whether to certify the action as a class action."). Dr. Macpherson's "Opinions" appear in Section V of the report, beginning at page 6. After quoting extensively

from this Court's decisions in *Kennedy v. United Healthcare of Ohio*, 206 F.R.D. 191 (S.D. Ohio 2002) and *Fenley v. Wood Grp. Mustang, Inc.*, 325 F.R.D. 232 (S.D. Ohio 2018), Dr. Macpherson marches through the Rule 23 factors, as articulated in that precedent. *See* Rpt. at 10 ("Other factors identified by the Court also support numerosity."); *id*. at 12 ("If the Court is looking for common answers, the answer to the question whether Ms. Littler could have resigned at any time would apply equally to every other member of the class."); *id*. at 14 ("As discussed above, the choices faced by the named plaintiff is [sic] typical of the choices of [sic] facing every public employee represented by OAPSE."). Dr. Macpherson then summarizes his analysis (in a section also labeled "V") beginning on page 16, again marching through the Rule 23 factors. Rpt. at 16-17. This blatant attempt to subvert the role of the Court should be excluded.

For this reason, multiple courts have excluded similar reports that purport to opine on the propriety of class certification because such reports do not assist in reaching determinations of fact. For instance, in *Walsh v. Principal Life Ins. Co.*, 266 F.R.D. 232 (S.D. Iowa 2010), the plaintiff offered expert testimony from a law school dean who purported to be "an expert in class action law and practice." *Id*. at 237. The expert's report examined evidence presented to him and concluded that, "in his opinion, class certification would be appropriate under Rule 23(b)(3)." *Id*. The court excluded the report "[b]ecause the whole of [the expert's] report and deposition testimony opine on the legal issue of whether the proposed class satisfies Rule 23 requirements." *Id*. at 238; *see also Romero v. Allstate Ins. Co.*, 52 F. Supp. 3d 715, 723 (E.D. Pa. 2014) (excluding expert report that offered "no particularized knowledge of any of the factual issues relevant to a class certification analysis," but merely an opinion "based in case law and citation of law reviews and treatises"); *Witt v. Chesapeake Exploration, L.L.C.*, Civ. A. No. 2:10-cv-22-TJW, 2011 WL 2790174, at *2 (E.D. Tex. July 14, 2011) (striking law professor's report

providing a summary of various legal authorities on class certification issues and using his interpretation of these authorities to argue that the requirements for class certification had been met in this case); *Woodard v. Andrus*, CIV. A. No. 03-2098, 2009 WL 140527, at *2 (W.D. La. Jan. 20, 2009) (excluding expert testimony that "focused exclusively on whether the legal standard for class certification has been satisfied"). The Court should follow suit and exclude Dr. Macpherson's report here.

## II. Dr. Macpherson's Report Contains Numerous Other Flaws That Render It Inadmissible

In addition to constituting an improper legal opinion, Dr. Macpherson's report suffers from other significant flaws that render it inadmissible under Rule 702. The report's limited[1] analysis requires no expertise, the report makes impermissibly conclusory assertions about causation, the report engages in rank speculation, and the report makes credibility determinations inappropriate for an expert witness.

(a) Under Rule 702, expert testimony is admissible only when an expert's specialized knowledge is necessary to assist the trier of fact in understanding the evidence. *See* Fed. R. Evid. 702 Advisory Cmte. Notes (noting that test for determining admissibility of evidence is whether

---

[1] The limited, perfunctory nature of Dr. Macpherson's report is demonstrated by its method of preparation. As described in the declaration of Georgina Yeomans filed with this motion, Plaintiff's counsel have proffered expert reports by Dr. Macpherson in support of their motions for class certification in two other cases, in addition to the instant one, seeking return of union dues and fees: *Hoekman. v. Education Minnesota*, 0:18-cv-01686-SRN-ECW (D. Minn.) and *Prokes v. American Federation of State, County, and Municipal Employees, Council No. 5*, 0:18-cv-02384-SRN-ECW (D. Minn.). In his deposition, Dr. Macpherson admitted that he prepared the report for *Hoekman* first in time, then subsequently modified the *Hoekman* report to create the *Prokes* report, and then further modified the modified report to finally come up with the *Littler* report, Macpherson Tr. at 170-171, spending only four hours preparing the *Littler* report. Macpherson Tr. at 169. This cut-and-paste job resulted in mistakes in the *Littler* report, as Dr. Macpherson acknowledged. Macpherson Tr. at 171.

"layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding"). When a jury could just as competently review the record and conduct the analysis proffered by the expert, the testimony should be excluded. *Hanson v. Parkside Surgery Ctr.*, 872 F.2d 745, 750 (6th Cir. 1989) (expert testimony regarding video, which jury could evaluate on its own, was properly excluded); *see also Berry*, 25 F.3d at 1350.

Although Dr. Macpherson's report nods to his expertise in the field of economics, it does so in a conclusory fashion. *See, e.g.*, Rpt. at 7 (asserting, without elaboration, that proposed survey of putative class members is "readily accepted in the field of economics"); *id*. at 12 (alluding to unarticulated "principles of economics" to conclude that putative class members did not have a free choice pre-*Janus*); *id*. (citing unexplained "economic principles" to assert that if reasons for union membership were important to the union, the union would conduct surveys). Nowhere does Dr. Macpherson identify any analysis that is beyond the capabilities of a layperson. For instance, Dr. Macpherson's assertion that, "[f]rom my standpoint as an economist, litigating these issues over and over in separate actions would be an enormous waste of . . . time," Rpt. at 13, as Dr. Macpherson admits, is a value judgment well within the ken of a layperson to make:

> Q: But you didn't do any economic or statistical analysis to support that opinion right?
> A: I mean, it's pretty obvious. It would be expensive on an individual plaintiff's level to go sue. It's just basic math.

Macpherson Tr. at 112.

At numerous other points in his deposition, Dr. Macpherson confirmed the non-expert nature of his analysis. *E.g.,* Macpherson Tr. at 65 ("Q: So that calculation you performed? A: Correct. Q: That is math? A: Yes. Q: That wasn't statistical regression analysis or anything like

that; that was just math? A: Correct."); *id*. at 68 ("Q: . . . You have not performed any statistical analysis at all to support your opinion that there are significant numbers in classes two and three, right? A: Correct."); *id*. at 79 ("Q: There's no methodology in this report that explains how you got from these numbers to your conclusions about attitudes towards union membership, right? A: No."); *id*. at 119 ("Q: And it does not flow from any independent research that you've reviewed either, correct? A: I mean, it's more of a fact. I mean, it's either they paid the union dues, paid the agency fees, or not. That's it. I mean, it's no—it's a fact.").

(b) In addition to being devoid of any actual expertise, Dr. Macpherson's report engaged in improper extrapolation, failed to consider other possible causes of union-membership trends, and speculated, each of which constitutes a "[r]ed flag[] that caution[s] against certifying an expert." *Newell Rubbermaid, Inc. v. Raymond Corp*., 676 F.3d 521, 527 (6th Cir. 2012).

For instance, Dr. Macpherson notes that AFSCME lost 98% of its agency-fee payers after *Janus*, which he concludes "indicates that the agency-fee payers did not believe that they were getting value from paying agency fees." Rpt. at 9. This was egregious extrapolation that failed to take into account other explanations. Dr. Macpherson didn't consider that AFSCME was legally barred from collecting agency fees in the public sector, and therefore necessarily lost *all of its* public sector agency-fee payers after *Janus*. In other words, the loss of 98% of AFSCME's agency-fee payers had nothing to do with a choice made by former agency fee payers to stop paying, and had everything to do with the fact that AFSME was no longer legally *allowed* to collect, and the employees were no longer *allowed* to pay, such fees:

> Q: Isn't it true that after *Janus*, the number of fair share fee payers, agency fee payers, at SEIU and AFSCME, the number of agency fee payers dropped to zero among the public sector employees, right?
> A: I believe, yes. I think that might be right.

> Q: Right, and that a small number of private sector units still had fair share fees after *Janus* at SEIU and AFSCME? Do you know?
> A: Yeah, I think there are some small number.
> Q. Right. So the 98 percent and 94 percent drop in the number of agency fee payers is simply a reflection of the fact that SEIU and AFSCME could no longer charge agency fees to public sector employees, correct? They didn't exist after *Janus* in those sectors; therefore, there was a reduction in the number of those. Isn't that what this number shows?
> A: I'm not certain. I'm not certain.

Macpherson Tr. at 90. Dr. Macpherson's decision to ignore this basic reality in order to opine speculatively that the agency fee payers stopped paying fees because they felt they weren't getting value from the union is emblematic of the conclusory and flawed nature of his report.

Dr. Macpherson's analysis regarding the rate of union membership and contract coverage among public employees in Michigan after the passage of a right-to-work law in 2013 is similarly simplistic. According to Dr. Macpherson, because the aggregate number of public-sector workers covered by a union contract and the aggregate number of public-sector workers who were union members dropped after 2013, people who do not face the prospect of an agency fee are less likely to join their union.[2] Rpt. at 9. Dr. Macpherson admits, first, that his analysis required nothing more than "math"—not a regression analysis or other expert economic analysis. *See* Macpherson Tr. at 65. And Dr. Macpherson admits that he did not consider any other possible factors contributing to the change in union membership or contract coverage in Michigan since 2013, including the fact that there was an unprecedented municipal bankruptcy in Detroit the same year that Michigan passed the right-to-work law. *See* Macpherson Tr. at 87-88;

[2] Dr. Macpherson did not consider the *rate* of union membership among those covered by a union contract—*i.e.* how many people *in the bargaining unit* represented by a union will choose to join that union—which is the only relevant number in determining whether people will join their union in a right-to-work context. *See* Macpherson Tr. at 75.

*see also id*. at 67-74, 79. Such speculative and conclusory statements that fail to separate correlation from causation are not appropriate expert testimony.

Moreover, Dr. Macpherson's report engages in leaps of logic under the guise of economic analysis that can only be described as guesswork. For instance, in his discussion of the commonality requirement for class certification, Dr. Macpherson discusses the union's conduct and opines that "[u]nder economic principles, if details such as reasons for membership (or lack thereof) were important distinctions, the union would keep records and conduct surveys on this issue." Rpt. at 12. Macpherson's speculation as to what is important to a union, and his value judgment that failure to conduct surveys must mean that something is unimportant, is inappropriate. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008) (court's reliability gatekeeping function should exclude testimony based on "unsupported speculation"); *cf. Woods v. Lecureux*, 110 F.3d at 1221 ("For a witness to stack inference upon inference and then state an opinion regarding the ultimate issue is even more likely to be unhelpful to the trier of fact."). The premise for this speculation is also factually inaccurate: OAPSE did conduct a survey to determine why certain employees declined to join OAPSE. *See* Macpherson Tr. at 181-84. OAPSE produced the survey results in discovery and they were included as an exhibit to Gary Martin's deposition, which Macpherson purports to have reviewed. *See* Rpt. at 4.[3]

---

[3] At his deposition, Dr. Macpherson admitted that the converse of what he said in his report on this point was true—he agreed that, if a union did conduct surveys about the reasons for membership or non-membership, those reasons would be important distinctions. See Macpherson Tr. at 181-182 ("A. Yeah, that would be important. If they really cared about it, they'd ask about it."). When then confronted with the OAPSE survey, which he allegedly reviewed as an exhibit to Gary Martin's deposition but then ignored in his report ("A. I think I might've seen this. Q. You might've seen it but it doesn't appear to have been referenced in your report, is that correct? A. Yes." Macpherson Tr. at 184), he admitted that the survey reflected that there are different reasons why non-members would want to join the union ("A. There are some differences."

The improper extrapolation and speculation throughout Dr. Macpherson's report only highlight that, as Dr. Macpherson admits, he did not utilize the standard tools of economic analysis in preparing this report, *see supra* at p. 5, meaning that even if his report advanced some economic analysis, which it does not, it would fail the Supreme Court's requirement that "[a]n expert who presents testimony must 'employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

(c) Finally, Dr. Macpherson engages in credibility determinations wholly inappropriate for an expert witness. "An expert cannot testify about a witness' credibility. The jury, not the expert, evaluates credibility." *MAR Oil Co. v. Korpan*, 973 F. Supp. 2d 775, 787 (N.D. Ohio 2013) (citing *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999)). Nonetheless, Dr. Macpherson's report opines that based on Ms. Littler's complaint and deposition, "she is motivated to provide every class member a free and fair choice regarding union membership. She appears to be a woman of conviction about making sure that every union member is treated fairly and represented equally." Rpt. at 14. Not only does Dr. Macpherson's report not explain the reasoning behind this credibility determination, *see* Macpherson Tr. at 177-79, but this type of credibility determination is without a doubt the exclusive province of the factfinder, not a witness.

**CONCLUSION**

---

Macpherson Tr. at 185), contradicting the conclusion he reached concerning the impact of the union's conduct on his opinion on commonality expressed in his report. His deposition testimony on this point demonstrates not only the slip-shod nature of his report's preparation, but also the lack of any genuine expert economic analysis underlying the speculative opinions he offers there.

For the foregoing reasons, Defendant OAPSE respectfully requests that the Court exclude Dr. Macpherson's report.

Dated: December 6, 2019

By: */s/ Richard F. Griffin, Jr.*

Richard F. Griffin, Jr. (admitted *pro hac vice*)
Georgina Yeomans (admitted *pro hac vice*)
Bredhoff & Kaiser PLLC
805 Fifteenth St NW, Suite 1000
Washington, DC 20005
Tel: 202-842-2600

Robert J. Walter
Ohio Bar No. 0009491
Lane Alton
Two Miranova Place, Suite 220
Columbus, OH 43215
Tel: 614-228-6885

*Counsel for Defendant Ohio Association of Public School Employees*

**CERTIFICATE OF SERVICE**

On this 6th day of December, 2019, I caused a true and correct copy of the foregoing Motion to Exclude Expert Report of David A. Macpherson by Defendant OAPSE to be served on all counsel by CM/ECF filing:

Paul W. Leithart II
Strip Hoppers Leithart
McGrath & Terlecky Co., LPA
575 South Third St.
Columbus, OH 43215
(614) 545-7728 (phone)
pwl@columbuslawyer.net

Jonathan F. Mitchell (*pro hac vice*)
TX Bar No. 24075463
Mitchell Law PLLC
106 East Sixth Street, Suite 900
Austin, Texas 78701
(512) 686-3940 (phone)
jonathan@mitchell.law

Talcott J. Franklin (*pro hac vice*)
Texas Bar No. 24010629
Talcott Franklin PC
1920 McKinney Avenue 7th Floor
Dallas, Texas 75201
(214) 736-8730 (phone)
tal@talcottfranklin.com

/s/ Richard F. Griffin, Jr.