# EXHIBIT 1

# DEPOSITION OF DAVID A. MACPHERSON

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

Randall C. Eason and Thomas          *
P. Piekarski, on behalf of           *
themselves and others                *
similarly situated,                  *
     Plaintiff,                   *
                   *     Case No.
     v.                           *     0:18-cv-2384-SRN-ECW
                   *
American Federation of State,        *
County, and Municipal                *
Employees, Council No. 5,            *
     Defendant.                   *


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

Linda Hoekman, on behalf of          *
Herself and all others               *
similarly situated;                  *
Deborah York, on behalf of           *
herself and all others               *
similarly situated,                  *
     Plaintiff,                   *
                   *     Case No.
     v.                           *     0:18-cv-01686-SRN-SER
                   *
Education Minnesota; Anoka           *
Hennepin Education Minnesota,        *
As representative of the             *
class of all chapters and            *
affiliates of Education              *
Minnesota; National Education        *
Association; American                *
Federation of Teachers; Anoka        *
Hennepin School District, as         *
representative of the class          *
of all school districts in           *
Minnesota; Mark Dayton, in           *
his official capacity as             *
governor of Minnesota; Lori          *
Swanson, in her official             *
capacity as Attorney General         *
of Minnesota; Todd L.                *

```
1   Doncavage, in his official    *
    capacity as Commissioner of   *
2   the Minnesota Bureau of       *
    Mediation Service,            *
3        Defendant.               *

4
                    UNITED STATES DISTRICT COURT
5              FOR THE SOUTHERN DISTRICT OF OHIO
                        COLUMBUS DIVISION
6
    Christina Littler, on behalf  *
7   of themselves and others      *
    similarly situated,           *
8        Plaintiff,               *
                                  *      Case No.
9        v.                       *      2:18-cv-1745
                                  *
10  Ohio Association of Public     *
    School Employees;             *
11  South-Western City School     *
    District,                     *
12       Defendant.               *

13

14  ************************************************************

15                      ORAL DEPOSITION OF
                    DAVID A. MACPHERSON, PhD
16                     SEPTEMBER 27, 2019

17  ************************************************************

18

19       THE ORAL DEPOSITION OF DAVID A. MACPHERSON,

20  produced as a witness at the instance of the Defendant,

21  and duly sworn, was taken in the above-styled and

22  numbered cause on September 27, 2019, from 9:07 A.M. to

23  3:21 P.M., before Pasqual Perez, III, Notary Public in

24  and for the State of Texas, reported by electronic

25  reporting and transcription, at Regus, 300 Convent
```

1  Street, Suite 1330, San Antonio, TX 78205, pursuant to

2  the Federal Rules of Civil Procedure and the provisions

3  stated in the record or attached hereto.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                        APPEARANCES

 2   FOR THE PLAINTIFF:

 3              Talcott J. Franklin
                Talcott Franklin PC
 4              1920 McKinney Avenue, 7th Floor
                Dallas, Texas  75201
 5              Phone: (214) 736-8730
                Email: tal@talcottfranklin.com
 6

 7   FOR THE DEFENDANT AFSCME:

 8              Leon Dayan
                Richard F. Griffin, Jr.
 9              Bredhoff & Kaiser
                805 15th Street N.W., Suite 1000
10              Washington, DC 20005
                Phone: (202) 842-2600
11              Email: ldayan@bredhoff.com
                       rgriffin@bredhoff.com
12

13   FOR THE DEFENDANT EDUCATION MINNESOTA:

14              Danielle Leonard
                Altshuler Berson
15              177 Post Street, Suite 300
                San Franicsico, CA 94108
16              Phone: (415) 421-7151
                Email: dleonard@altber.com
17

18

19

20

21

22

23

24

25
```

INDEX

                                                    Page

Stipulations . . . . . . . . . . . . . . . . . . 2

Appearances  . . . . . . . . . . . . . . . . . . 4

Examination by Ms. Leonard . . . . . . . . . . . 7

Examination by Mr. Dayan . . . . . . . . . . . 136

Examination by Mr. Griffin . . . . . . . . . . 169

Cross-Examination by Mr. Franklin . . . . . . . 195

Signature and Changes  . . . . . . . . . . . . 201

Reporter's Certification  . . . . . . . . . . . 198


                        EXHIBITS

No.  Description                                 Page

 1   Analysis of Class Action Qualifications . . . . 12

 2   Union Membership and Earnings Data Book . . . . 22

 3   Teacher Salaries, State Collective Bargaining

     Laws, and Union Coverage. . . . . . . . . . . 29

 4   Letter to David Macpherson from Talcott J.

     Franklin dated May 24, 2019 . . . . . . . . . 37

 5   Article titled: Union Report - NEA Conference

     Reveals Disconnect Between How One Teachers Union

     Trains Its Staff vs. How It Talks in Public . . 101

 6   David A. Macpherson, Ph.D. CV . . . . . . . . . 125

 7   ALM Experts: David A. Macpherson, Ph.D. . . . . 125

1

2   8   LexVisio: David A. Macpherson, Ph.D.. . . . . . 125

3   9   Litigation Economics Website . . . . . . . . 127

4   10  Litigation Economics CV . . . . . . . . . . . 127

5   11  Martin v. City of Atlanta Summary . . . . . . 132

6   12  David A. Macpherson, Ph.D. Invoice Statement . 133

7   13  Article titled: Mass Exodus of Public Union Fee

8       Payers After High Court Ruling. . . . . . . . 135

9   14  Union Membership and Coverage Database from

10      the CPS . . . . . . . . . . . . . . . . . . . 135

11  15  Analysis of Class Action Qualifications . . . . 137

12  16  David A. Macpherson, Ph.D. Invoice Statement . 168

13  17  Analysis of Class Action Qualifications . . . . 179

14  18  Notice of a Lawsuit and Request to Waive

15      Service of a Summons. . . . . . . . . . . . . 181

16  19  Littler v. OAPSE Plaintiff's First Amended

17      Class-Action Complaint . . . . . . . . . . . 188

18  20  Deposition of Gary Martin, August 6, 2019. . .

19  21  OAPSE Non Member Survey Top-Lines. . . . . . 190

20

21

22

23

24

25

1             COURT REPORTER:  This is the videotaped

2    deposition of David A. MacPherson taken in the matter of

3    Linda Hoekman, et al. vs. Education Minnesota, et al., in

4    the United States District Court for the District of

5    Minnesota, 4th Division.  This is also the deposition of

6    Dr. David A. MacPherson in the matter of Jamie Prokes, et

7    al. vs. American Federation of State, County and

8    Municipal Employees Council No. 5 in the United States

9    District Court for the District of Minnesota, Case No.

10   018-cv-2384-SRN-ECW.  And this is a videotaped deposition

11   of David MacPherson in the matter of Christina Littler,

12   et al. vs. Ohio Association of Public School Employees,

13   et al., United States District Court, Southern District

14   of Ohio, Columbus Division, Case No. 218-cv-1745.

15             Sir, will you raise your right hand, please?

16                  DANIEL A. MACPHERSON,

17        having been duly sworn, testified as follows:

18             MS. LEONARD:  Thank you.  I just want to say

19   at the beginning -- at the outset, you said videotaped

20   deposition and I will need to correct that for the

21   record, that we are on videotape today.

22             COURT REPORTER:  Thank you.

23             MS. LEONARD:  Okay.  You're welcome.

24                  DIRECT EXAMINATION

25   BY MS. LEONARD:

David Macpherson - 9/27/2019

8

1    Q.   Okay.  Good morning.

2    A.   Good morning.

3    Q.   Let me introduce myself again.  My name is

4  Danielle Leonard and I represent the defendants in one of

5  the three cases we're talking about here today.  I

6  represent the teachers' unions in the Hoekman case.

7         Could you state your name and address for the

8  record?

9    A.   David Allen McPherson, 125 Park Drive, San

10 Antonio, Texas 78212.

11   Q.   And, Dr. -- should I call you Dr. MacPherson?

12   A.   Whatever you like.

13   Q.   Okay.  I'll call you Dr. MacPherson.  Dr.

14 MacPherson, you've been deposed before; is that right?

15   A.   Yes.

16   Q.   Approximately how many times?

17   A.   Over 100.

18   Q.   Over 100 times?  So you're familiar with how a

19 deposition works; is that fair to say?

20   A.   Yes.

21   Q.   Okay.  Well, nonetheless, just to make sure we

22 are on the same page, since I've never taken your

23 deposition before, I'm going to go over some of the

24 ground rules, okay?

25   A.   Yes.

David Macpherson - 9/27/2019

9

```
 1        Q.   Okay.  As you're aware, there's a court
 2   reporter writing everything down so it's very important
 3   that we don't speak over each other.  Does that make
 4   sense?
 5        A.   Yes.
 6        Q.   Okay.  Because as you know, it's difficult for
 7   the court reporter to transcribe two people talking at
 8   the same time.  And I would ask that you answer verbally
 9   rather than nodding your head or saying um-hmm.  Does
10   that make sense?
11        A.   Yes.
12        Q.   Thank you.  If you don't understand one of my
13   questions, please ask me to clarify it and I will be
14   happy to do so.  Does that make sense?
15        A.   Yes.
16        Q.   And if I ask a question and you answer it
17   without asking for clarification I'm going to understand
18   that you understood it and are giving me your full and
19   complete answer, okay?
20        A.   Yes.
21        Q.   I don't want you to guess in response to any
22   of my questions but I'm entitled to your best estimate.
23   Does that make sense?
24        A.   Yes.
25        Q.   Okay.  The example I usually give with people
```

David Macpherson - 9/27/2019

1    who haven't been deposed before is if there's a table in

2    another room and I ask you how long it is that would be a

3    guess but if I asked you to estimate how long the table

4    in this room was you could give me a fair estimation.

5    Does that make sense?

6          A.   Yes.

7          Q.   Okay.  You are being represented by counsel

8    here today; is that right?

9          A.   Yes.

10         Q.   Okay.  And it's Talcott Franklin who's sitting

11   here to your right?

12         A.   Correct.

13         Q.   Okay.  Mr. Franklin may object at times to the

14   form of my questions but you understand that even if he

15   objects you must answer the question, right?

16         A.   Yes.

17         Q.   Okay.  And the only exception to that is if

18   Mr. Franklin instructs you not to answer because of an

19   issue of privilege and in that case, you are entitled to

20   follow your counsel's instruction if you so choose.  Does

21   that make sense?

22         A.   Yes.

23         Q.   Okay.  And if you need to take a break please

24   let me know.  We can take a break at any time.  There's

25   only one rule, which is you can't take a break while a

David Macpherson - 9/27/2019

11

1    question is actually pending.  Does that make sense?

2         A.   Yes.

3         Q.   Okay.  Is there any reason you can't answer my

4    questions truthfully and fully here today?

5         A.   No.

6         Q.   Okay.  You're not taking any medication or any

7    other reason why you can't give your full and complete

8    answers?

9         A.   No.

10        Q.   Okay.  So we are dealing with three different

11   cases in federal court here today in one deposition,

12   which is a little unusual.  I will do my best to be clear

13   with respect to which case I am talking about but if I

14   don't specify you can understand that the questions

15   generally apply to all three cases.  Does that make

16   sense?

17        A.   Yes, that sounds efficient.

18        Q.   We are trying to be efficient.  Efficiency is

19   the order of the day.  And I think as appropriate for

20   deposing an economist.  So -- but we can, you know, I'm

21   happy to clarify if there's any confusion as to that.

22   And the three cases, just to also be clear, Hoekman is

23   the case involving the Minnesota teachers' unions.  Does

24   that make sense?

25        A.   Yes.

David Macpherson - 9/27/2019

                                                                    12

1        Q.    And you're familiar with each of these cases,

2    yes?

3        A.    Yes.

4        Q.    Okay.  And Prokes is the Minnesota case

5    involving OAPSE?

6        A.    Yes.

7        Q.    Okay.  And then Littler also involves OAPSE as

8    well in --

9             MR. FRANKLIN:  OAPSE.  The Ohio Association of

10        Public School Employees.

11   BY MS. LEONARD:

12        Q.    Okay, the OAPSE, the Ohio Association of

13   School Employees so it's in Ohio.  Does that make sense?

14        A.    Yes.

15        Q.    Okay.  Okay.  Let's start with an exhibit,

16   with those preliminaries out of the way.  So from time

17   to time we're going to mark some exhibits.  Actually,

18   I'm --

19             MS. LEONARD:  Do you want to do this?  You

20        should do this.  So I'm handing the court reporter

21        what he's going to mark as Exhibit 1 but he can't

22        write while I'm talking so while he's doing this

23        I'll stop talking.

24             (Thereupon, MacPherson Exhibit 1 was marked

25        for identification.)

```
 1              THE WITNESS:  Okay.

 2              MS. LEONARD:  All right.  Here you go, Tom.

 3   BY MS. LEONARD:

 4        Q.   Okay.  Dr. MacPherson, you've been handed

 5   what's been marked by the court reporter as MacPherson

 6   Exhibit 1.  We'll go consecutively with exhibits in this

 7   deposition.  Do you recognize this document?

 8        A.   Yes, I do.

 9        Q.   Okay.  And this is the expert report that you

10   wrote in the Hoekman case; is that right?

11        A.   Correct.

12        Q.   Okay.  Can you turn to Appendix A, which is

13   Page 23?  Is this your resume?

14        A.   Yes.

15        Q.   Okay.  And was this resume current as of the

16   time you attached it to this report?

17        A.   Yes.

18        Q.   And does this resume accurately describe your

19   educational and professional experience?

20        A.   Yes.

21        Q.   On the first page you describe your education.

22   You have -- is it correct that you have undergraduate

23   and graduate degrees in economics?

24        A.   Yes.

25        Q.   And what year was your Ph.D.?
```

1      A.    1987.

2      Q.    And what year was your undergraduate degree in

3  economics?

4      A.    1981.

5      Q.    Are these your only academic degrees?

6      A.    Yes.

7      Q.    You don't have a law degree, do you?

8      A.    No.

9      Q.    Okay.  And you are not and have never been an

10  attorney?

11      A.    No.  Yes, I've never been an attorney.

12      Q.    Okay.  And you are not and have never been a

13  judge?

14      A.    Correct.

15      Q.    Could you turn back to Page 3 of your report,

16  please?  Great.  This is the section, Section 2, where

17  you describe your qualifications, correct?

18      A.    Yes.

19      Q.    Okay.  Here you say that you've taught courses

20  involving the statistical analysis of economic data and

21  labor economics, right?

22      A.    Correct.

23      Q.    And that you have extensive research

24  background in labor economics?

25      A.    Yes.

1      Q.   Okay.  So you're familiar with the statistical

2  methodology called regression analysis, correct?

3      A.   Correct.

4      Q.   Okay.  In your words, Dr. MacPherson, how

5  would you explain was regression analysis is used for?

6      A.   Trying to explain a dependent variable with

7  independent variables.

8      Q.   The relationship between the two?

9      A.   Yes.

10      Q.   And is that how you describe it in one of your

11  economics classes?

12      A.   Some variation of that, yes.

13      Q.   Okay.  And the proper use of regression

14  analysis is something you teach in your courses; is that

15  right?

16      A.   When I teach those kind of classes, yes.

17      Q.   Okay.  So you've taught the statistical

18  analysis of economic data, for example?

19      A.   Yes.

20      Q.   And you would teach regression analysis in

21  that?

22      A.   Correct.

23      Q.   And would you agree that controlling for

24  relevant variables is an important part of doing

25  regression analysis?

David Macpherson - 9/27/2019

16

1      A.   Yes.

2      Q.   And if you're performing a statistical

3   regression analysis and you don't control for relevant

4   variables, that can cause the results of the analysis to

5   be unreliable, right?

6      A.   Potentially.

7      Q.   Are you also familiar with something called

8   the causation correlation fallacy?

9      A.   Yes.

10      Q.   What does that mean in statistics?

11      A.   Because two things are correlated doesn't mean

12   that necessarily one caused the other.

13      Q.   And one of the reasons that something might

14   not cause the other is because there's an intervening

15   variable, right?  A relevant variable?

16      A.   That's potentially one way it could happen.

17      Q.   Okay.  Do you teach your students, for

18   example, how to avoid causation correlation fallacy?

19      A.   I will certainly discuss the issue.  Sometimes

20   it can be hard to avoid so --

21      Q.   But it's -- I'm sorry, go ahead.

22      A.   It's an issue.  It is an issue.

23      Q.   And why is it a fallacy?

24      A.   Just, again, because just because two things

25   are correlated doesn't necessarily mean one caused the

David Macpherson - 9/27/2019

17

```
 1   other.

 2        Q.   And does that mean that you can't draw

 3   conclusions about causation simply from data showing the

 4   correlation of two variables?

 5        A.   Potentially.

 6        Q.   Without knowing more?

 7        A.   Yes.

 8        Q.   Without controlling for other relevant

 9   variables that might impact causation, right?

10        A.   Potentially.

11        Q.   And is that another way of saying if you don't

12   control for variables that are affecting your data you

13   might draw unreliable conclusions?

14        A.   Again, potentially.

15        Q.   Okay.  But that's something that you discuss

16   in your statistics classes when you teach them?

17        A.   Yes.

18        Q.   Would you agree that a regression analysis is

19   a standard methodology used by economists to draw

20   conclusions about the relationship between two

21   variables?

22        A.   It's often used, yes.

23        Q.   It's one of the standard methodologies, yes?

24        A.   Yes.

25        Q.   Particularly to draw conclusions, as you said,
```

 1    about the relationship between an independent and

 2    dependent variable?

 3         A.   Correct.

 4         Q.   And as part of your academic career, you've

 5    reviewed graduate dissertations; is that right?

 6         A.   Correct.

 7         Q.   Okay.  And is one of the things you are

 8    looking for when you review graduate dissertations is

 9    the correct use of a regression analysis?

10         A.   Yes.

11         Q.   Okay.  You're reviewing to make sure the

12    results of those regression analyses are reliable,

13    right?

14         A.   Yes.

15         Q.   Okay.  No errors in the data, for example,

16    that might impact the analysis?  You're looking for

17    that?

18         A.   There's always errors in data.

19         Q.   The appropriate use of errors in the data or a

20    discussion or consideration of; would you look for that?

21         A.   All the data that my graduate students ever

22    used always had errors in the data and it's impossible

23    to get rid of.  People sometimes give wrong responses to

24    a question so it's not something you can eliminate.

25         Q.   Okay.  Are you looking for whether the

1    graduate students have identified the proper relevant

2    variables that have been controlled for in the

3    regression analysis?

4         A.    Usually.

5         Q.    Okay.  And that's true in labor economics as

6    much other areas of economics?

7         A.    Yes.

8         Q.    And you've used regression analysis to examine

9    the relationship between variables and data in your own

10   research, right?

11        A.    Yes, I have.

12        Q.    Okay.  And you've done this as a hired expert

13   in litigation as well, correct?

14        A.    Yes.

15        Q.    Many times?

16        A.    Many might be overstating it.  Often the

17   analysis doesn't involve regression analysis.

18        Q.    But you have -- how many times have you used

19   regression analysis as a hired expert in litigation,

20   would you say?  When examining the relationship between

21   variables.

22        A.    I don't know if I could give you a number.

23   I've been an expert for 20 years almost so I couldn't

24   tell you.

25        Q.    How many cases have you been an expert -- a

1  hired expert in?

2      A.    More than 100.

3      Q.    So, hence, the more than 100 depositions?

4      A.    Yes.

5      Q.    Okay.  Can you give me your best estimate?

6      A.    It's something I don't keep track of.

7      Q.    You don't have records of how many cases

8  you've been involved in?

9      A.    No, I don't keep track of that.  I keep track

10 of testimony but not keep track of cases, no.

11     Q.    All right.  We'll return to that.

12     A.    Yeah.

13     Q.    Under research areas -- sorry, I think this

14 might be on your resume.  Going back to Page 23 -- yes.

15 Under research areas you list labor unions, correct?

16     A.    Yes.

17     Q.    Okay.  And your research on labor unions has

18 included the relationship between union membership and

19 earnings, right?

20     A.    Yes.

21     Q.    Can you turn to Page 24, the next page?  About

22 halfway down the page there's a -- under books there's a

23 book listed, Union Membership and Earnings Data Book,

24 Complications from the Current Population Survey 2019

25 from the Bureau of National Affairs.  Do you see that?

1    A.    Yes.

2    Q.    Okay.  And this is a book that you are a co-

3 author of?

4    A.    Yes.

5    Q.    With Barry Hirsch?

6    A.    Yes.

7    Q.    Okay.  How long have you been the co-author of

8 that book?

9    A.    Since 1994.

10    Q.    Okay.  And the data in that report -- in that

11 book -- involve public and private sector rates of union

12 membership, as well as union and non-union earnings in

13 those sectors; is that right?

14    A.    That is correct.

15    Q.    The book is a compilation of data by year in

16 those areas; is that right?

17    A.    Yes.

18    Q.    And is it -- does the book involve an analysis

19 of causation in any way?

20    A.    Not really, no.

21    Q.    It's descriptive data, right?

22    A.    Correct.

23    Q.    So you're reporting on actual rates of union

24 membership in a particular year, for example?

25    A.    Yes.

David Macpherson - 9/27/2019

22

1     Q.   In different geographic areas and different

2  sectors of the economy?

3     A.   Correct.

4     Q.   Okay.  The data in that report often show that

5  the wage rates for union members are higher than non-

6  union employees in the same sectors; is that right?

7     A.   Yes.

8     Q.   Including among public employees?

9     A.   Yes.

10     Q.   And teachers?  Including teachers?

11     A.   I believe so.

12     Q.   Okay.  Do you recall that the book shows that

13  Minnesota Public Teachers have higher average wage rates

14  than non- -- sorry.  I'm going to ask that again.  Do

15  you recall that that book shows that Minnesota Public

16  Teachers who are union members have higher average wage

17  rates than non-union teachers?

18     A.   No.

19     Q.   Okay.  Let's look.

20     A.   Okay.

21     MS. LEONARD:  Let's mark this as the next --

22     (Thereupon, MacPherson Exhibit 2 was marked

23  for identification.)

24     THE WITNESS:  I'm glad you bought my book.

25     MR. FRANKLIN:  Aww, he's flattered you bought

1      his book.

2  BY MS. LEONARD:

3      Q.   All right.  Dr. MacPherson, you've been handed

4  what has been marked as Exhibit 2.  I will represent

5  that this is not the entire book; that we have compiled

6  some excerpts and you can quickly look through and let

7  me know when you're done.

8      A.   Yep, that looks like the book.

9      Q.   Okay.  So you recognize Exhibit 2?

10     A.   Yes.

11     Q.   And this is the Union Memberships and Earnings

12 Data Book that you are the co-author of -- excerpts of?

13     A.   Correct.

14     Q.   Okay.  And this looks like it's the 2018

15 edition, correct?

16     A.   Correct.

17     Q.   Okay.  There is a 2019 edition?

18     A.   Correct.

19     Q.   Okay.  If you turn -- the excerpts here

20 include the table of contents and the, for lack of a

21 better word, the introduction and then some of your

22 tables.  If you'd turn to the second to the last page?

23     A.   Okay.

24     Q.   I believe that's where Minnesota is.

25     A.   Yes.  Minnesota.  Yep.

David Macpherson - 9/27/2019

24

1     Q.   Table 5-A?

2     A.   Yeah.  I'm there.

3     Q.   Okay.  And this is talking generally about

4 private and public sector employees, right?

5     A.   Yes.

6     Q.   Okay.  I'm sorry, this might have been the

7 wrong excerpt but this is -- is this table only

8 manufacturing workers?

9     A.   No, it's --

10    Q.   Okay.

11    A.   -- total, private -- public and private

12 manufacturing.

13    Q.   Good.  Okay.  Then we can talk about it.  If

14 you look down to the Minnesota, does this table show

15 that union -- public employees in Minnesota who are

16 union members on average earn higher wages than public

17 employees who are non-union?

18    A.   Correct.

19    Q.   Okay.  And if you look to the next page, Table

20 8-A, which talks about union density employment and

21 earnings in 2017 I believe we found teachers in the

22 middle of the list of occupations.

23    A.   Yep.

24    Q.   Do you see some teachers listed there?

25    A.   Yep.

David Macpherson - 9/27/2019

25

 1    Q.   We've got post-secondary teachers, pre-school

 2  and kindergarten teachers, elementary and middle school

 3  teachers.  Generally does this table also show that

 4  public teachers -- is this table broken up by public and

 5  private?

 6    A.   No, it's not.

 7    Q.   Okay.  Then I won't ask that question.  But it

 8  generally shows for teachers that union members earn

 9  higher wages than non-union members for teachers?

10    A.   Yes.

11    Q.   Okay.  You can set that aside.

12    A.   Okay.

13    Q.   You also have -- actually, let me ask.  Do you

14  get paid for the work that you do in compiling this data

15  book?

16    A.   Yes.

17    Q.   And who pays you for it?

18    A.   Bloomberg BNA.

19    Q.   Okay.  You also have a website that sets out

20  data on union membership in various industry sectors as

21  well, right?

22    A.   Correct.

23    Q.   Okay.  And that is www.unionstats.com,

24  correct?

25    A.   Correct.

David Macpherson - 9/27/2019

26

 1       Q.   And do you get paid for the work you do on

 2  that website as well?

 3       A.   No, it's pro bono.

 4       Q.   It's pro bono?

 5       A.   Yes.

 6       Q.   Does it rely on the work that you do in

 7  compiling the union membership and earnings data book?

 8       A.   It's different.  It's different

 9  complimation -- compli -- complimation.

10            MR. FRANKLIN:  Compilation.

11            THE WITNESS:  Yes, thank you.

12  BY MS. LEONARD:

13       Q.   Okay.  And the website is an internet data

14  resource providing public -- private and public sector

15  labor union membership coverage and density estimates,

16  right?

17       A.   Yes.

18       Q.   Okay.  So does it rely on the same data that

19  you use to compile the union membership and earnings

20  data book?

21       A.   Yes.

22       Q.   But sorted in a different way; is that what

23  you're saying?

24       A.   It's aggregated in a different way.

25       Q.   Okay.  How is it different from the data book?

1    A.    It's generally more detailed by industry and

2  occupation than what's in the data book, for example.

3    Q.    And the website does not contain analysis of

4  factors impacting union membership coverage and density;

5  is that right?

6    A.    Correct.

7    Q.    It's just descriptive data, again?

8    A.    Correct.

9    Q.    Okay.  Is it fair to say there are many

10 variables that impact rates of union membership coverage

11 and density?

12   A.    Many is very vague.  There are multiple.

13   Q.    But it's not the purpose of this website or

14 your analysis of the data that's on that website to

15 isolate or analyze any particular variable as it affects

16 union membership, for example, right?

17   A.    No.

18   Q.    No, it's not?

19   A.    It's not.

20   Q.    It's not the purpose?

21   A.    It's not the purpose.

22   Q.    Okay.  Just the hard numbers, not a causal

23 analysis, right?

24   A.    Correct.

25   Q.    Okay.  But in other research you have studied

David Macpherson - 9/27/2019

28

 1  the causal effect of union membership on teacher

 2  salaries, for example, right?

 3       A.   Yes.

 4       Q.   Okay.  And your research found that there's a

 5  positive correlation between union membership and higher

 6  teacher salaries, right?

 7       A.   Yes.

 8       Q.   And that controlling for various variables in

 9  your regression analysis, you concluded that

10  approximately half of the salary advantage could be

11  attributed to collective bargaining coverage, right?

12       A.   I wrote that paper seven years ago, I think,

13  so it's -- I'd have to refresh my memory on that.

14       Q.   Okay.  But do you recall that you were

15  employing a regression analysis to attempt to determine

16  the relationship between collective bargaining coverage

17  and teacher salary?

18       A.   Yes.

19       Q.   And union membership, in particular?

20       A.   Yes.

21       Q.   Okay.  And you were trying to isolate the

22  relevant -- you were trying to control for the various

23  relevant variables that might impact the relationship

24  between collective bargaining coverage and teacher

25  salary?

1    A.    Yes.

2    Q.    And to determine -- the goal was to determine

3  the causal relationship between collective bargaining

4  coverage and teacher salary?

5    A.    Yes.

6    Q.    Okay.  Let's take a look.

7         MS. LEONARD:  Number 3.

8         (Thereupon, MacPherson's Exhibit 3 was marked

9  for identification.

10         THE WITNESS:  Oh, thank you.

11  BY MS. LEONARD:

12    Q.    Okay, Dr. MacPherson, you've been handed

13  what's been marked as Exhibit 3.  Do you recognize this?

14    A.    Yes.

15    Q.    And what is this document -- what is Exhibit

16  3?

17    A.    A paper I co-wrote with Barry Hirsch and John

18  Winters on teacher salaries, state collective bargaining

19  laws and union coverage.

20    Q.    And am I correct in understanding that this

21  paper was not a -- this paper was not published; is that

22  right?

23    A.    Yes.

24    Q.    That it's a -- it's a draft?

25    A.    Yes.  I've been working on other papers, so as

1   Barry and so as John, so we haven't had the time to --

2   he just retired, Barry, so --

3           MR. FRANKLIN:  So it's probably not going to

4       happen?

5           THE WITNESS:  Probably not going to happen.

6           MS. LEONARD:  Okay.

7   BY MS. LEONARD:

8       Q.   Okay.  But when you were working on this was

9   your goal to eventually submit it for publication

10  somewhere potentially?

11      A.   Yes.

12      Q.   Okay.  And it looks like it was prepared

13  for -- it says at the bottom it was prepared for the

14  public sector collective bargaining session at the

15  American Economic Association meetings; is that right?

16      A.   Yes.

17      Q.   Okay.  Those are the -- known as the meetings

18  in the economic world; is that right?

19      A.   They're the main meetings.

20      Q.   Yep.  Okay.  If you turn to Page -- so this is

21  the paper that I was previously discussing when I said

22  that you have studied in your own research the causal

23  relationship between collective bargaining sector --

24  sorry, collective bargaining coverage and teacher

25  salary.  Is this the paper and analysis you were

 1  referring to?

 2      A.   Yes.

 3      Q.   Okay.  Were you -- I think the first sentence

 4  of the abstract here on the front says, "What are the

 5  causal effects of collective bargaining on teacher

 6  salaries;" is that right?

 7      A.   Yes.

 8      Q.   Okay.  Can you turn to the second page,

 9  please?  The second paragraph, last sentence, starting,

10  "More fundamentally."  Can you read that, please, out

11  loud?

12      A.   "More fundamentally, union membership

13  coverage, bargaining power and salary outcomes are

14  influenced by state level collective bargaining laws,

15  making it methodologically difficult to identify and

16  disentangle causal effects of state laws and union

17  coverage on teacher salaries.

18      Q.   Okay.  So here you're explaining that it's

19  methodologically difficult to identify and disentangle

20  causal effects because there are many variables that

21  impact the relationship between union membership and

22  salaries, right?

23      A.   Yes.

24      Q.   Okay.  And is it true that in general there

25  are many variables that impact union membership in

1   general?

2        A.   Again, the word "many" is -- I'd say multiple.

3        Q.   Okay.  And you have never studied the

4   relationship between -- you've never studied, as a

5   matter of your academic research, the causal effect of

6   other factors or other variables on union membership

7   rates; is that right?

8             MR. FRANKLIN:  Objection.

9        A.   I don't understand what you're asking me.

10       Q.   Sure.  Sure.  So here you're studying the

11  causal relationship between union membership and teacher

12  salary, correct?

13       A.   Correct.

14       Q.   Okay.  And you recognize that it's

15  methodologically difficult to identify and disentangle

16  the causal effects there?

17       A.   Yes.

18       Q.   Because these are complicated, multi-variable

19  questions, right?

20       A.   Yes.

21       Q.   Have you -- you have never studied the causal

22  relationship between union membership and anything else

23  in your academic research; is that right?

24       A.   No, that's not quite true.

25       Q.   Have you ever studied the causal relationship

1   between union membership and -- no, I'll come back to

2   that.  I'll come back to that.  Okay.

3        You used a regression analysis here to analyze

4   the causal relationship between collective bargaining

5   and teacher salaries, right?

6        A.   Correct.

7        Q.   Because there were relevant variables that

8   impact that relationship, right?

9        A.   Yes.

10       Q.   And you were trying to control for those

11  variables and used that regression analysis to determine

12  the causal relationship, right?

13       A.   Yes.

14       Q.   And that's a standard economic methodology for

15  examining the relationship between dependent and

16  independent variables, as we've discussed, right?

17       A.   Yes.

18       Q.   Okay.  Dr. MacPherson, you've never been a

19  teacher in Minnesota, have you?

20       A.   Nope.

21       Q.   Okay.  Or a member of the teacher's union

22  there?

23       A.   Nope.

24       Q.   And so the testimony that you're offering in

25  the Hopes -- in the Hoekman case is not based on

David Macpherson - 9/27/2019

34

 1 personal knowledge regarding the facts of that case,

 2 right?

 3      A.   Correct.

 4      Q.   Okay.  The offered testimony is expert opinion

 5 testimony only?

 6      A.   Correct.

 7      Q.   Okay.  And that is also true of the Prokes and

 8 Littler case; you've never been a member of the unions

 9 at issue in those cases, right?

10      A.   Correct.

11      Q.   Okay.  And you are not offering testimony in

12 those cases based on personal knowledge?

13      A.   Correct.

14      Q.   Solely expert opinion testimony?

15      A.   Correct.

16      Q.   Okay.  Let's switch gears and talk about what

17 you have done to prepare for this deposition.  Did you

18 do anything in particular to prepare for this

19 deposition?

20      A.   Yes.

21      Q.   What did you do?

22      A.   Read my reports and I read depositions of the

23 plaintiffs and I talked with counsel.

24      Q.   Okay.  Let's take those one by one.  The

25 reports are the three expert reports that you've

David Macpherson - 9/27/2019

35

1   submitted in these three cases; is that right?

2       A.   Correct.

3       Q.   Okay.  And then when you said you read

4   depositions of plaintiffs; did you read all of the

5   depositions of all of the plaintiffs in these three

6   cases?

7       A.   Yes.

8       Q.   Had you read those plaintiffs' depositions

9   before?

10       A.   Yes.

11       Q.   Okay.  Did you read those plaintiffs'

12   depositions in preparing each of the reports in these

13   cases?

14       A.   Yes.

15       Q.   When you met with counsel when was that?

16       A.   Wednesday.

17       Q.   And when you said you met with counsel, you

18   met with Mr. Franklin?

19       A.   Correct.

20       Q.   Did you meet with anyone else?

21       A.   No.

22       Q.   Okay.  How long did you meet with Mr.

23   Franklin?

24       A.   A couple of hours.

25       Q.   Did you review any documents -- did you review

David Macpherson - 9/27/2019

36

1    any other documents other than your reports and the

2    plaintiffs' deposition transcripts in preparation for

3    this deposition?

4         A.    Yes.

5         Q.    What documents were those?

6         A.    A picture of the award Mr. Franklin got for

7    pro bono work he'd done.

8         Q.    All right.  Anything else?

9         A.    No.

10        Q.    Okay.  So you did not review any documents

11   that are not listed as sources in your reports beyond

12   the documents that you just described?

13        A.    That is correct.

14        Q.    Okay.  Did you speak with anyone else in

15   preparation for your deposition other than counsel?

16        A.    No.

17        Q.    You were first retained as an expert in the

18   Hoekman litigation in May of 2019, correct?

19        A.    That sounds right.

20        Q.    Okay.  And you were retained by Talcott

21   Franklin, P.C.; is that right?

22        A.    Correct.

23        Q.    Okay.  All right.

24              MS. LEONARD:  Let's mark this one for next.

25              (Thereupon, MacPherson Exhibit 4 was marked

David Macpherson - 9/27/2019

37

1   for identification.)

2              THE WITNESS:  Okay.

3              MS. LEONARD:  Is that Number 4?

4              COURT REPORTER:  It is.

5              MS. LEONARD:  Okay.

6   BY MS. LEONARD:

7       Q.   Mr. -- Dr. MacPherson, you've been handed

8   what's been marked as Exhibit 4.  Do you recognize this?

9       A.   Yes.

10      Q.   And what is it?

11      A.   It's the engagement letter between Mr.

12  Franklin and myself.

13      Q.   And it's dated May 24th, 2019; is that right?

14      A.   Correct.

15      Q.   Okay.  And the letter refers to both the

16  Prokes and the Hoekman cases in the subject line there;

17  is that right?

18      A.   Correct.

19      Q.   Okay.  Are there any other retention letters

20  for these three cases that you have with Talcott

21  Franklin, P.C.?

22      A.   No.

23      Q.   Do you have any retention letters with

24  Jonathan Mitchell?

25      A.   No.

1      Q.   Okay.  So there's no retention letter for the

2  Littler case?

3      A.   That is correct.

4      Q.   Okay.  This second paragraph here describes

5  the scope of retention as providing consulting and

6  litigation support services; is that right?

7      A.   Yes.

8      Q.   Okay.  So there's no specific instruction here

9  as to what type of reports or subject matter in the

10  reports you were retained to prepare; is that right?

11      A.   That is correct.

12      Q.   Okay.  At the time you were retained what was

13  your understanding of the expert opinions you were being

14  asked to provide?

15          MR. FRANKLIN:  Hang on one second before you

16      answer.  I don't know that -- I'll let him answer

17      that if you agree that it's not a waiver of any

18      work product protection.

19          MS. LEONARD:  Are you interposing a privilege

20      objection?

21          MR. FRANKLIN:  I am.  We're only -- you're

22      only entitled to communications that identify facts

23      or data the attorney provided, the expert

24      considered or assumptions the attorney provided and

25      the expert relied on, plus the compensation.  So, I

1          mean, again, I'm not trying to [unintelligible] but

2          I --

3               MS. LEONARD:  Um-hmm (affirmative).

4               MR. FRANKLIN:  But I don't want to waive that.

5               MS. LEONARD:  Okay.  Let me ask a different

6          question.  I'm going to withdraw that question and

7          ask a different question.

8    BY MS. LEONARD:

9          Q.   At the time you were retained, did you have an

10   understanding of the expert opinions you were being

11   asked to provide?

12         A.   Actually, I don't recall.

13         Q.   All right.

14         A.   Well, it's the truth.  I mean, it's the truth.

15   I just don't remember.

16         Q.   That solves that problem.  Okay.  Were there

17   any communications in writing about the scope of your

18   services other than this letter?

19         A.   No.

20         Q.   Okay.  And after this retention letter you had

21   a meeting with Mr. Franklin about the expert services

22   you would provide; is that right?

23         A.   That is correct.

24         Q.   Here in San Antonio?

25         A.   Correct.

1    Q.   Okay.  Was that the only meeting that you had

2  with Mr. Franklin about the scope of the expert services

3  you would provide in first the Hoekman litigation?

4    A.   Yeah, I think that would be the only meeting.

5    Q.   Okay.  And was that the only meeting about the

6  scope of the expert services you would provide in the

7  Prokes litigation?

8    A.   Actually, I should remember if we -- I think

9  we met twice.  I can't remember how many times -- I'm

10  not sure.

11    Q.   Were the -- did Mr. Franklin provide you with

12  any directions that included assumptions you should use

13  in your report?

14    A.   No.

15    Q.   For any of the three reports?

16    A.   Correct.

17    Q.   Was it at that meeting that Mr. Franklin told

18  you the subject of the report he wanted you to prepare?

19    A.   Yes.

20    Q.   Okay.  And he asked you to prepare a report

21  stating that the Hoekman and Prokes cases were

22  appropriate for class certification?

23         MR. FRANKLIN:  Objection.

24    A.   Asked me to evaluate whether they were

25  appropriate for class certification.

 1      Q.   Did you discuss preparing a report for the

 2  Littler case at that meeting?

 3      A.   No.

 4      Q.   So that came later?

 5      A.   Yes.

 6      Q.   Okay.  Did you have an understanding that you

 7  would piggyback or build off of the work for one case

 8  and use that for another?

 9      A.   Yes.

10      Q.   So that was an assumption that was provided?

11      A.   Yes.

12      Q.   And at some point Mr. Franklin gave you some

13  information regarding the cases that you used in

14  preparing for your reports?

15      A.   Correct.

16      Q.   Okay.  Did all of the sources used in your

17  report for the Hoekman case come from Mr. Franklin?

18      A.   No.

19      Q.   Okay.  Can you look back at the Exhibit 1,

20  please?  And if you'd turn to Page --

21          MR. FRANKLIN:  Four.

22          MS. LEONARD:  Yeah, we'll find it.

23  BY MS. LEONARD:

24      Q.   Page 4, Section 3.  Did you find the NEA

25  Survey yourself -- article about the NEA Survey yourself

David Macpherson - 9/27/2019

42

1   or did he point you to that?

2       A.   He pointed me to that.

3       Q.   Okay.  Which of the sources listed here did

4   you find yourself?

5       A.   www.unionstats.com.

6       Q.   Everything else was provided to you by

7   counsel; is that right?

8       A.   No.

9       Q.   Was there some place other than counsel or

10  finding it yourself that you obtained any of these

11  sources?

12      A.   Yes, Robert Iafol- -- I don't how you say his

13  name.

14          MR. FRANKLIN:  Iafolla, I-A-F-O-L-L-A.

15      A.   I found that.

16      Q.   You found that article?

17      A.   Yes.

18      Q.   Okay.  So there wasn't any source other than

19  Mr. Franklin or things you found yourself that

20  contributed -- where you received information listed in

21  these sources; is that right?

22      A.   Yes.

23      Q.   You either found it -- sorry, I'm going to ask

24  that again.  You either found it yourself or it came

25  from Mr. Franklin, right?

43

1      A.    Correct.

2      Q.    Okay.  And so -- so just so that we're clear.

3  Can you identify the sources that you found yourself on

4  this list?

5      A.    www.unionstats.com, Iafolla.  I think they're

6  the ones that I found myself.

7      Q.    Okay.  Have you ever spoken to -- you can set

8  that aside.

9      A.    Okay.

10     Q.    Have you ever spoken to Jonathan Mitchell

11 about this litigation?

12     A.    No.

13     Q.    Have you ever spoken with anyone at Juris

14 Capital regarding this litigation?

15     A.    No.

16     Q.    Or any other litigation funder?

17     A.    No.

18     Q.    Have you ever spoken with anyone other than

19 Mr. Franklin about this litigation?

20     A.    Nope.

21     Q.    Okay.  What about the partners in your

22 economic litigation consulting firm?

23     A.    No.

24     Q.    Okay.  You haven't talked to them about this

25 case?

1     A.   Nope.

2     Q.   Okay.  Is your retention in this case through

3  that economic litigation consulting firm?

4     A.   No.

5     Q.   Are you currently retained by Mr. Fra- -- ooh,

6  sorry.

7          MS. LEONARD:  We're -- do we need to take a

8          timeout?  Okay.  He's -- the court reporter is

9          handing you another microphone so we're going to

10         attach it.

11         MR. FRANKLIN:  Actually, before you ask a

12         question I might take a drink of this water.  Maybe

13         we'll just take a two-minute timeout?

14         MS. LEONARD:  I think there was a question

15         pending.

16         MR. FRANKLIN:  Oh, okay.  What's the question?

17     Oh, yeah, what was your question?

18         MS. LEONARD:  Sure.

19  BY MS. LEONARD:

20     Q.   Are you currently retained by Mr. Franklin to

21  provide reports in any cases other than Hoekman, Prokes

22  and Littler?

23     A.   No.

24         MS. LEONARD:  Okay.  Now we can take a break.

25         COURT REPORTER:  Off the record at 9:50.

1          We're back on the record, 10:02.

2     BY MS. LEONARD:

3          Q.     Okay.  Dr. MacPherson, you're not currently

4     retained by Mr. Franklin to provide any expert services with

5     respect to opiate litigation?

6          A.     No.

7          Q.     Okay.  Why were you exchanging articles with Tal

8     Franklin about opiate issues this summer?

9          A.     I have a labor economics textbook, and he is

10    involved in some opioid litigation, and I wrote a box about

11    the impact of opioids on labor force participation in my

12    fourth coming edition.

13         Q.     Do you have an understanding that you'll be

14    retained in the future to provide expert services for Mr.

15    Franklin on those issues?

16         A.     No.

17         Q.     Or on any other issues?

18         A.     No.

19         Q.     So no expectation of being hired again by Mr.

20    Franklin?

21         A.     No.

22         Q.     Let's turn back to your report, Exhibit Number 1,

23    in the Hoekman case.  And here I'm going to be asking you

24    questions specifically about this report so, therefore,

25    specifically about the Hoekman report.  This written report

1    contains all of the opinions you're offering in this case,

2    correct?

3        A.    With the information I have right now, yes.

4        Q.    Let me ask that again.  This report contains all

5    of the opinions you are offering in this case, correct?

6        A.    Yes, unless some new information comes available.

7        Q.    Do you have an intention of providing additional

8    expert opinions in this case?

9        A.    No, but just in case something happens.

10       Q.    So you weren't talking about a specific plan; you

11   were talking hypothetically that potentially there could be

12   something down the road?

13       A.    Correct.

14       Q.    So there's no opinion you currently intend to

15   offer that you have not put in this report, right?

16       A.    Correct.

17       Q.    You have not been asked to offer any opinions in

18   support of class certification in this case other than

19   what's presented in this report, right?

20       A.    Correct.

21       Q.    You don't intend to offer any opinions in support

22   of class certification other than what's presented in this

23   report, right?

24       A.    Correct.

25       Q.    You've set forth all the bases for your opinion

1    in this report as well, right?

2        A.    Correct.

3        Q.    You didn't just explain the opinions; you set

4    forth the bases and the rationale for those opinions, right?

5        A.    Correct.

6        Q.    There's not any other basis for the opinions

7    offered in this report that you intend to offer in this case

8    that you have not set forth in the report, right?

9        A.    Yes.

10       Q.    Yes, that's correct?

11       A.    Yes, that's correct.

12       Q.    Thank you.  The opinions you are offering in this

13   case are based on your academic and professional training as

14   an economist; is that right?

15       A.    Correct.

16       Q.    Turn to Page 2, please, in the introduction.  The

17   last sentence of the first paragraph says, "I was asked to

18   analyze whether this case meets the requirements for class

19   action qualification."  This is an accurate statement of the

20   opinions you were asked to provide by plaintiff's counsel;

21   is that right?

22       A.    Yes.

23       Q.    This says your opinions are set forth in Section

24   5, correct?

25       A.    Yes.

```
 1        Q.    Can you tell me, did you have any staff who

 2   assisted you with any of the analysis set forth in this

 3   report?

 4        A.    No.

 5        Q.    Did anyone else draft portions of the report for

 6   you?

 7        A.    No.

 8        Q.    You drafted the entire thing yourself?

 9        A.    Um-hmm (affirmative), yes.

10        Q.    Did you perform any analysis or calculations as

11   part of preparing your expert opinions offered here that you

12   chose not to include in the report?

13        A.    No.

14        Q.    Are any of the opinions set forth in this report

15   the subject of a peer-reviewed publication that you have

16   authored?

17        A.    Repeat the question again, please.

18        Q.    Sure.  Are any of the opinions set forth in this

19   report the subject of a peer-reviewed publication that you

20   have authored?

21        A.    Union stats data is discussed in a journal

22   article that I co-wrote.

23        Q.    Sure.  I'm not asking about the sources.  I'm

24   talking about the actual opinions.  So the opinions that you

25   have set forth in this report specific to the Hoekman
```

1    litigation are not the subject of a peer-reviewed

2    publication that you've authored, correct?

3         A.    No, that's correct.

4         Q.    The opinions set forth in this report are not the

5    subject of a peer-reviewed publication by anyone else that

6    you're aware of, correct?

7         A.    Correct.

8         Q.    The opinions you've set forth in this report were

9    all specifically created for this litigation, correct?

10        A.    Correct.

11        Q.    None of the opinions you've included in this

12   report are the result of an independent research project

13   that you're engaged in separate and apart from this

14   litigation, correct?

15        A.    Correct.

16        Q.    You're not engaged in any research, academic or

17   otherwise, regarding, for example, the impact of the Janus

18   decision on union membership, right?

19        A.    Correct.

20        Q.    And specifically on membership in the Minnesota's

21   teachers' union, correct?

22        A.    Correct.

23        Q.    You're not engaged in any research on the impact

24   of the Janus decision on union members' attitudes towards

25   membership, correct?

David Macpherson - 9/27/2019

50

```
 1        A.    Correct.

 2        Q.    You're not engaged in any research on union

 3  members' attitudes towards membership prior to the Janus

 4  decision, correct?  Let me ask that question again.  I'm

 5  going to strike that because I was a little confusing.  You

 6  are not currently engaged in any research studying,

 7  analyzing, union members' attitudes prior the Janus decision

 8  on membership in the union?

 9        A.    I think I've done some studies looking at union

10  membership in the past and -- not specifically attitudes

11  because that's extremely hard to measure.  You can't measure

12  attitudes very well.

13        Q.    Why is it hard to measure attitudes towards union

14  membership?

15        A.    It's something that's someone's opinion.

16        Q.    There are many factors that affect someone's

17  opinion about union membership, right?

18        A.    There can be multiple factors.

19        Q.    And they differ by individual, right?

20        A.    Potentially, yes.

21        Q.    So some people might share, but you don't know

22  that without talking to any individual about their opinion,

23  right?

24        A.    That's correct.

25        Q.    Would that make it difficult to do any analysis
```

 1   of the causal effect of those attitudes on -- to do a causal

 2   analysis of any particular factor on union membership?

 3          MR. FRANKLIN:  Objection.

 4      A.    There are studies done of union membership

 5   looking at causal factors that -- factors tend to be

 6   correlated with attitudes.

 7      Q.    But it's difficult to do such a study because of

 8   the number of independent variables; is that right?

 9      A.    Oh, I mean, I've done studies looking at

10   determinacy in union membership.

11      Q.    You have not done studies looking at causal

12   effects of attitudes on union membership, right?

13      A.    Correct.

14      Q.    It would be difficult to do such a study because

15   of the number of independent variables, right?

16      A.    Well, I'm not sure it's the number of independent

17   variables.  It's the actual variables themselves.

18      Q.    The nature of those variables?

19      A.    Yes.

20      Q.    And perhaps the strength of which they matter to

21   an individual, right?

22      A.    When you're doing regression analysis, it's not

23   down to the individual in terms of -- you don't have a

24   separate attitude variable for every single person.  That'd

25   be nuts.

David Macpherson - 9/27/2019

52

1    Q.    And that's why this type of analysis would be
2    difficult, right?

3    A.    Well, impossible, I'd say.

4    Q.    You've not engaged in --

5    A.    At the individual person.

6    Q.    At the level of an individual?

7    A.    Yeah.

8    Q.    You've not engaged in any research, academic or
9    otherwise, regarding the impact of the Janus decision on
10   public employee membership in AFSCME, have you?

11   A.    No.

12   Q.    Or any public employees in either Minnesota or
13   Ohio?

14   A.    No.

15   Q.    Or any public employees in any state or
16   nationwide?

17   A.    Correct.

18   Q.    You've not engaged in any research, academic or
19   otherwise, regarding how any public employees in Minnesota
20   or Ohio made decisions about whether or not to join a union
21   in an agency fee environment, correct?

22   A.    Correct.

23   Q.    That's true in any state or nationwide as well,
24   correct?

25   A.    Correct.

David Macpherson - 9/27/2019

53

1      Q.    Could you turn to Section 5 of your report,

2  please?  Section 5 is the section in which you set forth

3  your opinions, correct?

4      A.    Correct.

5      Q.    So on Page 7, you describe your understanding of

6  the three classes of teachers that you understand the

7  plaintiffs intend to move to certify; is that right?  Sorry,

8  Page 7 to 8.

9      A.    Correct.

10      Q.    The basis for this description is the first

11  amended complaint and information provided to you by

12  plaintiffs' counsel?

13      A.    Correct.

14      Q.    You didn't independently come up with these

15  classes?

16      A.    No, no.

17      Q.    Can you look at first class one?

18      A.    Yes.

19      Q.    Class one is described here as all non-union

20  members who have been forced to pay fair share fees to

21  Education Minnesota or its affiliates as a condition of

22  their employment; you see that?

23      A.    Yes.

24      Q.    You're not offering an opinion that fair share

25  fee payers in Minnesota were forced to pay fees to the

1  union, right?

2      A.    No.

3      Q.    You don't have any personal knowledge about

4  anyone being forced to pay fees, right?

5      A.    No, no personal knowledge.

6      Q.    You are not offering an expert opinion on that as

7  well?

8      A.    Correct.

9      Q.    You have not conducted any economic analysis or

10 reached any economic conclusions regarding whether teachers

11 were "forced" to pay fees, right?

12     A.    Correct.

13     Q.    That's a fairly loaded characterization; wouldn't

14 you agree?

15     A.    Well, they really didn't have a choice.  If they

16 wanted to work in a unit that was covered by Education

17 Minnesota, they were forced to pay.  I mean, either they

18 paid the fees or they couldn't work so that's, by

19 definition, I think is forced.

20     Q.    You don't know anything about what any individual

21 fair share fee payer felt about paying those fees at the

22 time, do you?

23     A.    I know Ms. Hoekman felt like she was forced.

24     Q.    From your describing what you understand to be

25 Ms. Hoekman's testimony in her deposition?

1    A.    Correct.

2    Q.    But you don't actually have any personal

3 knowledge or expert opinion regarding what any fair share

4 fee payer felt at the time about paying those fees, right?

5    A.    Well, I think they have to feel like they were

6 forced to pay because they had to pay.

7    Q.    You are speculating, correct, Dr. MacPherson,

8 about what people must have felt?

9    A.    Well, I mean, it's just a fact that they had to

10 pay the fees in order to work.

11    Q.    You don't actually know what any fair share fee

12 payer actually felt about paying those fees to the teacher's

13 unions in Minnesota, correct?  You don't actually know?

14    A.    Whether they would have paid voluntarily the fees

15 that they were mandated to pay if they weren't mandated?

16    Q.    How they felt about paying them, is the question.

17 What their opinion was, you don't know?

18    A.    Other than Hoekman?  No.

19    Q.    And you have not studied that or analyzed that?

20    A.    No.

21    Q.    You don't know whether, for example, a fair share

22 fee payer might have thought they were getting a good deal

23 by being able to pay less than union dues, right?

24    A.    It's going to depend on the individual.

25    Q.    Some of the fair share fee payers might have

1    chosen to pay a lower amount for financial reasons because

2    they are a low-pay teacher, right?

3         A.    We don't know.

4         Q.    Even though they supported the union, they might

5    have chosen, for financial reasons, to pay fair share fees,

6    right?

7         A.    Potentially.

8         Q.    We've previously discussed that you've written on

9    the wage advantage for individuals covered by collective

10   bargaining agreements, including for public teachers, right?

11        A.    Yes.

12        Q.    Your research showed a positive wage advantage

13   for teachers covered by a collective bargaining agreement?

14        A.    Correct.

15        Q.    So it's possible some fair share fee payers were

16   aware that their wages were higher because they were being

17   represented by a union, right?

18        A.    Potentially.

19        Q.    It's possible that some of those individuals

20   thought they were getting a good deal by being able to pay

21   fair share fees and still get all the benefits of union

22   representation, right?

23             MR. FRANKLIN:  Objection.

24        A.    I can't remember.  On some of these cases, they

25   didn't get all the benefits of being -- whether they could

1   vote, I don't know if they can -- I can't remember, but I

2   think in some of these cases they cannot vote for like union

3   officers unless they're a member of the union.

4       Q.   But they're paid the same wages as members of the

5   union. There's no differential in wage between members and

6   non-union members, right?

7       A.   Correct.

8       Q.   You're not offering an expert opinion as to fair

9   share fee payers' attitudes about whether they got certain

10   benefits or not?  You haven't analyzed that?

11       A.   No.

12       Q.   But wouldn't it be possible that if some of the

13   fair share fee payers actually thought they were getting a

14   good deal by paying less that they wouldn't feel forced at

15   all to pay those fees, right?

16       A.   Potentially some.

17       Q.   And others might have felt differently and may

18   have objected to paying any amount of money to a union,

19   right?

20       A.   Yes.

21       Q.   Because they had ideological differences with

22   unions, right?

23       A.   Yes.

24       Q.   Or disagreed with unions politically?

25       A.   Correct.

1     Q.    You're aware from your research on labor unions

2 that there's a wide range of feelings and opinions about

3 unions, right?

4     A.    Yes.

5     Q.    You don't have any reason to believe that that's

6 not true of people in Minnesota, right?

7     A.    Yes.

8     Q.    Yes?

9     A.    That is true.

10     Q.    Once again, you have not conducted any research

11 attempting to measure or analyze attitudes towards union

12 membership in Minnesota, have you?

13     A.    No, no.

14     Q.    You have not?

15     A.    I have not.

16     Q.    Or specifically among teachers, right?

17     A.    That is correct.

18     Q.    Or even more specifically among fair share fee

19 payers among the teachers' union, right?  You have not

20 analyzed that?

21     A.    No.

22     Q.    No, you have not?

23     A.    I have not analyzed that.

24     Q.    Can you look at class two on Page 7?  Class two

25 is described as all members or formers members of Education

```
 1   Minnesota or its affiliates who would have quit the union
 2   had they not been forced to work in an unconstitutional
 3   agency shop.  Again, this is a description that came from
 4   plaintiffs' counsel, right?
 5        A.    Correct.
 6        Q.    You're not offering an expert opinion about
 7   anyone being forced to work based on any economic analysis,
 8   right?
 9        A.    Correct.
10        Q.    You mean by this description union members who
11   would have chosen at the time not to pay union dues if the
12   choice had been between paying dues or nothing, right?
13        A.    Yes.
14        Q.    As an economist, you understand the term "free
15   rider," right?
16        A.    Yes.
17        Q.    Can you describe for me what a free rider is?
18        A.    People who get the benefits of a collective good
19   but don't pay towards the cost.
20        Q.    Sometimes they get the benefit of something that
21   someone else is paying for, right?
22        A.    Yes.
23        Q.    Do economists generally understand that people
24   have a wide range of feelings about being a free rider?
25        A.    Economists usually don't analyze opinions like
```

David Macpherson - 9/27/2019

60

1   that.  I wouldn't say it's an extensively studied issue.

2       Q.    It's more for a sociologist or a psychologist,

3   right?

4       A.    Exactly.

5       Q.    But some people really like being a free rider,

6   right?  Is that fair to say?

7       A.    Some people potentially would be, yes.

8       Q.    They like feeling like they're getting away with

9   something?

10      A.    Well, that's reading someone's -- I can't give an

11  opinion on that.

12      Q.    Other people might really not like it?  They

13  might feel really uncomfortable getting a benefit that

14  they're not paying for?

15      A.    Yes.

16      Q.    You don't have any reason to believe that the

17  people of Minnesota are any different with respect to these

18  types of opinions than anyone else?

19      A.    Yes.

20      Q.    Yes, you don't have any reason to think --

21      A.    Yes, I don't have any reason.

22      Q.    Right.  And you have not conducted any research

23  as an economic matter attempting to measure or analyze

24  attitudes towards receiving benefits without paying them in

25  Minnesota, have you?

David Macpherson - 9/27/2019

61

```
 1        A.    No.

 2        Q.    You have not conducted such research specifically

 3   among teachers?

 4        A.    No.

 5        Q.    There's no way in an agency shop environment to

 6   observe from any objective characteristic about a person

 7   what their attitude may be about paying agency fees, right?

 8   Like height or weight or gender?

 9        A.    No.  You'd have to do a survey.

10        Q.    Of individuals?

11        A.    Yes.

12        Q.    Of their opinions?

13        A.    Correct.

14        Q.    There's similarly no objective characteristic

15   that you're aware of that allows you to analyze the reasons

16   that an employee chooses not to be a member of the union,

17   right?  You can't determine that from someone's gender or

18   age?

19             MR. FRANKLIN:  Objection.

20        A.    I think there is some studies I've done myself

21   that union membership is correlated with some objective

22   characteristics.

23        Q.    The likelihood that someone is going to be a

24   union member is correlated with objective statistics,

25   characteristics, right?
```

David Macpherson - 9/27/2019

62

1      A.    Yes.

2      Q.    But that does not tell you the reasons that the

3  person chose to be a union member or not, right?

4      A.    People make inferences based --

5      Q.    Sorry, but those objective characteristics don't

6  reveal the reasons that a person becomes a union member or

7  not, right?

8      A.    No.

9      Q.    The third class is described on Page 8, and these

10  are the individuals who've attempted to resign; is that

11  right?

12      A.    Yes.

13      Q.    Then in this report, you offer opinions about the

14  number of individuals in each of those groups, right?

15      A.    Yes.

16      Q.    So that is the subject of your expert opinion

17  here under numerosity is you are offering an expert opinion

18  about the number of individuals in each of these three

19  categories, right?

20      A.    Correct.

21      Q.    Those opinions start on Page 8 on the numerosity

22  issue go through Page 12?

23      A.    Yes.

24      Q.    Once again, the basis for these opinions about

25  those numbers are set forth here in this section, right?

David Macpherson - 9/27/2019

63

1    A.    Yes.

2    Q.    The first full paragraph that's not a block quote

3  here that starts on June 4th, 2019; do you see that?

4    A.    Yes.

5    Q.    You describe some numbers in particular

6  categories, members and fair share fee payers in Minnesota

7  among the teachers' union.  This information came from data

8  provided by the union in deposition, right?

9    A.    Correct.

10   Q.    You didn't perform any economic analysis to reach

11 these numbers?

12   A.    Correct.

13   Q.    And no statistical regression analysis to reach

14 these numbers, right?

15   A.    No.

16   Q.    Sorry.  That's correct that you did not perform?

17   A.    Yes.

18   Q.    You offer an opinion starting in the next

19 paragraph that, "experience with state statues abolishing

20 agency shops demonstrates that a significant portion of

21 union members fall into classes two and three.  That is,

22 they did not want to join the union, were not fully informed

23 of their rights, or want out of the union now."  That is one

24 of the opinions you're offering here, right?

25   A.    Yes.

1      Q.    The basis for this opinion is the Michigan

2   example, right?

3      A.    Correct.

4      Q.    That you have provided here.  You discussed that

5   Michigan switched to being a right-to-work law state in

6   2013, right?

7      A.    Correct.

8      Q.    So what does that mean to you?

9      A.    That workers didn't have to pay union dues if

10  they didn't want to.

11     Q.    Well, before 2013, workers didn't have to pay

12  union dues if they didn't want to, correct?

13     A.    Or agency fees.  Both.

14     Q.    So in 2013, Michigan allowed workers to choose

15  between being a member of the union and paying union dues or

16  not being a member of the union and not having to pay fair

17  share fees, right?

18     A.    Right.

19     Q.    So if you look at your table on Page 9, this

20  table reflects total aggregate numbers of individuals who

21  were members of a union and who were covered by bargaining

22  agreements, right, in particular years?

23     A.    Correct.

24     Q.    Correct.  These numbers come from your Unionstats

25  website?

David Macpherson - 9/27/2019

65

1        A.     Correct.

2        Q.     Then you've calculated a rate for union

3   membership and for contract coverage, right?

4        A.     Yes.

5        Q.     So that calculation you performed?

6        A.     Correct.

7        Q.     That is math?

8        A.     Yes.

9        Q.     That wasn't a statistical regression analysis or

10  anything like that; that was just math?

11       A.     Correct.

12       Q.     For the first category here, union membership,

13  did you compare the total number of union members to the

14  total number of employees to achieve the rate?

15       A.     Yes.

16       Q.     What employees were union?  Sorry.  I'm going to

17  take a drink of water and not get tongue-tied.  What number

18  for employees were you using to calculate that rate?

19       A.     I don't know because I don't have it listed here.

20       Q.     Were you using the total number of public sector

21  employees?

22       A.     Yes.

23       Q.     You were comparing that to the total number of

24  public sector union members?

25       A.     Correct.

1    Q.    Then for contract coverage, you're talking about

2    the total number of individuals covered by a bargaining unit

3    as opposed to who are members of the union, right?

4    A.    Correct.

5    Q.    So you were comparing the total number of

6    individuals, public sector employees covered by a bargaining

7    unit in Michigan to the total number of public sector

8    employees to get a rate?

9    A.    Yeah.  It's actually an estimate of the contract

10   coverage rate because the data assumes that every person

11   who's a union member is covered by collective bargaining

12   contract. When, in fact, that potentially might not be the

13   case.

14   Q.    So how did you get the difference in the numbers

15   in the column for union membership and contract coverage in

16   this chart?

17   A.    They asked the question of contract coverage for

18   people who are not covered by a --  no, who are not a union

19   member and asked them are they covered by a contract.

20   Q.    When you say "they," you mean the data that you

21   are relying on that is compiled on Unionstats?

22   A.    Correct.

23   Q.    That is conducted by someone else?

24   A.    The Current Population Survey.

25   Q.    So that contract coverage question is part of the

David Macpherson - 9/27/2019

67

1    Current Population Survey; those numbers are reported on

2    Unionstats, and then you relied on those for this table?

3         A.    Correct.

4         Q.    So those are not calculations that you performed

5    for preparing this expert opinion?

6         A.    Correct.

7         Q.    You didn't analyze the contract coverage

8    question?

9         A.    No, I just know how the question's done.

10        Q.    Right.  And so you just pulled those numbers from

11   Unionstats and put them in this table?

12        A.    Correct.

13        Q.    But you did calculate the rate?

14        A.    Correct.

15        Q.    Again, that was math?

16        A.    Yes.

17        Q.    Or arithmetic, whatever we want to call it.  As

18   we've discussed, you don't have any personal knowledge of --

19   well, let me ask this question again.  You've not analyzed

20   or conducted any research analyzing how union members felt

21   with respect to paying fair share fees in Michigan prior to

22   2013, right?

23        A.    Correct.

24        Q.    You have not conducted any research analyzing how

25   union members felt about the choice between union membership

David Macpherson - 9/27/2019

68

1   or not after 2013, right?

2        A.    Correct.

3        Q.    You've not performed any statistical analysis at

4   all to support your opinion that a significant portion of

5   union members fall into classes two or three, right?

6        A.    No, but I think the very next paragraph is pretty

7   telling about how the number of agency fee payers dropped by

8   98 percent amongst AFSCME and 94 percent amongst SEIU fee

9   payers.

10       Q.    But let's go back to my question because I want a

11  clear answer to this.  You have not performed any

12  statistical analysis at all to support your opinion that

13  there are significant numbers in classes two and three,

14  right?

15       A.    Correct.

16       Q.    You didn't evaluate any data specific to

17  Minnesota to support this opinion, did you?

18       A.    No.

19       Q.    No, you did not?

20       A.    I did not.

21       Q.    And no data specific to Minnesota teachers

22  either, right?

23       A.    Other than what I cited earlier from the union

24  indicating they had a change in 2018 to 2019 that 647

25  members changed to fair share as opposed to 43 to 67 in

```
1   prior years.

2        Q.    When you say "changed," you mean that there were

3   647 fair share fee payers, right?

4        A.    Yes.

5        Q.    In those years?

6        A.    Changed to, yes.

7        Q.    There were 647 fair share fee payers in those

8   years, right?

9        A.    Right, right.

10       Q.    As opposed to the number of fair share fee payers

11  in previous years?

12       A.    Yes.

13       Q.    So that's the change you're talking about?

14       A.    Yes.

15       Q.    You're talking about the aggregate number; you're

16  not talking about whether any individual changed their

17  status, right?

18       A.    Yes, right.

19       Q.    Let's go back to Michigan.  In this example of

20  Michigan.  You say that the numbers in Table 1 show that

21  union membership and contract coverage rates dropped after

22  the 2013 right-to-work law eliminated agency fees, right?

23       A.    Yes, the adoption of the right-to-work law, which

24  also got rid of required agency fees, so two things were

25  going on at the same time.
```

David Macpherson - 9/27/2019

70

1    Q.    But your opinion is that the union membership and

2 contract coverage rates dropped after that?

3    A.    Yeah.  It's pretty clear they did.

4    Q.    The aggregate numbers dropped?

5    A.    Yeah.

6    Q.    That's the basis for your conclusion that

7 experience with state statutes demonstrates that many union

8 members fall into classes two and three, right?

9    A.    Yes.

10    Q.    Isn't it true that the aggregate numbers of union

11 members can be affected by things like attrition?

12    A.    Yes.

13    Q.    Isn't it true that the aggregate number of union

14 members can be affected by things like outsourcing of union

15 jobs?

16    A.    Potentially.

17    Q.    Have you analyzed whether the numbers of union in

18 Michigan were affected by the outsourcing of union jobs in

19 these years reflected in your chart?

20    A.    No, but the decline in Michigan was much greater

21 than the rest of the country.

22    Q.    But I'm talking about the numbers in Michigan.

23    A.    Right.  So what I'm saying is comparing the

24 decline in Michigan versus the overall trend in public

25 sector union membership, there was a steep decline in

David Macpherson - 9/27/2019

71

1    Michigan that didn't occur in the rest of the country.

2         Q.    Let's separate this out because I'm asking about

3    the opinion that you set forth in this report which does not

4    discuss any statistics for the rest of the country, correct?

5         A.    Correct.

6         Q.    You have not set that forth in this report,

7    right?

8         A.    Correct.

9         Q.    Did you study whether the decline in the union

10   membership rates in Michigan, aggregate numbers, were the

11   effect of outsourcing of jobs?

12        A.    No, I did not.

13        Q.    So you're not aware whether or not any single

14   number reduction here is the result of the outsourcing of

15   public jobs to the private sector?  You don't know?

16        A.    Don't know.

17        Q.    So it's possible that could account for the

18   entire amount here of reduction in any given year?  You

19   don't know?

20             MR. FRANKLIN:  Objection.

21        A.    I think it's highly unlikely.

22        Q.    Okay.  But you don't know?

23        A.    No.

24        Q.    Isn't it true that retirements also affect the

25   total number of union members?

David Macpherson - 9/27/2019

72

1      A.    Assuming they don't replace the person.

2      Q.    So it could, right?

3      A.    Potentially.

4      Q.    Same thing with deaths?

5      A.    Yes.

6      Q.    For --

7      A.    Again, assuming that they don't replace the

8  people.

9      Q.    But you don't know?  You haven't analyzed whether

10 any of those factors affected the aggregate number of union

11 members in Michigan in these years that are reflected in

12 Table 1, right?

13     A.    Correct.

14     Q.    Isn't it true that contracting out of public jobs

15 could also affect the number of individuals covered by

16 bargaining unit contracts, right?

17     A.    Potentially.

18     Q.    So the contract coverage numbers that you've

19 listed here, the aggregate numbers, those could reflect --

20 the reduction, could reflect the fact that those jobs have

21 been contracted out, right?

22     A.    Correct.

23     Q.    You have not studied or analyzed whether these

24 numbers are affected by that factor, correct?

25     A.    Correct.

David Macpherson - 9/27/2019

73

1    Q.    The rates of union membership or contract

2    coverage, those could also be affected by the addition of

3    non-union jobs to the public sector workforce, right?

4    A.    Yes.

5    Q.    You've not studied here whether any of the rates

6    were affected by such a factor in any of the years reflected

7    in this chart, right?

8    A.    No.

9    Q.    No, you've not?

10   A.    I have not.

11   Q.    So you were just looking at the absolute numbers

12   here and you didn't control for any independent variables

13   that would explain the expansion or contraction of the

14   number of jobs in the union workforce when you analyzed

15   this, right?

16   A.    Correct.

17   Q.    We've already identified several factors that --

18   independent variables that could impact the aggregate number

19   of union members in contract coverage in Michigan in the

20   years in Table 1, right?

21   A.    I'd say, yes but, again, I'm very familiar with

22   union membership data because I've been studying it for

23   decades.  To get this big a drop in union membership to be

24   caused by factors other than the change in the right-to-work

25   law I would find highly unlikely.

1    Q.    But you didn't set forth any of that other data

2    that you're talking about right now in this report, did you?

3    A.    No.

4    Q.    You didn't provide any analysis of how this data

5    from Michigan compares to data from any other state, did

6    you?

7    A.    No.

8    Q.    You have not provided any analysis of how this

9    data from Michigan compares to any other years in Michigan

10   or any other state, have you?

11   A.    No, I have not.

12   Q.    You have not provided here any analysis of how

13   any of these independent variables would have affected the

14   aggregate numbers set forth in this chart, right?

15   A.    Correct.

16   Q.    You didn't compare the number of union members to

17   the number of individuals covered by contracts in any given

18   year, did you?

19   A.    No.

20   Q.    Do you know whether the rates actually went down

21   if you did that calculation after 2013?

22   A.    Say the question again.

23   Q.    Sure.  If you're comparing the number of union

24   members to the number of individuals covered by contracts,

25   you would get a percentage, right?

David Macpherson - 9/27/2019

75

1          A.    Yes.

2          Q.    It would probably a pretty high percentage

3    looking at some of these numbers here, right?  There aren't

4    that many people covered by contracts in the public sector

5    in Michigan who are non-union members, right?

6          A.    Yeah, and there's going to be sampling

7    variability, so I wouldn't put too much weight on any single

8    year in terms of the difference between membership and

9    coverage because it's a sample.

10         Q.    Right.  But you're talking about -- you're trying

11   to draw a conclusion about union members who didn't want to

12   be union members and who didn't want to pay fair share fees,

13   right?

14         A.    Yes.

15         Q.    You didn't look at the relationship between union

16   membership and contract coverage to determine the percentage

17   of individuals?  You didn't determine that percentage,

18   right?

19         A.    No, I did not.

20         Q.    And you did not look at whether that percentage

21   went up or down after 2013?

22         A.    Because a high percentage of the contract

23   coverage is made up by union members.

24         Q.    Would you be surprised if I told you it went up

25   in later years, that percentage?

1    A.    But, again, I doubt it's statistically

2    significant.  I wouldn't put any weight on it.

3    Q.    But you didn't perform the calculation;

4    therefore, you didn't perform the statistical analysis to

5    determine whether it was statistically significant, right?

6    A.    That is correct, but --

7    Q.    Just like -- oh, I'm sorry.  Go ahead.

8    A.    -- I'm very familiar with the state.  I've worked

9    on it three decades.  I know how big a difference it would

10   take to be statistically significant, and that will not be

11   statistically significant.

12   Q.    You didn't do any statistical analysis to attempt

13   to control for the many independent variables that can

14   affect the aggregate numbers of union members and contract

15   coverages reflected in this table, correct?

16   A.    Correct.

17   Q.    But you're asserting that there's a relationship

18   between the elimination of fair share fees and union

19   membership, right?

20   A.    I'm asserting that after Janus -- say that

21   question again.

22   Q.    Sure.  You're asserting that there's a

23   relationship between the elimination of fair share fees in

24   Michigan and union membership?

25   A.    And also people's willingness to -- yes.

David Macpherson - 9/27/2019

77

1     Q.    Without performing a statistical analysis that

2  controls for the relevant variables, right?

3     A.    Actually, what I'm saying is there's a sufficient

4  number of people in this group -- in this class of people

5  who don't want to be paying those fees.

6     Q.    The basis for that is your analysis that there

7  was a reduction in the aggregate number of union members

8  after 2013 in Michigan, right?

9         MR. FRANKLIN:  Objection.

10    A.    It's part of it.  I mean, the other part, I have

11  other reasons why that I think there's a sufficient number

12  of people in that class; not just this one table.

13    Q.    Right.  But this is the first part of that,

14  right?

15    A.    Also we talked about how the people changed in

16  just their own data in 2018, 2019.

17    Q.    The aggregate number changed, right?

18    A.    Yes.

19    Q.    You don't know whether any individual changed,

20  right?

21    A.    Well, it'd have to be a bunch of individuals to

22  come up with the aggregate.

23    Q.    Right.  But isn't it true that there's turnover

24  in any economic sector in terms of new people being added to

25  the job population in any given year and people leaving?

David Macpherson - 9/27/2019

78

1    A.    But the way I compared relative to the number of

2  people who were doing it in previous years, I think it was

3  43 to 67, and it jumped to 647 in 2018/2019.  That's a

4  factor of roughly 10 in the year in which you could change.

5    Q.    You don't know whether those are all new hires,

6  do you?

7    A.    I think we know the number of people who were

8  covered in their data.  I'd have to look at the table again.

9    Q.    But you have not set forth any analysis here to

10 talk about whether or not that those are the same

11 individuals as in previous years, right?  Sorry.  Let me ask

12 that again.  You have not conducted any analysis to

13 determine whether any individual person changed their

14 status, any individual teacher?

15   A.    Yeah, I think it's the total number is what they

16 reported in the union, yeah.

17   Q.    That's one of the things you relied on.  Then

18 another one of the things you relied on for this opinion

19 that there are a significant number of people in categories

20 two and three is the aggregate number drop that you have

21 described in this table, right?

22   A.    Right.

23   Q.    You didn't employ any methodology in an attempt

24 to rule out other explanation for the numbers in Table 1,

25 correct?

1       A.      Correct.

2       Q.      You didn't employ any methodology that attempted

3  to rule out other conclusions that the data indicate about

4  attitudes towards union membership than the conclusions you

5  reached, right?

6       A.      Correct.

7       Q.      There's no methodology in this report that

8  explains how you got from these numbers to your conclusions

9  about attitudes towards union membership, right?

10      A.      No.

11      Q.      That's not right, or yes, that's right?

12      A.      Yes, that's right.

13      Q.      It's simply inference, right, that you used?

14      A.      Yes.

15      Q.      Without ruling out other alternative

16  explanations, right?

17      A.      Other than what I said earlier, this is a

18  dramatic drop in union membership and contract coverage much

19  bigger than what it is in the rest of the country.

20      Q.      That's not set forth in your report, right?

21      A.      No, but it's in the data book for Unionstats.

22      Q.      Sure.  But that analysis is not set forth in your

23  report, right?

24      A.      Correct.

25      Q.      You can't tell me what the potential error rate

David Macpherson - 9/27/2019

1   is in your conclusion that the numbers demonstrate that

2   employees who were union members before agency shop was

3   abolished would not have chosen to join if there had been an

4   open shop, right?

5        A.    Not on that table, no.

6        Q.    You can't tell me what any potential error rate

7   in your conclusion that these numbers demonstrate that union

8   members were not fully informed of their rights, right?

9        A.    That's not part of this survey, no.

10       Q.    You can't tell me the potential error rate in

11  your conclusion that these numbers demonstrate that union

12  members in Minnesota want out of a union now, right?

13       A.    No.

14       Q.    No, you can't tell me that, right?

15       A.    That's right.

16       Q.    You're not aware of any peer-reviewed publication

17  that performs an analysis of the Michigan numbers in this

18  table and reaches the conclusions that you have reached

19  here, right?

20       A.    Correct.

21       Q.    You've authored more than 60 peer-reviewed

22  published journal articles and book chapters, right?

23       A.    Correct.

24       Q.    You're generally familiar for the standards of

25  peer-reviewed publications in economics?

1    A.    Yes.

2    Q.    The conclusion that the law change in 2013

3 actually caused a drop in union membership would not satisfy

4 the standards for a peer-reviewed publication in economics,

5 correct?

6    A.    It could be part of a study because it's such a

7 dramatic drop.  It's hard to come up with a -- if you look

8 at the decline in Michigan versus, as I said, the rest of

9 the country, this is a large drop, and it could certainly be

10 part of a peer-reviewed study.

11    Q.    The analysis you've set forth here, which does

12 not control for any independent variables, including the

13 outsourcing of jobs, attrition, retirement, deaths, the

14 addition of non-union public jobs, the analysis that you

15 have set forth here reaching the conclusion that these

16 numbers reflect the attitudes about union membership, that

17 would not satisfy the standards for a peer-reviewed

18 publication, correct?

19    A.    I'm saying it could be part of a peer-reviewed

20 study.  Peer-reviewed studies often include descriptive

21 data.

22    Q.    Causal conclusions drawn from data that do not

23 control for all of the relevant factors, do those generally

24 survive the standards for a peer-reviewed publication, Dr.

25 MacPherson?

David Macpherson - 9/27/2019

82

1    A.    As I said, I mean, it certainly is part of it for

2    sure.

3    Q.    So it's your opinion that the analysis that

4    you've set forth in this report would survive the standards

5    for a peer-reviewed publication?

6    A.    If it was part of a bigger study.

7    Q.    As it stands, the analysis you've given us in

8    this report, do you think this would be published?

9    A.    You're only going to publish one table.

10    Q.    This is what you've given us.  Do you think --

11    A.    I mean, it's part of my opinion.  It's not the

12    sole part of my opinion.

13    Q.    Do you think your opinion in this report would

14    survive the standards of a peer-reviewed publication, Dr.

15    MacPherson?

16    A.    I think combined with the other information I

17    include about the SEIU information to say that a lot of

18    people opt not to pay agency fees when they're given the

19    option not to, I think in the SEIU part, combined with the

20    other evidence, gives an overall picture, I think depending

21    upon where you're publishing.

22    Q.    What journal would publish the analysis that

23    you've put forward in this report, Dr. MacPherson?

24    A.    I'd have to give it thought.

25    Q.    All right.

David Macpherson - 9/27/2019

83

1          MS. LEONARD:  Why don't we take a break; we've

2      been going for a little while?

3          COURT REPORTER:  Off the record.  The time is

4      10:51.

5          We're back on the record.  The time   is 11:03.

6  BY MS.  LEONARD:

7      Q.    Okay, Dr.  Macpherson, I am going to return to

8  table one.

9      A.    Okay.

10     Q.    I just want to ask you a couple more questions

11 about this table.  The opinion you're offering is that the

12 reduction in aggregate union membership after 2013 reflects

13 something about members' attitudes about whether they would

14 have wanted to be union members before that, right?

15     A.    Yes.

16     Q.    Okay.  If you look at the number in 2013: 255,747

17 members, right?

18     A.    Right.

19     Q.    Say you have Employee A who is a union member in

20 2013, who retires, okay?

21     A.    Okay.

22     Q.    I believe earlier I had asked you a question,

23 "Well, can't these numbers be affected by retirement?" and

24 you mentioned, "What if the job is retained," right?

25     A.    Yes.

1    Q.    Say you have Employee A who retires, and that

2  person is replaced by Employee B, who is not a union member,

3  who chooses not to be a union member, right?  Okay?

4    A.    Well, when did they change the law?  2013, okay.

5  It depends.  2013 is probably not a good year, because

6  there's change in the law during that year.

7    Q.    Okay.  Well, the number -- the reduction you're

8  referring to is between 2013 and 2014, and 2015, right?

9    A.    Right.

10    Q.    I'm happy to use 2014 to 2015, if you want.

11    A.    All of them are going down but yeah.

12    Q.    Well, after 2015 it doesn't go down, right?  It

13  goes back up.

14    A.    It's all sampling, but by 2018 it's down.

15    Q.    Right, but 220,000 to 234,000 to 239,000, those

16  numbers go up from 2015 to 2017, right?

17    A.    It's sampling.  Yeah, but it's all likely

18  sampling, variability.

19    Q.    Okay, so you -- sorry.

20    A.    I would argue you got to look at -- well, you got

21  to take 2013 and all the way to 2018.  I think you got to

22  look at a longer time horizon to see the full effects of

23  switching.

24    Q.    The sampling variability might affect the

25  reliability of the numbers and the conclusions that you're

1  drawing from them, Dr. Macpherson?

2       A.    For any given year, so you want to pick something

3  over a longer time horizon to get -- if you're seeing a

4  trend, I would look for 2013 to 2018.  But to go from the

5  five -- from 2016 to 2017, the rise of roughly 5,000, that

6  won't be statistically significant.

7       Q.    Okay.  You don't actually know what caused that

8  rise, right?

9       A.    No, but I know this data really well for 30

10 years.

11      Q.    Sure, and what you've studied is the descriptive

12 data, right?

13      A.    I've done statistical analysis too.

14      Q.    Okay, but you haven't looked at what factors

15 cause people to become union members in Michigan or anywhere

16 else, as we previously discussed, right?  You have not done

17 an analysis of the causal relationship between people's

18 attitudes and union membership, correct?

19            MR. FRANKLIN:  Objection.

20      A.    Well, that's not quite true.  I've looked at

21 studies looking at determinants of union membership, sure.

22      Q.    You have not personally researched or analyzed

23 the causal relationship between attitudes and union

24 membership, correct?

25      A.    I've looked at -- attitudes are correlated with

1    characteristics.  And so I've looked at the effect of

2    characteristics of people on union membership.  That I have

3    done.

4         Q.    You did not study that for the years here in

5    Michigan, and you did not include that in your report,

6    right?

7         A.    Correct.

8         Q.    Let's go back to my question.  We'll use 2014 to

9    2015, because of your concern.  You have Employee A, who was

10   a union member who retires, who's included in the 230,847

11   individuals here, and is replaced by Employee B, who is a

12   non-union member, right?

13        A.    That's assuming that they're not -- the person

14   who's retired, you're looking at membership.  This is after

15   they've gotten rid of the mandated membership.  Potentially,

16   yes.

17        Q.    I'm just talking about -- there's a person who

18   was a union member in 2014 and is part of this 230,847

19   individuals, who is replaced by someone who chooses not to

20   be a union member, Employee B.

21        A.    Okay.

22        Q.    So if that were the only change between 2014 and

23   2015, that number, 230,847, would go down to 230,846 for the

24   next year, correct?

25        A.    Yes.

David Macpherson - 9/27/2019

87

1    Q.    That change would occur without any individual

2  changing their union membership, as a result of their

3  attitude about fair share fees, correct?

4    A.    Yes.

5    Q.    You gave some information that is not included in

6  the report, about comparing Michigan to what you understand

7  to be nationwide trends, right?

8    A.    Absolutely.

9    Q.    You offered that -- if you compare this to trends

10  in the United States, that there is something unprecedented

11  happening here in Michigan in these years, correct?

12    A.    Correct.

13    Q.    Okay, but you didn't provide any of that analysis

14  in this report, right?

15    A.    Yeah.  I can't anticipate including everything in

16  the report, but, yes.

17    Q.    Sure.  There was also something unprecedented

18  happening with respect to public employees in Michigan in

19  these years, wasn't there?  Are you aware of what was

20  happening in Michigan with respect to public employees that

21  was unprecedented in the United States in these years?

22    A.    I don't recall right now.

23    Q.    Are you aware of the Detroit bankruptcy?

24    A.    The city went bankrupt?  Yes.

25    Q.    Are you aware that it was the largest municipal

1  bankruptcy that had ever happened in the United States?

2      A.    No.

3      Q.    Are you aware of what year that happened, Dr.

4  MacPherson?

5      A.    No.

6      Q.    Are you aware that it was 2013?

7      A.    No.

8      Q.    Are you aware or did you study the impact of the

9  Detroit bankruptcy on the number of union jobs in Michigan

10  in these years?

11      A.    No, I did not.

12      Q.    Let's talk about the SEIU numbers.  The next

13  piece of information that you cite supporting your opinion

14  that there are a substantial number of individuals in

15  classes two and three -- two and three -- is the reduction

16  in the number of agency fee payers at AFSCME and SEIU in

17  2018, as reported in a Bloomberg article, correct?

18      A.    Correct.

19      Q.    You have not done any independent assessment of

20  these numbers, correct?

21      A.    No.  I believe that they're based on reported

22  data to the government.

23      Q.    Okay, but you haven't independently analyzed or

24  confirmed that, correct?

25      A.    No.  I have no reason to doubt the Bloomberg Law

1   is reporting accurately, the numbers from the government

2   reports.

3       Q.   You didn't look at the LM-2s, did you?

4       A.   No, I did not.

5       Q.   The opinion that you're offering is that that

6   reported reduction indicates that the agency fee payers did

7   not believe they were getting value from paying agency fees,

8   correct?

9       A.   Absolutely.

10      Q.   The reduction in agency fee payers at AFSCME and

11  SEIU, isn't that a reflection of the fact that Janus held

12  that agency fees were unconstitutional?

13      A.   Well, it's saying, yes, after Janus they had the

14  choice of not paying those agency fees, and they, 98 percent

15  of the AFSCME fee payers decided not to pay it, and 94

16  percent SEIU.  Before, they couldn't not pay.  Now, they

17  could.  Since they've decided that they -- since a court

18  ruled that they don't have to pay, a lot of them decided not

19  to pay.

20      Q.   After Janus, SEIU and AFSCME could not charge

21  agency fees, correct?

22      A.   Unless you --

23      Q.   To public employee members, correct?

24      A.   Right.

25      Q.   There's still some private members, right?

1      A.     Right.

2      Q.     Isn't it true that after Janus, the number of

3  fair share fee payers, agency fee payers, at SEIU and

4  AFSCME, the number of agency fee payers dropped to zero

5  among the public sector employees, right?

6      A.     I believe, yes.  I think that might be right.

7      Q.     Right, and that a small number of private sector

8  units still had fair share fees after Janus at SEIU and

9  AFSCME?  Do you know?

10     A.     Yeah, I think there are some small number.

11     Q.     Right.  So the 98 percent and 94 percent drop in

12  the number of agency fee payers is simply a reflection of

13  the fact that SEIU and AFSCME could no longer charge agency

14  fees to public sector employees, correct?  They didn't exist

15  after Janus in those sectors; therefore, there was a

16  reduction in the number of those.  Isn't that what this

17  number shows?

18     A.     I'm not certain.  I'm not certain.

19     Q.     You were not analyzing the number of former agent

20  --  fair share fee payers at AFSCME and SEIU that chose to

21  become union members or not chose -- chose to not become

22  union members?  Let me re-ask that.  You did not analyze the

23  number of former fair share fee payers at AFSCME or SEIU who

24  chose to become union members after the Janus decision,

25  right?  You did not analyze those numbers, right?

David Macpherson - 9/27/2019

91

1     A.     No, I did not.

2     Q.     So it's possible that the numbers reflected here

3  simply reflect the fact that there were no more agency fee

4  payers at SEIU and AFSCME, among the category of public

5  sector employees, right?

6     A.     It's possible.

7     Q.     Okay, because just to carry this all the way

8  through, you would agree that a non-member agency fee

9  member, Employee A, who decided to become a member after

10  Janus, if that were true, say there was this Employee A at

11  AFSCME; AFSCME still would have lost one agency fee payer if

12  you are calculating aggregate number of agency fee payers,

13  right?

14     A.     Yes.

15     Q.     You have not conducted any analysis of the

16  variables impacting the decisions of individuals covered by

17  AFSCME and SEIU bargaining units to choose whether or not to

18  become a union member after the Janus decision, right?

19     A.     No.

20     Q.     No, you have not?

21     A.     I have not.

22     Q.     You did not attempt to control for any of the

23  variables that impacted any of these individuals' decisions,

24  right?

25     A.     That is correct.

David Macpherson - 9/27/2019

92

```
1        Q.    You have not conducted any analysis of AFSCME or
2   SEIU fee payers' attitudes about whether they were getting
3   any value from the union prior to the Janus decision, right?
4        A.    That is correct.
5        Q.    No analysis of whether fee payers thought they
6   were getting a good deal in the years prior to Janus, right?
7        A.    No, not on the basis of this, but we do have a
8   lot of document production from the union of all these
9   withdrawal letters from workers wanting to get out of the
10  union.  I did see a lot of letters.  So we do have some
11  evidence of that.
12       Q.    Okay, we, meaning you on the side of the
13  plaintiffs in these cases?
14       A.    Well, just we being everybody can see the
15  evidence.
16       Q.    You didn't perform any statistical or other
17  economic analysis of the documents produced by plaintiffs
18  that reflect emails from their members in this case,
19  correct?
20       A.    I didn't do any -- I looked at the letters.
21       Q.    But my question was slightly different.
22       A.    I mean, I looked at them, but I didn't do any
23  statistical analysis of those letters.  But they all wanted
24  out.
25       Q.    That was under your impression?
```

93

1     A.    I saw a whole bunch of letters where they wanted

2 out, yes.

3     Q.    Are you aware that the document request was for

4 requests to be let out?

5     A.    Right.

6     Q.    So that's not all of the communications with the

7 union.  So you didn't perform any statistical or economic

8 analysis on -- with respect to the documents that were

9 produced regarding communications with the union members in

10 these cases, right?

11     A.    Correct.

12     Q.    There's no methodology that you used here, other

13 than looking at the numbers reported in this Bloomberg

14 article, and then reaching a conclusion about what agency

15 fee payers believe about the value of the union, right?

16     A.    Correct.

17     Q.    Are you aware that some fair share fee payers

18 have joined unions after the Janus decision?

19     A.    I'm sure there's some.

20     Q.    You have not conducted any independent research

21 or analysis analyzing the reasons that fair share fee payers

22 decided to join unions after the Janus decision, correct?

23     A.    Correct.

24     Q.    Either for SEUI, or AFSCME, or the teacher's

25 unions?

David Macpherson - 9/27/2019

94

1    A.    Correct.

2    Q.    Or any union representing public employees?

3    A.    Correct.

4    Q.    If you turn to the next page of your report, you

5  continue to discuss the Bloomberg law article and quote a --

6  or not quote.  Sorry.  You discuss a -- there's a reference

7  here to a pro-union researcher about union rates among

8  teachers in right-to-work states that banned fair share fees

9  in states that did not.  Do you see that?

10    A.    Yes.

11    Q.    That states that the unionization rates among

12  teachers are about 24 percent lower in states with

13  collective bargaining under right-to-work laws as opposed to

14  not, right?

15    A.    Right.

16    Q.    You're using this to support your opinion that

17  there are a large number of union members who would have

18  chosen not to pay union dues if they didn't have to, right?

19    A.    Right.

20    Q.    But you didn't connect any independent analysis

21  to confirm the accuracy or source of these numbers, right?

22    A.    Correct.

23    Q.    You didn't conduct any economic analysis to

24  determine whether union members in Minnesota share the

25  sentiments of the individuals who have chosen not to be

David Macpherson - 9/27/2019

1  union members in other states, correct?

2      A.    Correct.  There's no reason to think Minnesota is

3  different from other states.

4      Q.    But you haven't connected any analysis of that,

5  right?

6      A.    No.

7      Q.    You know from your own research there are a large

8  number of variables that impact any individual's attitude

9  about union membership, right?

10      A.    I'd say there are multiple.

11      Q.    It's difficult to analyze the causal effect

12  between individuals' attitudes and union membership, right?

13      A.    One can look at aggregate numbers and find things

14  that are correlated with union membership for sure.

15      Q.    But we've talked about the correlation causation

16  fallacy, haven't we, Dr. MacPherson?

17      A.    No.  This is based on microeconomic data that's

18  aggregated up.  I've done analysis looking at individual

19  level data, and one can explain variations in union

20  membership with variables like age, schooling, occupation.

21      Q.    But those objective characteristics don't tell

22  you anything about the person's reasons and attitudes about

23  union membership, right?

24      A.    Well, if we got one group that doesn't

25  participate in the union and it's -- say, women have not

David Macpherson - 9/27/2019

96

1  historically participated at the same rate the men have.

2  One can infer there is a reason why women don't participate

3  at the same rate than men, likely due to their attitude

4  towards the union.

5     Q.   But you could not infer from that data that the

6  reason for that is because of the Janus decision, for

7  example, right?

8     A.   No, because I'm talking just gender differences.

9     Q.   Right.  You could not infer from that that the

10  reason for that is because of their attitude towards fair

11  share fees, right?  That's a step too far, right?

12     A.   Potentially, yes.

13     Q.   On Page 10 you also talk about a question -- one

14  question in a 2018 survey from the National Education

15  Association that was reported in a news article, right?

16     A.   Right.

17     Q.   You're relying on these numbers to support a

18  conclusion that a large number of union members, teachers in

19  particular, do not want to pay union dues if given the

20  option not to, right?

21     A.   Yes.

22     Q.   That's the opinion you're offering here?

23     A.   Yes.

24     Q.   Right.  And the methodology you used is you

25  looked at the survey results for this question, and you saw

1  57 percent in one category, and 69 percent in another

2  category, and you think those are high percentages?

3      A.   Yes, I think they're pretty high.

4      Q.   But you didn't conduct an analysis that would

5  identify and analyze any variables that would impact

6  individual teachers' attitudes towards union membership and

7  dues, right?

8      A.   Well, there is one right there.  If the union

9  talked to this year, or the last few years, 57 percent

10  wouldn't pay, but if the union talked more than a few years

11  ago or never, 69 percent wouldn't pay.

12      Q.   Right, but you didn't conduct any analysis to

13  identify and analyze the variables that would affect

14  attitudes towards union membership and dues, right?  You

15  have not done that?

16      A.   No, I have not done that but the survey is --

17  indicates quite telling that a large number of people would

18  not pay.

19      Q.   But there's a variable identified in the survey

20  itself with respect to people's -- the teachers' attitudes

21  surveyed -- the teachers' attitudes towards paying dues,

22  right?

23      A.   Right.

24      Q.   On its face, there's a variable here, right?

25      A.   Correct.

1    Q.    Right.  And that variable is whether the union

2    talked to people this year or in the last few years, or the

3    union talked more than a few years ago, never, right?

4    A.    Right.

5    Q.    That variable had a pretty substantial impact on

6    the response rate, right?

7    A.    Yes.  I'd say in the aggregate, that survey is

8    telling us over half of the people would not pay.  Across

9    all teachers, regardless of whether union talked to them or

10   not, that survey is telling us that over half would not pay

11   the union.

12   Q.    You can reach that conclusion without analyzing

13   all the relevant variables that affect that answer?  You're

14   comfortable doing that?

15   A.    I'm comfortable on the basis of the NEA Survey

16   indicates that over half of the teachers -- if the question

17   was if you wake up tomorrow and discover that you could stop

18   paying a fee to your union, but the union would still have

19   to pay to represent you, you would still opt to pay?  And

20   according to that survey, that's a lot of people.

21   Q.    Do you believe that there are no other variables

22   that affect people's answers to that question?

23   A.    Assuming that that question was done correctly, I

24   mean, the survey, the sample was correct, it does indicate

25   that half of the teachers, more than half -- because either

1   the union talked to you in the last few years or it didn't.

2       Q.    That's the only variable that affects the answer

3   to the question of whether you feel you would or wouldn't

4   pay union dues?

5       A.    I'm not saying that.  What I'm saying is

6   across -- assuming this is the universe of teachers, either

7   they talked to them or they didn't.  That means over half

8   don't belong to the union.

9       Q.    Okay.

10          MS. LEONARD:  Let's mark the next.  Number 5?

11          COURT REPORTER:  Yes, ma'am.

12          (Thereupon, MacPherson Exhibit 5 was marked for

13   identification.)

14   BY MS. LEONARD:

15       Q.    You've been handed what's been marked as Exhibit

16   5.  The title is Union Report NEA Conference Reveals

17   Disconnect Between How One Teachers Union Trains Its Staff

18   Versus How It Talks In Public, which is the same as the --

19   by Mark Antonucci, the footnote on Page 10.  Do you

20   recognize this?

21       A.    Yes.

22       Q.    Okay.  This is the article that you were

23   referencing as your source for this information?

24       A.    Yes.

25       Q.    If you turn to Page 3 of this article, you see

1  the same bar graph that you have reproduced on Page 10 of

2  your report?

3         A.    Right.

4         Q.    Can you read out loud the paragraph following the

5  bar graph, please?

6         A.    "The survey then asked the following question to

7  those who were asked, who would not pay: ï¿½What if you found

8  out that opting not to join or pay a fee would weaken your

9  union, or employee association to the point where you can no

10 longer negotiate your wages, benefits, and working

11 conditions, would you still choose to stop paying'?"

12        Q.    Then the next paragraph, please.

13        A.    "The NEA found between 38 and 81 percent of those

14 who would not pay votes were then reversed, depending upon

15 the respondent's previous interactions with their unions."

16        Q.    So by asking a follow-up question about another

17 variable, the respondents' responses changed dramatically

18 with respect to their attitude of whether they would pay

19 dues or not, right?  That's what this reflects.

20        A.    Correct.

21        Q.    So there are other variables, including at least

22 information given about whether not paying dues would weaken

23 the union, that dramatically impact union members' attitudes

24 about whether they would or would not want to pay dues,

25 correct?

1    A.    Correct, but it's still a significant fraction

2  still would not pay.

3    Q.    A 81 percent drop is not a significant reduction

4  in the number of individuals who wouldn't pay?  That's what

5  this says, right?

6    A.    81 percent of -- it's not clear which one is the

7  81 percent.  Is it 81 percent of the 69, or 81 percent of

8  the 57?  You don't know.

9    Q.    Right, but 81 percent of either of those is

10 pretty big, right?

11   A.    But even so, 87 percent -- let's take 38 percent.

12 Quick calculation.

13   Q.    For the record that Dr. Macpherson is using a

14 calculator.  It's okay.  I would have to too.

15   A.    There you go.  Thanks.

16   Q.    Yeah.  We'll not write on the official exhibits.

17   A.    Well, it sure would help to know which --

18   Q.    Which one it applies to, right.  So we don't know

19 which of the -- whether the 81 percent applies to the 57 or

20 the 69, but I'm guessing from the math, that it drops it to

21 a pretty small percentage, right?  When you drop it by 81

22 percent, either of those numbers?

23   A.    If it's the 38 percent, it could be as high as 43

24 percent of the people still would not pay, right?  Or if

25 it's 38 percent of the 57, that would be 35 percent.

David Macpherson - 9/27/2019

102

1    Q.    And the 81 percent?

2    A.    Eleven and 13.

3    Q.    Right.  So that's two variables that they're

4    introducing into the survey that affect members' attitudes

5    about whether they would or would not want to pay dues under

6    these circumstances, right?  There's two variables, right?

7    A.    Yes.

8    Q.    So whether the union's talked to them and then

9    this information about whether not paying dues would impact

10   the union and their working conditions.  Surely, there are

11   other variables that impact union members' attitudes about

12   whether or not they want to pay dues as well, right?  Beyond

13   these two, correct?

14   A.    Potentially.

15   Q.    People's financial circumstances certainly affect

16   their attitudes towards paying dues, right?  Whether they

17   need the money?

18   A.    Potentially.

19   Q.    We talked earlier about individuals' attitudes,

20   varying attitudes about being a free rider.  That might

21   impact someone's attitude about whether or not they want to

22   pay dues, right?  How they feel about getting something for

23   nothing, right?

24   A.    Yes.  Well, actually, on the very next page

25   actually they actually do some calculations for us.

1    Q.    Sorry.

2    A.    It's a little basic arithmetic, using the above

3    numbers suggests that on the very best-case scenario -- the

4    very best-case scenario -- the NEA would immediately lose 11

5    percent of its members in agency fee states.  Under the

6    worst case, the union would lose about 36 percent.

7    Q.    Analyzing those two variables, right?  That's the

8    math using those two variables, right?

9    A.    Yes.

10    Q.    As we've discussed, there are other variables

11    that surely affect union members' attitudes towards paying

12    dues, right?

13    A.    But this survey is telling us what the percentage

14    of people who would not pay, based upon even is what this

15    article says, with such a loaded follow-up question, the

16    survey indicates NEA's immediate membership loss might be

17    much larger than I previously guessed.  They're calling that

18    follow-up question loaded.

19    Q.    You have not analyzed whether this survey

20    identified and controlled for all of the relevant variables

21    that impact individuals' attitudes towards this question of

22    whether they would or would not want to pay dues, right?

23    You have not analyzed that, correct?

24    A.    I have not analyzed it.  What I'm saying is this

25    survey says on its surface, that a large number of people

1  would, in fact, not want to pay the union dues, which is

2  what my report is trying to address.  Is there a significant

3  number of people who would not pay the union dues?  This

4  survey is consistent.  It's based on teachers.  It's

5  consistent with my opinion.

6       Q.    Right, and Dr. MacPherson, you're an economist

7  who understands that to properly draw conclusions about the

8  relationship between dependent variables, you need to

9  control for all relevant factors, right?  To have reliable

10 results?  Correct?

11      A.    But this actually -- yes.  But this is looking at

12 the kind of people we're talking about, which is school

13 teachers, who are represented by a union, and the question

14 is do they not want to pay dues?  And this survey indicates

15 that even with this loaded follow-up question, that a fair

16 number of people, even in the worst-case scenario, 11

17 percent; could be as high as 36.

18      Q.    This survey did not control for all the relevant

19 factors that impact peoples' attitudes about paying dues,

20 such as financial circumstances, their attitude about being

21 a free rider, their ideological differences with the union,

22 correct?  There are many factors that impact individuals'

23 attitudes about whether or not they want to pay union dues?

24           MR. FRANKLIN:  Objection.

25      A.    That's true, but that's built into the question,

1    because that's how they're answering the question.  So their

2    financial status is going to influence whether they answer

3    the survey question would they not pay or not?  Those

4    factors are helping determine their answer to this question.

5         Q.    People's attitudes towards union membership

6    change over time, right, potentially?

7         A.    Potentially.  But this survey, which was done in

8    2018, very close to the Janus decision, indicates that a

9    large fraction of people don't want to pay.

10        Q.    And is it your opinion that this survey in 2018,

11   controlling for these two variables, indicates anything

12   about those individuals' attitudes in 2016?  Your opinion as

13   an economist?

14        A.    I can't say with certainty.

15        Q.    What about any other year, other than the year

16   they were surveyed?

17        A.    We don't know.

18        Q.    Right.  You yourself have not conducted such a

19   survey of public employees and their attitudes with respect

20   to whether they would or wouldn't want to pay dues under

21   different scenarios, right?

22        A.    No.

23        Q.    No, you have not?

24        A.    I have not done that.

25        Q.    On the next page of your report, Page 11, you

1    offer an opinion that in the field of economics, national

2    data can be used, unless information exists to the contrary.

3    That's what you say here, right?

4         A.    Yes.

5         Q.    That's overly simplistic, is it not, Dr.

6    MacPherson?  Is national data always used unless there's no

7    contrary information?

8         A.    Putting the statement of all -- the question is,

9    if you want to make some inference, right?  As I said,

10   generally granular data is preferred but if, in fact, there

11   is no reason to suspect that somehow Minnesota school

12   teachers are different from other school teachers, one can

13   make inferences based on a national survey.

14        Q.    But what you say here is that there is no known

15   contradictory information about a particular state, right?

16   Then, therefore, economists would use the national data;

17   that's your opinion?

18        A.    My opinion is yes, unless you have some

19   information to the contrary saying why Minnesota's somehow

20   different, their school teachers, from the national survey,

21   one can make some inferences based on the national one.

22        Q.    So you would agree that if there was a known

23   relevant variable that might impact the outcome of the

24   statistical analysis, that then the nationwide data might

25   not be appropriate to use, right?

David Macpherson - 9/27/2019

107

1     A.    It might not be if it's a significantly big

2 enough difference.

3     Q.    And that is something that would need to be

4 studied, correct?

5     A.    Potentially.

6     Q.    So there are scenarios under which using the

7 national data, even if there's not known contradictory

8 information if, for example, there is a relevant variable

9 that hasn't been accounted for, it would not be appropriate

10 to use the nationwide data, right?

11     A.    No, not necessarily.  It depends how important

12 that variable is.  If it's not very important in whatever

13 you're studying, then the national probably is still -- who

14 knows?  We don't know.

15     Q.    Right.  But the point is that that is something

16 that would need to be studied, right?

17     A.    Potentially.

18     Q.    And economists would not conclude that the

19 results based on nationwide data were reliable if there was

20 no control for a relevant variable, right?

21     A.    I have not seen anything yet that tells me that

22 Minnesota is somehow different from this national survey.

23     Q.    Right, but that wasn't my question.  My question

24 is that economists would not agree that the results were

25 reliable, relying on nationwide data, if a relevant variable

1  had not been controlled for, right?

2       A.    It has to be quantitatively important.  Just

3  because it's a variable that's not controlled for, that has

4  a small impact, that -- you'd still use the national survey.

5       Q.    Okay, but you have --

6       A.    There'd have to be a substantive difference.

7       Q.    Right.  And you say you haven't seen anything

8  that indicates that Minnesota would be any different, but

9  you haven't conducted any analysis of any data that would

10 allow you to control for all the variables that impact

11 Minnesota teachers' attitudes about union membership, right?

12      A.    I have not, because I didn't have access to their

13 data.

14      Q.    And you haven't conducted that analysis in any

15 year?

16      A.    Again, I don't have access to their data.

17      Q.    You haven't performed any such analysis in any

18 year in which fair share fees were lawful in Minnesota,

19 correct?

20      A.    Correct.  I don't have access to the data.

21      Q.    And for after 2018, either, right?

22      A.    Correct.

23      Q.    We have now looked at everything that you have

24 set forth here in your report that supports your opinion

25 that class two and class three likely has a healthy number

1    of class members -- sorry.  That's the wrong quote.  That

2    there are a significant number of class members in class two

3    and three, right?

4         MR. FRANKLIN:  Objection.

5         A.    Not exactly, because as I mentioned earlier, that

6    I saw these withdrawal letters of a large number of people

7    who were asked to be withdrawn.

8         Q.    All right.  Sorry.  That's on Page 12?

9         A.    Yeah.

10        Q.    Finally, class two and class three --

11        A.    Yeah.

12        Q.    -- likely has a healthy number of class members

13   based on the production of documents.  But you didn't set

14   forth any analysis of the number of individuals, the

15   relationship of that number, to the number of union members

16   in Minnesota at all in this report, did you?

17        A.    No, I did not.

18        Q.    Now we've looked at everything that you've set

19   forth in your report.

20             MR. FRANKLIN:  Objection.

21        Q.    Now we've looked at everything that's set forth

22   in your report that supports your opinion that class two and

23   class three have a significant number of members, right?

24        A.    Correct.

25        Q.    This opinion is not based on any statistical

David Macpherson - 9/27/2019

110

1   analysis, correct?

2       A.   It's based on actual descriptive data as well as

3   this survey of -- NEA Survey.

4       Q.   And then the data that you looked at, the

5   methodology used to reach the conclusion that class two and

6   class three had significant numbers, that was just

7   inference?

8       A.   Well, it's more than inference when you get

9   letters showing that a large number of people say they want

10  to quit.  They're stating it in the letters.  I've looked at

11  a large number.

12      Q.   Okay.  And that's not an economic analysis, is

13  it?

14      A.   Well, it's a -- looking at the number of people

15  who are requesting out.

16      Q.   Counting?

17      A.   Counting.

18      Q.   Is that the methodology you used, Dr. MacPherson?

19      A.   Yes.

20      Q.   So on Page 12 you make a statement.  Let me find

21  it.  I believe it's right above the title, Commonality

22  Predominance.  Here it is.  You make a statement about

23  whether -- that it would be uneconomical for a plaintiff to

24  pursue a claim in this case.

25      A.   Oh, yes.

1      Q.     On Page 15, if you can turn to that, you make a

2   similar statement about the economics of litigation.  Let's

3   find it.  Right above typicality; do you see that?

4      A.     Yes.

5      Q.     Litigating these issues over and over in separate

6   actions would be an enormous waste of the court's time and

7   resources, as well as those of the parties.  You have not

8   conducted any economic analysis or statistical analysis to

9   support this opinion, have you?

10     A.     No.  But it's pretty clear, given the cost of

11  having depositions doing it over and over and over again,

12  would be very expensive.

13     Q.     Did you do any calculations of the individual or

14  aggregate damages in this case?

15     A.     No, I have not.

16     Q.     Do you know what the statute of limitations is?

17     A.     No.  I'm not -- don't know.

18     Q.     If I told you it was six years, do you know how

19  much average dues a teacher in Minnesota would have paid

20  over six years?

21     A.     No.

22     Q.     Or fair share fees a teacher would have paid over

23  six years?

24     A.     No.

25     Q.     Did you consider the potential size of damages

1  before making these statements about whether it would be

2  economical to pursue litigation?

3      A.    Well, litigation's expensive.  Expert witnesses

4  are expensive.  Attorneys are expensive.  And I don't know

5  the size of the dues.  I know what the union dues I would

6  have had to pay in Florida.  That's a bit, about 1.25

7  percent of pay, and that's a small -- and if you do it over

8  six years that would be -- I don't know what it is in this

9  case, but certainly less than 10 percent.

10     Q.    But you didn't do any economic or statistical

11 analysis to support that opinion, right?

12     A.    I mean, it's pretty obvious.  It would be

13 expensive on an individual plaintiff's level to go sue.

14 It's just basic math.

15     Q.    But that's a yes?

16     A.    Yes.

17     Q.    Damages aren't the only reason people bring

18 lawsuits, right?  You'd agree with that?

19     A.    Yes.

20     Q.    Plenty of lawsuits are brought for ideological

21 reasons, right?

22     A.    Sometimes.

23     Q.    You've not performed any survey of union members

24 in forming your expert opinions, right?

25     A.    No.

David Macpherson - 9/27/2019

113

1    Q.    You've not performed any survey of former fair

2  share fee payers in forming your expert opinions, right?

3    A.    Correct.

4    Q.    And you've not designed any survey of union

5  members, and explained the validated design for such a

6  survey in this report, right?

7    A.    No.

8    Q.    Correct?

9    A.    Correct.

10    Q.    Sorry.  And you've not set forth a validated

11  design for a survey of fair share fee payers in this report,

12  right?

13    A.    No, but one can use standard techniques for doing

14  surveys.

15    Q.    Right, but --

16    A.    I've done surveys in the past and --

17    Q.    But you have not set that forth in this report,

18  right?

19    A.    No.  I think I talk about doing a survey in one

20  of these reports.

21    Q.    Footnote 3, maybe?

22    A.    Okay, thanks.

23    Q.    Is that right?

24    A.    Yes.  There you go.

25    Q.    Okay, but that's not a survey design, right?

1    You're just talking about the idea of doing a survey here?

2         A.    Correct, but it can be done and I have done it.

3         Q.    Sure.  So you know how to design such a survey,

4    right?

5         A.    Correct.

6         Q.    But you did not set forth the design for a survey

7    that would be intended to achieve reliable results in this

8    report, right?

9         A.    No.  One could -- if the class is certified, one

10   can design it afterwards.

11        Q.    Right, but that's a different question.  You have

12   not set forth a design for such a survey in this report?

13        A.    No, I have not.

14        Q.    Okay.  To be clear, you have not designed a

15   survey that you can say will avoid potentially biased

16   outcomes, right?

17        A.    I have not done that because it's not part of the

18   task of this report.

19        Q.    And you've not designed a survey that would avoid

20   a low response rate, right?

21        A.    No.

22        Q.    You've not designed any of the potential

23   questions, right?

24        A.    No.

25        Q.    Or procedures for validating the results of those

David Macpherson - 9/27/2019

115

1  questions?

2      A.    Nope.

3      Q.    That's important, right?  Designing procedures

4  for validating the results of questions?

5      A.    Potentially.

6      Q.    You haven't proposed any methodology at all for

7  conducting such a survey of class members in this case,

8  right?

9      A.    No, but it can be done.

10     Q.    Right.  No, you have not done that?

11     A.    I have not done that.

12     Q.    And you haven't been provided with any proposal

13  for a survey by counsel that some other expert drafted

14  before you came to a conclusion that a survey could be done?

15     A.    No, but, again, I've done surveys in the past,

16  and I know how to do them.

17     Q.    Turn to Page 13, please.  On Page 13 you're

18  asserting an opinion that employees face the same choice,

19  right?

20     A.    Yes.

21     Q.    And that choice is whether or not to join the

22  union, right?

23     A.    Yes.

24     Q.    And you assert some constraints here on those

25  choices, right?

1     A.    Yes.

2     Q.    The first constraint is what you would say is the

3  erroneous belief that individuals had to join the union or

4  not be employed, right?

5     A.    Yes.

6     Q.    And the second constraint is what you say was the

7  legally inaccurate choice between paying fair share fees and

8  union dues, right?

9     A.    Yes.

10    Q.    And then you reach a conclusion that because of

11 these two constraints, the choice of whether or not to

12 become a union member was not a free choice?

13    A.    Correct.

14    Q.    That's the opinion you're offering?

15    A.    Yes.

16    Q.    And then the final part of that opinion is that's

17 true for every public employee in an agency shop?

18    A.    Correct.

19    Q.    With respect to the first constraint, which you

20 say is an erroneous belief that people -- sorry, is a belief

21 that people had to join the union or not be employed; you

22 have not conducted any economic analysis that would allow

23 you to determine the number of union members at any point in

24 time, who felt this way, right?

25    A.    No.  Had the lead plaintiff -- not the lead

1  plaintiff.  Mary D. Boroughs is one person.

2       Q.    Okay, but you haven't conducted any economic

3  analysis to determine the number of union members at any

4  point in time, who have felt this way, right?

5       A.    Correct.

6       Q.    You don't know the number of Minnesota public

7  school teachers who suffered from this failure of

8  information at any given time, right?

9       A.    I do not know.

10      Q.    You haven't studied or analyzed anyone else's

11  statistical analysis of this issue, right?

12      A.    Correct.

13      Q.    With respect to the second constraint, regarding

14  the choice between agency fees and union dues, you do

15  recognize that until 2018 fair share fees were legal,

16  correct?

17      A.    Yes.

18      Q.    But, nonetheless, you say this was a constraint

19  that impeded free choice before that point in time?

20      A.    Yes.

21      Q.    And, again, you've conducted no economic or

22  statistical analysis to support this conclusion, correct?

23      A.    Well, it's basic principle that if they were

24  forced to choose between join the union or paying an agency

25  fee beforehand.  SO that wasn't a completely free choice.

1    Q.    But you describe it as a legally inaccurate

2  choice.

3    A.    Yes, because Janus said that they didn't have to

4  pay agency fees.

5    Q.    That was true after the Janus opinion?

6    A.    The question is does it apply before.

7    Q.    And it's your opinion that it does?

8    A.    It's not my -- I can't offer legal opinions.

9    Q.    Okay, thanks.  But my question was whether you've

10 conducted -- that you've conducted no economic or

11 statistical analysis to support the conclusion that

12 individuals were impeded in free choice by this constraint.

13 This is again, an inference, correct?

14   A.    Yes.

15   Q.    There's no methodology set forth here to explain

16 how you reached the conclusion that every union member

17 suffered from both of these constraints?  That's again, an

18 inference, right?

19        MR. FRANKLIN:  Objection.

20   A.    Well, those are the choices they had.  So it's

21 more than an inference; it's a fact.  Either they join the

22 union, pay the agency fees.  There's no other option if they

23 wanted to work in the public sector.

24   Q.    This opinion was created specifically for this

25 litigation and does not flow from any independent research

David Macpherson - 9/27/2019

119

1  that you are conducting, correct?

2       A.    Correct, because I was looking at this specific

3  issue.

4       Q.    And it does not flow from any independent

5  research that you've reviewed either, correct?

6       A.    I mean, it's more of a fact.  I mean, it's either

7  they paid the union dues, paid the agency fees, or not.

8  That's it.  I mean, it's no -- it's a fact.

9       Q.    And this opinion that you're offering here is not

10  set forth in any peer-reviewed economic journals that you

11  have relied on here, correct?

12       A.    Correct.

13       Q.    If you look to section six of this report, you

14  have --

15       A.    Wow.

16       Q.    I think there's a typo.

17       A.    There's a typo.

18       Q.    We'll call it second five, which I think is six,

19  summary and conclusions.  You are not intending to set forth

20  any additional opinions or bases for those opinions in this

21  section, but you're summarizing the opinions in section

22  five, right?

23       A.    Yes.

24            MS. LEONARD:  I think now is a good time for

25        another break, and then I have a short -- I think my

1    portion will probably be concluded in a nice time to

2    get lunch.  I don't think we're going to finish

3    everything.

4         COURT REPORTER:  Off the record?

5         MS. LEONARD:  We can go off the record.

6         COURT REPORTER:  The time is 11:54.

7         COURT REPORTER:  We're back on the record.  The

8    time is 12:01.

9  BY MS. LEONARD:

10       Q.    Okay, can you turn back to Exhibit 4 which is the

11  retention letter?

12       A.    Okay.

13       Q.    This is dated May 24th, 2019, correct?

14       A.    Correct.

15       Q.    How did you come to be retained in this case?

16       A.    Don't know.

17       Q.    Okay, did you contact Mr. Franklin or did he

18  contact you?

19       A.    He contacted me.

20       Q.    Okay, did he find you through an advertisement?

21       A.    Don't know.

22       Q.    But you advertise for expert services, right?

23       A.    Correct.

24       Q.    Okay.  All right.

25            MS. LEONARD:  Let's mark these three at the same

```
 1  time.
 2         THE WITNESS:  It's an old form.
 3         MR. FRANKLIN:  Are we done for those for now?
 4         MS. LEONARD:  For now.  You want to help me out,
 5  Leon?
 6         MR. LEON:  Sure.
 7         MS. LEONARD:  I'll take one.  And then throw in
 8  the towel.
 9         MR. LEON:  Okay.  There's yours.  There's yours.
10         MS. LEONARD:  Here you go.
11         MR. LEON:  This will be mine.  But then, wait.
12  But that one probably -- wait, wait, wait.  This one
13  is before that one.
14         THE WITNESS:  I don't know if you know, is
15  misspelling my name.  There's no A.
16         MS. LEONARD:  Oh, I did that.  Did I do that?  I
17  am sorry.  I wrote those.  We'll fix them.  We'll fix
18  them.  That's my fault.
19         MR. FRANKLIN:  Let me see the other one.
20         MR. LEON:  Okay, so this is that.
21         MR. FRANKLIN:  Seven and then --
22         MS. LEONARD:  Oh, there's no E at the --
23         THE WITNESS:  No.
24         MS. LEONARD:  Okay, got it.
25         MR. LEON:  We have three of these?
```

```
 1                 MS. LEONARD:  Yes.

 2                 MR. LEON:  Okay, all right.

 3                 MS. LEONARD:  So these are Exhibit 7, 8 -- 6, 7

 4      and 8, right?

 5                 THE WITNESS:  Yes.

 6                 (Thereupon, Macpherson Exhibits 6, 7 and 8 were

 7  marked for identification.)

 8  BY MS. LEONARD:

 9      Q.    Okay, can you just take a second to look over

10  these and tell me if you recognize them?

11      A.    Don't recognize that one but recognize 6 and 7.

12      Q.    Okay, and are these online advertisements for

13  expert witness services?

14      A.    Yes.

15      Q.    That you placed?

16      A.    Yes.

17      Q.    Okay, are there other websites on which you

18  advertise your services as a hired economic expert?

19      A.    Not that I'm aware of.  Let's see.  Yeah, not

20  that I'm aware of, no.

21      Q.    Okay, and can tell me when you were first

22  contacted regarding this litigation, roughly?

23      A.    Sometime in 2019, before May 24th.

24      Q.    Okay, can you give me an estimate?

25      A.    We had talked earlier and I just don't know
```

1  exactly, but sometime in 2019.

2      Q.    It was in 2019?  Okay.  You're a principal in a

3  litigation consulting firm, right?

4      A.    Correct.

5      Q.    Called Litigation Economics, LLC?

6      A.    Right.

7      Q.    Okay, and you've been with Litigation Economics

8  for over 15 years?

9      A.    Gosh, that long?  Okay.

10     Q.    Since 2005?

11     A.    Yeah, sounds like it's about right.

12     Q.    Okay, can you turn back to Exhibit 1, Page 23,

13 please?  Is your professional experience as a litigation

14 consultant, as a paid litigation consultant, reflected on

15 your resume that you attached to this report?

16     A.    No, it's not.

17     Q.    Okay, all right.

18      MS. LEONARD:  Number 9.

19          (Thereupon, Macpherson Exhibit 9 was marked for

20 identification.)

21 BY MS. LEONARD:

22      Q.    Can you take a look at what's been marked as

23 Exhibit 9 and let me know if you recognize this?

24     A.    Yes.

25     Q.    Okay, this is the website for Litigation

David Macpherson - 9/27/2019

124

 1  Economics, LLC?

 2      A.    Yes.

 3      Q.    Okay, and then you are listed there as a

 4  principal?

 5      A.    Yes.

 6      Q.    Okay, and it has a button for downloading your

 7  CV?

 8      A.    Yes.

 9            MS. LEONARD:  Okay, Number 10.  One more.  One

10       more.

11            (Thereupon, Macpherson Exhibit 10 was marked for

12  identification.)

13  BY MS. LEONARD:

14      Q.    Okay, do you recognize Number 10?

15      A.    Yeah, I remember doing -- oh, 2017, yes.

16      Q.    Okay, and if I represent that if you click the

17  button on the Litigation Economics website that says

18  download CV, that this is the document that it links to,

19  would that sound right?

20      A.    Yes.

21      Q.    Okay, and this CV does list your professional

22  experience as a litigation consultant at Litigation

23  Economics, correct?

24      A.    Correct.

25      Q.    Okay, so when you testified earlier that your

1  resume attached to the report accurately reflected your

2  professional experience, it did not include your

3  professional experience as a paid litigation consultant for

4  over 15 years, correct?

5       A.   Correct.  It was my academic CV.

6       Q.   You have worked a very wide range of cases as a

7  paid expert witness, right?

8       A.   Yes.

9       Q.   Okay, and as you previously testified, you

10 believe it was over 100 cases?

11      A.   Yes.

12      Q.   Okay, and the CV that you attached to your expert

13 report, lists on Page -- starting on Page 45, your

14 deposition and trial testimony, correct?

15      A.   Correct.

16      Q.   But this does not list -- sorry, from 2012 to

17 2019?

18      A.   Correct.

19      Q.   So this doesn't list deposition and trial

20 testimony prior to 2012?

21      A.   Correct.

22      Q.   And it also doesn't list every case that you've

23 participated as an expert, correct?

24      A.   Yes.  I don't keep track of the cases I've

25 testified in.  I mean, not testified in.

1    Q.    That you've prepared an expert report or provided

2    other services, but didn't have a deposition or trial

3    testimony?

4    A.    Correct.

5    Q.    Okay, can you tell me what percentage of your

6    income last year came from being an expert hired for

7    litigation?

8    A.    Last year was higher than average.  Typically,

9    it's about 20 percent.  Last year, it was probably a third,

10   I'm thinking.  I'm not sure exactly but something like that.

11   Q.    Okay, and you've anticipated my next question.

12   In the past five years, what percentage of your income comes

13   from being a hired expert?

14   A.    I'd say 20.

15   Q.    Okay, and that's been typical for how long?

16   A.    Well, it's probably at least five years.  It's

17   probably less 10 years ago than five years ago.

18   Q.    Does most of the work come through Litigation

19   Economics or through your online advertising?

20   A.    Most of it's referral.

21   Q.    What do you mean by that?

22   A.    Other attorneys recommending me.

23   Q.    Do you know if that's how you came to be the

24   expert in this case?

25   A.    I don't know.

1      Q.      Okay, have any of your expert opinions ever been
2    rejected by a court as inadmissible?
3      A.      In 2005, with Stan Stevenson, we turned a
4    preliminary report in federal court and it was a multi-
5    plaintiff case and on the first plaintiff we were relying on
6    another expert's analysis that wasn't included.  So we were
7    -- put a preliminary report in saying we needed the data.
8    We were not allowed to do a preliminary report.  The next
9    plaintiff, we were let in.
10      Q.      Okay.  What was that case?
11      A.      Alvarado vs. FedEx.
12      Q.      And who are you -- what side were you on?
13      A.      Oh, the plaintiff.
14      Q.      It was in federal court?
15      A.      Yeah.
16      Q.      In which federal court?
17      A.      California.
18      Q.      Do you remember which district?
19      A.      No.
20      Q.      Did you remember which city?
21      A.      San Francisco.
22      Q.      The Northern District.
23      A.      There you go.
24      Q.      My hometown.  Okay, one of your reports in that
25    case, there was a subsequent report that was admitted?

David Macpherson - 9/27/2019

128

1    A.    Subsequent plaintiff.  There was a whole bunch of

2 plaintiffs and they were all done individually and it was

3 the first plaintiff that we were excluded.

4    Q.    And have any of your expert opinions ever been

5 rejected by any other court as inadmissible?

6    A.    There was one other one.  I did a report, it was

7 a promotion case involving Atlanta firefighters or, yeah, it

8 was firefighters.  And the facts of the case had changed

9 right before the trial and so the judge, without even the

10 defense asking, excluded my testimony.  It was a disparate

11 treatment and a disparate impact case.  They dropped the

12 disparate impact part of the case right at the pretrial,

13 whatever.  And my analysis didn't account for disparate

14 treatment.

15    Q.    That was the Martin case, right?

16    A.    Yeah.

17    Q.    In fact, the judge excluded your opinion because

18 you didn't control for all the relevant variables, right?

19    A.    Right, given that it was a treat -- it was a --

20 the way the attorneys explained it to me, because it was a

21 treatment case rather than an impact.

22    Q.    Have you read the opinion by the court?

23    A.    I think a long time ago I did.  It was 2013,

24 2014, something like that.

25           MS. LEONARD:  Okay, Number 11.

1          (Thereupon, Macpherson's Exhibit 11 was marked

2  for identification.)

3          THE WITNESS:  Yes.

4  BY MS. LEONARD:

5      Q.    And you don't have to read the whole document.

6  I'm just going to ask you general questions.  Martin v. City

7  of Atlanta; is that the case you were talking about?

8      A.    Yes.

9      Q.    Okay, and on the first page here, there's a

10 reference to Dr. David Macpherson.

11     A.    Right.

12     Q.    The same name as, spelling as yours.  You are the

13 Dr.  David Macpherson this is referring to?

14     A.    Correct.

15     Q.    Okay, all right.  Other than the Martin case and

16 the Alvarado case, has any other court, federal or state,

17 redacted your expert testimony as inadmissible?

18     A.    No.

19          MS. LEONARD:  Okay, one more Exhibit 12.

20          (Thereupon, Macpherson's Exhibit 12 was marked

21 for identification.)

22          THE WITNESS:  Thanks.

23 BY MS. LEONARD:

24     Q.    Okay, can you take a look at what's been marked

25 as Exhibit 12?

David Macpherson - 9/27/2019

130

1      A.     Yes.

2      Q.     And do you recognize this?

3      A.     Yes.

4      Q.     Is this a document that you generated?

5      A.     Yes.

6      Q.     Okay, is it a invoice or a billing statement for

7  the work done in Hoekman?

8      A.     Yes.

9      Q.     Is this a complete and accurate statement of all

10 the work done up until preparation for this deposition?

11     A.     No.

12     Q.     What is not on this invoice?

13     A.     Preparation for the time I did preparing for this

14 deposition.

15     Q.     Okay, up until that point in time?

16     A.     Yeah.

17     Q.     Everything before that, for the Hoekman case, is

18 reflected on this --

19     A.     Yes.

20     Q.     Invoice?  Okay, and the time for the Prokes case

21 is not reflected on this invoice, correct?

22     A.     Correct.

23     Q.     And the time for the Littler case is not

24 reflected on this invoice, correct?

25     A.     Correct.

David Macpherson - 9/27/2019

131

1    Q.    Okay.

2    A.    They have their separate invoices.

3    Q.    And to your knowledge, the dates and amounts are

4    accurate?

5    A.    Yes.

6    Q.    Okay, okay.  All right, I will talk to my

7    colleagues for two minutes and see what else we have right

8    at this point.  But, otherwise, we might be ready for lunch.

9          COURT REPORTER:  Off the record; the time is

10        12:16.

11         COURT REPORTER:  We're back on the record, 12:20.

12         MS. LEONARD:  I just have two final exhibits that

13        I want to confirm are the sources that you were citing

14        in your report.  So we can mark this one as 13 and 14,

15        please.

16         (Thereupon, Macpherson's Exhibits 13 and 14 were

17    marked for identification.)

18         THE WITNESS:  Thanks.

19    BY MS. LEONARD:

20    Q.    13 is the Bloomberg.

21    A.    Okay.  Oh yeah, I remember that.  Yep.

22    Q.    Okay.  All right.  If you could take a quick look

23    at Exhibit 13, Dr. MacPhearson?  Is this one of the articles

24    that you were relying on in your report?

25    A.    Yes.

David Macpherson - 9/27/2019

132

1    Q.    Okay.  You can set that aside.  And Exhibit 14,

2  this I will represent is something that was printed from the

3  www.unionstats.com website.  Does this look familiar?

4    A.    Yes, it does.

5    Q.    Okay, and this is information that appears when

6  you open up that website?

7    A.    Yes.

8    Q.    Okay.

9          MS. LEONARD:  And with that, I have no further

10         questions for this portion, so we can take a break for

11         lunch and return with the rest.

12         COURT REPORTER:  Off the record at 12:41.

13      We're back on the record, and the time is 1:32.

14                    DIRECT EXAMINATION

15  BY MR. DAYAN

16    Q.    Okay.

17    A.    Okay.

18    Q.    Good afternoon, Dr.  Macpherson.

19    A.    Good afternoon.  I'm just turning off my

20  computer.

21    Q.    Sure.

22    A.    Go ahead.  I can listen.

23    Q.    Okay, so we're continuing this deposition, and I

24  am the attorney who is representing the defendants in the

25  Prokes case, and we'll just get started.  I won't repeat all

1   of the preliminaries that Ms. Leonard covered so thoroughly,

2   okay?

3       A.   Yes.

4       Q.   So, let me start with having your report in the

5   Prokes case marked as an exhibit.

6           COURT REPORTER:  And we're at 15.

7           MR. DAYAN:  Yeah, I think we're at 15.  Yeah, so

8   that'll be Exhibit 15.

9           (Thereupon, Macpherson's Exhibit 15 was marked

10  for identification.)

11  BY MR. DAYAN:

12      Q.   Here you go.  Thanks.  So, my first question is

13  as you're leafing through it, this is your report in the

14  Prokes case, correct?

15      A.   Correct.

16      Q.   All right.  And I'm going to ask you some

17  questions about this report similar to the ones that Ms.

18  Leonard asked about the Hoekman report.  My first question

19  is this report contains all of the opinions that you're

20  offering in the Prokes case, correct?

21      A.   Yes.

22      Q.   And there's no opinion that you intend to offer

23  that you left out of the report, correct?

24      A.   Yes.

25      Q.   And you haven't been asked to offer any opinions

1   in support of class certification in Prokes other than

2   what's presented in Exhibit 15, correct?

3       A.   Yes.

4       Q.   And you're not intending to offer any opinions in

5   support of class certification in Prokes other than what's

6   presented in Exhibit 15, correct?

7       A.   Yes.

8       Q.   And you've set forth all of the bases for your

9   opinions in this report; is that right?

10      A.   Yes, subject to the things that I mentioned in

11  the previous deposition.  We talked about trends in the

12  union membership in Michigan versus the rest of the country.

13      Q.   Um-hmm (affirmative).

14      A.   That kind of thing.

15      Q.   Okay.  But other than that, there's nothing that

16  you're intending to add beyond what you've testified to in

17  regard to the corresponding report in Hoekman?

18      A.   Yes.

19      Q.   Okay.  And the opinions you're offering in the

20  Prokes case are based on your academic and professional

21  training as an economist; is that correct?

22      A.   Yes.

23      Q.   All right.  And if you turn to Page 2, you state,

24  "I was asked to analyze whether this case meets the

25  requirements for class action qualification," correct?

David Macpherson - 9/27/2019

135

1     A.    Yes.

2     Q.    And that's an accurate statement of the scope of

3  the opinions that you were asked to provide?

4     A.    Yes.

5     Q.    And then it states as in the other report that

6  section five sets forth your opinions?

7     A.    Yes.

8     Q.    And that the sources again are in section three,

9  correct?

10     A.    Yes.

11     Q.    All right.  And then we'll also look at -- let's

12  look at Page 4 of this report.  Is that the list of your

13  sources that you relied on in preparing the report in the

14  Prokes case?

15     A.    Yes.

16     Q.    And there are no other sources other than the

17  ones bullet pointed here?

18     A.    Yes.

19     Q.    And I'll ask another similar question to one you

20  had before, which is which sources came from counsel and

21  which did you develop on your own?

22     A.    The I-A-F-O-L-L-A and the unionstats I developed;

23  all the rest were from counsel.

24     Q.    Okay.  And as with the other report, you had no

25  staff helping you with this report; is that correct?

```
 1        A.    Yes.

 2        Q.    And you drafted this report yourself; is that

 3   correct?

 4        A.    Yes.

 5        Q.    With no assistance from any third party?

 6        A.    Yes.

 7        Q.    And did you perform any analysis or calculations

 8   as part of being an expert in this case that you left out of

 9   this report?

10        A.    No.

11        Q.    All right.  And Ms. Leonard asked you a series of

12   questions about whether the opinions in this report are ones

13   that you have worked up outside of this litigation as part

14   of your effort to write academic articles or do other sorts

15   of research studies.  Do you recall those questions?

16        A.    Yes.

17        Q.    Are your answers the same for this case as for

18   that case?

19        A.    Yes.

20        Q.    All right.  Now let's take a look at Page 6 of

21   Exhibit 15, which is the Prokes report.  And I'm now in the

22   opinions section; are you with me?

23        A.    Yes.

24        Q.    And on that page you state or describe your

25   understanding of four groups of public employees that you
```

David Macpherson - 9/27/2019

137

1    understand plaintiffs intend to include within their

2    proposed class; is that right?

3        A.    That is correct.

4        Q.    All right.  Let's talk about group one for a

5    minute.  Group one is described as, "Non-members of AFSCME

6    Council 5 who are compelled to pay fair share fees to the

7    union."  Do you see that?

8        A.    Yes.

9        Q.    Have you communicated with anyone who was

10   represented by AFSCME Council 5 prior to the Janus decision

11   but who was not a union member?

12       A.    I talked to Mr. Piekarski.  I think he might fit

13   that definition.

14       Q.    Mr. Piekarski?  Wasn't he a union member before

15   Janus?

16       A.    Yes, but then I think he quit.

17       Q.    So, your understanding is that he would count as

18   a non-member prior to Janus?

19       A.    Yeah, I think he resigned his membership if I

20   recall correctly.

21       Q.    And Mr. Piekarski is the only person you spoke

22   to?

23       A.    Yes.

24       Q.    We'll come back to your conversation with Mr.

25   Piekarski.  But let me ask you this, did you discuss with

```
 1  Mr. Piekarski in your conversation with him his reasons for
 2  resigning from the union?
 3       A.   No, I don't recall that.
 4       Q.   So, you didn't discuss with him his thought
 5  process pre-Janus as to why he initially was a member, then
 6  was even an officer, and then resigned his officer position,
 7  and then tendered his resignation?
 8       A.   No, we didn't talk about that.
 9       Q.   Oh, okay.  All right.  And so I asked you if you
10  had spoken to anyone other than Mr. Piekarski from AFSCME
11  Council 5 and the answer is no; is that correct?
12       A.   Correct.
13       Q.   Okay.  Have you done any research as to the
14  attitudes of individuals represented by AFSCME Council 5 who
15  were not union members before Janus?
16       A.   No.
17       Q.   And you haven't done any research into the
18  reasons why those individuals were non-members rather than
19  members before Janus?
20       A.   No.
21       Q.   Group two is described as employees who opposed
22  payments to the union but who reluctantly joined because
23  they decided that the difference between the cost of full
24  membership dues and the mandatory fair share fees would not
25  have been worth the loss of their voice in voting collective
```

1   bargaining matters.  Do you see that?

2      A.    Yes.

3      Q.    And is it your understanding that the people who

4   fall within this group are those who the plaintiff claims

5   would not have joined the union if there were no fair share

6   fee?  In other words --

7      A.    Yeah.

8      Q.    Is that the flip side of that?  Is it your

9   understanding that the people who fall within this group are

10   those who the plaintiff claims would not have joined the

11   union before Janus if there had been no fair share fee

12   requirement?

13      A.    Say that one again.

14      Q.    Yeah, sure.  Group two is employees who opposed

15   payments but who reluctantly joined, because they decided

16   that the difference between the cost of full membership dues

17   and the mandatory fair share fees would not have been worth

18   the loss of their voice in voting collective bargaining.

19      A.    Yes, that's clear to me.  Yes.

20      Q.    Right.  Okay.  Have you spoken to anyone who fits

21   into that category?

22      A.    I haven't spoken to anybody other than Mr.

23   Piekarski.

24      Q.    Right.  Mr. Piekarski testified that he does not

25   fit into that category, correct?

1    A.    I think in this testimony, yeah, I don't recall

2  him fitting that one.

3    Q.    Okay.  And have you done any research or study

4  into the attitudes of individuals in that group, meaning

5  pre-Janus members, but I'll call them reluctant members for

6  the reasons stated in the description of group two?

7    A.    No, other than the numbers that are cited on Page

8  9 where I talk about the number of people who got withdrawal

9  requests from the members.  From the numbers that are

10  provided, you can't distinguish between two or three, but we

11  can tell the number of people who did want to withdraw was

12  nontrivial.

13    Q.    Who expressed their desire to withdraw after

14  Janus was decided.

15    A.    Correct.

16    Q.    All right.  Let's just take a hypothetical

17  member, A.  If member A's reason for joining pre-Janus was

18  that the difference between the cost of full membership and

19  the fair share fee was not worth the loss of the membership

20  rights, would you expect person A then to resign after

21  Janus?

22    A.    If they're aware of Janus and all that, I think

23  they would resign.

24    Q.    Okay.  Now let's talk about group three.  You

25  described group three as employees who opposed payments to

1  the union but who joined because they were never informed of

2  their constitutional right to decline union membership and

3  pay a reduced amount in fair share fees.  Is it your

4  understanding that this group includes those who are not

5  informed that they had two choices?  Or does it also include

6  those who may have been informed that they had two choices

7  but they weren't told that it was a constitutional right?  I

8  just want to understand what your understanding of group

9  three is.

10      A.    There would be both, right?

11      Q.    It would include people who may not have known --

12  well, let me try it this way, suppose someone pre-Janus knew

13  they had two choices, agency fee payer or member, but they

14  got that information from someone other than the union, from

15  their general knowledge of the rights of public employees,

16  or from a coworker.  That person would not be in a group

17  three?  I just want to make sure I'm understanding.

18      A.    Let me think.  I'm not a legal expert, so here

19  I'm quoting from the complaint, and I think it might be

20  drawing a legal conclusion.  Exactly.

21      Q.    I just want to get your understanding.

22      A.    Yeah.

23      Q.    I won't hold your answer to bind the lawyers in

24  the case.  I just want to make sure I understand what you

25  thought you were analyzing here, so I'll just give an

1  example.  Member learns from another employee -- an employee

2  learns from a fellow employee just at the water cooler that

3  you do not need to be a member.  And, in fact, that other

4  employee may be a non-member and say to him, "I'm not a

5  member, and I have less deducted out of my paycheck than you

6  do."  A person like that is not in group three, correct?

7      A.    Yeah, I guess it depends on constitutional right,

8  exact definition of that.  I'd be inclined to agree, with

9  the exception that they may not have an accurate

10  understanding of their rights.  I mean, the workers could be

11  giving them incorrect information.

12      Q.    Right, but an employee who realizes that

13  membership in the union is voluntary and that there's

14  another option, which is agency fee pay or at a reduced

15  rate, that person who realizes that from whatever source is

16  not someone you consider a group three class member,

17  correct?

18      A.    Yeah, I would -- yeah, I guess I'm inclined to

19  agree.

20      Q.    Okay.  Now, have you communicated with anyone who

21  would fit the description of group three?

22      A.    No.

23      Q.    And do you know what percentage of employees

24  represented by AFSCME Council 5 before Janus were non-member

25  fair share fee payers?

1      A.     There was 7,641 were agency fee payers out of

2   39,715.

3      Q.     So, that's just shy of 20 percent, is that

4   roughly correct?

5      A.     Yes.

6      Q.     All right.  So, at least 20 percent must have

7   realized that they could be non-members, correct?

8      A.     Yes.

9      Q.     Now, with respect to group four on Page 7 of the

10  Prokes report, Exhibit 15, you describe your understanding

11  of group four as any other public employee who is offered

12  membership in AFSCME Council 5 while working in an agency

13  shop.  You see that?

14     A.     Yep.

15     Q.     Okay.  Let me give you another hypothetical just

16  to see if we're on the same page about what these groups

17  mean.  So, suppose employee X was hired by a government

18  agency in a Council 5 represented unit, but missed the union

19  orientation and was never given a membership application to

20  fill out, and so never joined the union.  Is that person

21  within the class definition?

22     A.     Turns of what you mean by offered membership.

23     Q.     Yeah, I'm trying to get your understanding.

24     A.     Yeah.

25     Q.     If the person was never approached by the union

1  for whatever reason, they were hired, the union never

2  contacted them, never gave them a card and a membership

3  authorization card, that person would not be in group four.

4  Is that fair to say?

5      A.    If they had no information about it, they had no

6  way -- if they had received no information about membership,

7  it would be hard to be offered if you've got no information.

8      Q.    All right, if they weren't given a membership

9  application to sign?

10     A.    Yes.

11     Q.    Or if they weren't --

12     A.    Yeah.

13     Q.    Okay.  All right, so now let's turn to Page 9 at

14  Exhibit 15.  And in this section you're offering your

15  opinion about the number of individuals in each of the

16  groups, is that correct?

17     A.    Yes.

18     Q.    And those opinions start on Page 9 and end at the

19  end of Page 11, is that correct?

20     A.    Yes.

21     Q.    And the bases for these opinions are set forth in

22  this section of the report, correct?

23     A.    Yes.

24     Q.    Now, immediately under that block quotation from

25  Judge Nelson, you provide numbers of employees and agency

1  fee payers represented by Council 5, correct?

2       A.    Yes.

3       Q.    And that information came from data provided by

4  the union in discovering this case, is that right?

5       A.    Yes.

6       Q.    And you didn't perform any economic or

7  statistical analysis to develop those numbers, correct?

8       A.    No, they were provided by the union.

9       Q.    Oh.  Forgive me if Ms. Leonard asked a question

10 that was broad enough to encompass this, I'll ask it anyway.

11 You didn't evaluate data regarding Minnesota public workers

12 to determine the likelihood that a, "Significant percentage

13 of union members would resign post-Janus," correct?

14      A.    No.

15      Q.    In other words, the no is you didn't do that?

16      A.    Correct.

17      Q.    Okay.  All right.  On Page 12 of the report under

18 the heading of commonality, if you sort of look a couple

19 lines below the block quote --

20      A.    Yes.

21      Q.    -- you state, "Many of those public employees

22 were constrained in their choice by two different but not

23 dissimilar options.  The first of those options was the

24 erroneous belief that they had to join the union or cease to

25 be a public employee.  The second of these options was the

1  factually correct but legally inaccurate, based on Janus,

2  choice between joining the union or paying an agency fee.

3  Under the principles of economics, neither of these choices

4  was a free choice." Do you see that?

5       A.    Yes.

6       Q.    Okay.  I want to explore what you mean by this.

7  Are you familiar with the practice of some employers who

8  require new hires to agree to binding arbitration of their

9  employment disputes?

10      A.    I'm not very familiar with that, but vaguely.

11      Q.    You've heard of mandatory arbitration clauses in

12 private employment agreements?

13      A.    Possibly.

14      Q.    Or is it your understanding that those kinds of

15 clauses involve the person waiving their right to a jury

16 trial?

17      A.    Because the mandatory arbitration implies, yes.

18      Q.    Okay.  Okay.  Are you familiar with the practice

19 in private employment of an employee -- excuse me, of an

20 employer presenting a new hire with a document that might

21 have a number of different terms separate from mandatory

22 arbitration, maybe a non-compete clause or a promise not to

23 disparage the company.  Are you familiar with that kind of

24 thing happening?

25      A.    I've heard of that, yes.

1      Q.    All right.  We can go with either one.  Let's go

2  back to the mandatory arbitration clause example.  Is there

3  a consensus among economists that clauses like that do not

4  reflect free choice?

5      A.    I don't know about the mandatory arbitration, but

6  I have heard certainly criticisms of these non-compete

7  clauses.  I know there's been research done on that and

8  arguing that gives too much power to employees.  I don't

9  know as much about mandatory arbitration.

10     Q.    Yeah.  Let's focus on not the economic effects of

11 them, but just on the free choice question.  Let me ask you

12 your own view.  Is it your understanding that someone who

13 signs a document upon being hired by an employee whereby

14 they agree to binding arbitration of employment disputes is

15 not exercising a free choice?

16     A.    I mean, it's not a free choice to take that

17 either.  You accept that or you don't be a worker for the

18 firm.  It's basically you can't opt out of that mandatory

19 arbitration, because that's the condition of employment.

20     Q.    So, in your view that's not a free choice.

21     A.    Well, my guess is a lot of people would not want

22 to have these non-compete clauses or these other features of

23 a job if they could not.

24     Q.    Right.  So, let me ask, let me just stick with

25 the arbitration example --

148

1    A.    The one I know the least about.

2    Q.    Yeah.  But do you consider that a free choice?
3  Does the person who signs that have a free choice in signing
4  it, in your view?

5    A.    Not really.  It's either in a sense other than
6  not working for the form, that's the choice.  Either you
7  take the mandatory arbitration or you don't work for the
8  firm.

9    Q.    Right.

10   A.    I mean, that's what I'm alluding to here.  I'm
11 saying either they had the erroneous belief they had to join
12 the union or cease to be a public employee, and so in the
13 mandatory arbitration I'd make the same analogy, you take
14 the mandatory arbitration or you work somewhere else.

15   Q.    And is there a consensus among economists that
16 that should not be considered a free choice in our economic
17 system?

18   A.    Again, I don't know as much about mandatory
19 retirement.  I know there's controversy over these non-
20 complete causes amongst economists.

21   Q.    Right, and is the controversy there that they're
22 bad for the economy and bad for competition, or is the
23 analysis there that the individual person is not making a
24 free and voluntary choice?

25   A.    I think on the non-competes, I would say there is

1  certainly arguments it's not good for the economy in the

2  sense that it restricts the ability of workers to switch

3  firms.  It's not good for the workers, because it gives

4  extra bargaining power to the firm relative to the worker.

5  And it's implicitly not a free choice for the worker,

6  because they would maybe like to go work for a different

7  firm, but they can't because of the non-compete, so there is

8  definitely -- I know in the non-competes it's even come down

9  to hairstylists having non-compete clauses, and it's

10 definitely controversial.

11       Q.    All right.

12       A.    I think there's some legislation maybe even in

13 California trying to ban them.

14       Q.    Right.  So, your understanding is that without a

15 ban they are common and enforceable in the economy.

16       A.    I know they've been subject to litigation, and I

17 don't know how enforceable they are in some cases.

18       Q.    And what about mandatory arbitration clauses?

19       A.    I don't know that much about mandatory

20 arbitration clauses.

21       Q.    You don't know whether they're enforceable or

22 not?

23       A.    Again, I don't know much, period, about them.

24       Q.    So, I'll just ask this one more time, it's

25 interesting to hear your views on this, is there a consensus

1   among economists that employees who enter into mandatory

2   arbitration clauses are not making a free choice?

3       A.    I mean, there is a choice, it's either you work

4   for the employer with this arbitration agreement or you work

5   somewhere else.  That's the choice.  You can't really opt

6   out of mandatory retirement or not.  Mandatory arbitration.

7       Q.    Right.  So, you would agree with me then that

8   it's ultimately a question of law as to whether to treat

9   those contracts as involuntary and unenforceable or as

10  voluntary and enforceable, correct?

11          MR. FRANKLIN:  Objection.

12      Q.    Ultimately, all these legal --- excuse -- are

13  subject to the court, right?  Employment, mandatory

14  arbitration, subject to court decision presumably as well.

15  I know non-competes are, for sure.  And economists don't

16  answer the question, whether agreements like that are

17  voluntary.  That's a legal question, correct?

18      A.    Yeah.  I mean -- voluntary.  These non-competes

19  are -- I don't know all that literature very well, but I'm

20  familiar with some of it, and there's certainly debate about

21  it.  That is certain about how harmful they are.

22      Q.    How harmful they are, but not about whether

23  they're voluntary or involuntary.

24      A.    I'd have to look at the papers more in detail.

25      Q.    Okay.  What about something as simple as the wage

1   rate?  The employer says, "You're hired, you'll be paid $20

2   an hour."  Is the person who accepts that wage rate making a

3   voluntary choice in your view?

4       A.    Yes.

5       Q.    Even if the employer says, "Take it or leave it,

6   it's non-negotiable; that's our starting salary?"

7       A.    Just like it is in a mandatory arbitration,

8   either you take it or you leave it.

9       Q.    Okay.

10      A.    And that's the issue.

11      Q.    All right.  Turn to Page 11 of Exhibit 15.  I

12  want to ask you just a few questions about this NEA report.

13      A.    Yes.

14      Q.    You haven't seen the NEA report itself, correct?

15  You're describing an article that in turn describes the NEA

16  report, is that right?

17      A.    Yes.

18      Q.    All right.  So, as characterized by the article,

19  is the chart that you included on Page 11 a snapshot of NEA

20  members' attitudes as of the time of that study?

21      A.    Yes.

22      Q.    And you don't know how many people returned NEA's

23  questionnaire or answered their survey, correct?

24      A.    Correct.

25      Q.    You don't know what the response rate was?

David Macpherson - 9/27/2019

152

1      A.    I do not.

2      Q.    You don't know what the margin of error was in

3  that survey?

4      A.    No.

5      Q.    And you don't know about any other aspects of

6  that survey that would bear on its quality as a survey?

7      A.    Correct.

8      Q.    Now, even on the survey is characterized in this

9  article, if a union different from NEA spent more of its

10  resources on having its union reps and staff people get out

11  among the members and the employees to help them with their

12  problems, speak about the union, whatever, the outcome of

13  the survey could differ, correct?

14      A.    Yes.

15      Q.    And you don't know whether AFSCME, either as a

16  national union or more importantly AFSCME Council 5 has its

17  reps spend more or less time with its members than NEA reps

18  were spending with their members during the period relevant

19  to this survey?

20      A.    Yes.

21      Q.    You don't know the difference?

22      A.    I don't know all the difference, right.

23      Q.    Now, does the NEA study as characterized in

24  Exhibit 5, which is the article that Ms. Leonard questioned

25  you about --

1    A.    Yeah.

2    Q.    If you want to take a look at that, just take a

3  moment.  So, Exhibit 5 is the article that describes the NEA

4  study, correct?

5    A.    Correct.

6    Q.    All right.  So, does the NEA study as

7  characterized by Exhibit 5 say one way or another whether

8  even someone who would not want to pay would want others not

9  to pay?

10    A.    That question wasn't asked.

11    Q.    So, there could be people who think the union is

12  worth it but won't pay because they know that other people

13  will ultimately pay.

14    A.    It's possible.

15    Q.    All right, and that's part of a free rider

16  problem, right?  Which is there's a little bit of a game

17  theory aspect to it, which is if you think the service is

18  worth it and you don't want the service to end but you also

19  think that not enough people will withhold payment, you can

20  withhold payment and have that free ride.  You can have the

21  service and not pay for it, correct?

22    A.    That's possible.

23    Q.    Okay.  All right.  I want to ask you a few

24  questions about we talked a little bit earlier that you

25  spoke to Mr. Piekarski.

1    A.    Yes.

2    Q.    Did you have one conversation, more than one with

3  him?

4    A.    One.

5    Q.    And was it in person, over the phone?

6    A.    Over the phone.

7    Q.    And approximately when did that conversation take

8  place?

9    A.    Very close to when I wrote the report.

10   Q.    Would it have been after his deposition had been

11 taken in the case?

12   A.    Yes.

13   Q.    Okay.  And was anyone on the phone call other

14 than you and Mr. Piekarski?

15   A.    I was talking with him, but Mr. Franklin was next

16 to me.

17   Q.    Okay.  Did you take notes of the conversation?

18   A.    No.

19   Q.    Did anyone else take notes?

20   A.    No.

21   Q.    What was the impetus for that conversation?

22   A.    To find out how he felt about the fee arrangement

23 for the case.

24   Q.    So, was it your understanding that before that

25 call he didn't know what the fee arrangement was?

1    A.    No, I just wanted to make sure that he understood

2  the fee arrangement that was taking place, including

3  Mitchell Law and that of Talcott Franklin.

4    Q.    Was it your understanding that he didn't know

5  about those fee arrangements before your call?

6    A.    I got the impression he understood it before my

7  call, because I always ask him did he understand it.

8    Q.    Had you already read his deposition transcript as

9  of the time of that call?

10   A.    Yes.

11   Q.    And in his deposition, he said he didn't

12  understand the fee arrangements, correct?

13   A.    That's my recollection.

14   Q.    Okay, so between your understanding or your

15  perception is that between the time of the deposition and

16  the time of your call, he had learned more about the fee

17  arrangement?

18   A.    Yes.

19   Q.    And what information did you think you needed

20  from Mr. Piekarski?

21   A.    To understand whether he understood the fee

22  arrangement.

23   Q.    All right.  And I take it you're not an expert on

24  sort of consumer, for lack of a better word, knowledge of

25  attorney fee arrangements, correct?

David Macpherson - 9/27/2019

156

1      A.    Correct.  I know general outlines.

2      Q.    How long was the conversation approximately?

3      A.    Several minutes.

4      Q.    All right.  And who arranged the conversation?

5      A.    Mr. Franklin.

6      Q.    All right.  Why don't you just walk me through

7   your conversation with Mr. Piekarski and tell me everything

8   you recall about it?

9      A.    I just asked him what I just said, was, "Do you

10  understand the fee arrangements?"  And he answered yes.

11     Q.    Did you go through them point by point?

12     A.    No.

13     Q.    No.  Did you bring up the issue of Juris Capital

14  with him?

15     A.    I can't remember.  It wasn't a long call.

16     Q.    All right.  Did you bring up the agreement

17  between the Mitchell Law firm and the Talcott Franklin firm?

18     A.    No, he understood that Mitchell Law was receiving

19  funding and that Talcott Franklin was not.

20     Q.    What's your understanding as to how Talcott

21  Franklin is being paid in this case?

22     A.    I've got to make sure I get -- it varies across

23  cases, so I've got to refresh my memory.  He's getting one-

24  third of the recovery, because it varies across the

25  different cases.

1    Q.    I see.  And did you explain that to him in the

2    call, or did you just ask him if he knew what it was?

3    A.    I can't recall exactly all the components of the

4    call other than we talked about the general fee

5    arrangements.

6    Q.    And you don't remember whether you sort of walked

7    him through those one by one or not?

8    A.    I didn't go in detail, I remember that.

9    Q.    Did you ask him when or how he learned about the

10   fee arrangements between the time of his deposition and the

11   time of your call?

12   A.    No.

13   Q.    Is your understanding about the fee arrangements

14   between Mitchell Law and Juris Capital and then between

15   Talcott Franklin, P.C.  and Mitchell Law, does that all come

16   from the lawyers?

17   A.    I also looked at one of the fee arrangements, the

18   loan that Mitchell Law was getting from Juris Capital.

19   Q.    Okay.

20   A.    It's basically a loan.

21   Q.    So, that's the one kind of document you looked

22   at?

23   A.    I definitely looked at that, yeah.

24   Q.    And did you look at any other documents that

25   documented the various fee arrangements?

1    A.    I don't recall which ones I looked at.  I

2  remember spending more time looking at the Juris Capital one

3  with Mitchell Law.

4    Q.    All right, so you don't recall whether you looked

5  at the underlying retainer agreement that Mr. Piekarski may

6  have signed?

7    A.    No, I didn't look at that.  I don't remember

8  looking at that at all.

9    Q.    Or any agreement running just between the two law

10 firms, Mitchell Law and Talcott Franklin, P.C.

11   A.    I think I did between Talcott Franklin and

12 Mitchell Law, yeah.  I think I remember, yeah.  Yeah, I

13 remember looking at that.

14   Q.    Would that be the source for Talcott Franklin

15 P.C.  looking to recover one-third of the recovery if the

16 case were successful?

17   A.    Yes.

18   Q.    You say on Page 15 of your report, which is

19 Exhibit 15, that you believe that Mr. Piekarski understands

20 the fee arrangements for counsel as well as the lawsuit

21 itself.  Did you speak to Mr. Piekarski about the lawsuit

22 itself in that conversation, or just the fee arrangement?

23   A.    It was mostly, if not all -- I can't remember if

24 we talked about the lawsuit itself.  I know most of the time

25 it was on the fee arrangements.

1    Q.    All right.  And speaking about the lawsuit

2    itself,

3    did --

4    A.    Oh, actually we did talk a little bit about it,

5    sorry.

6    Q.    About the lawsuit?

7    A.    Yeah, just how he was really wanted to pursue the

8    lawsuit and wanted to represent the class.

9    Q.    Did you discuss with him his understanding of the

10   different possible remedies in the lawsuit?

11   A.    No, I don't think we did.

12   Q.    All right.  And had you read his deposition in

13   advance of that phone call?

14   A.    Yes.

15   Q.    Did you go through his deposition with him and

16   ask him to clarify or whether he wanted to amend anything he

17   said in that deposition?

18   A.    No.

19   Q.    And did Mr. Piekarski say anything to you that

20   showed an understanding of the case different from what he

21   testified he understood about the case in his deposition?

22   A.    I don't think so.

23   Q.    Going back to Page 15 of Exhibit 15.

24   A.    Yes.

25   Q.    You say here that Mr. Piekarski refused the

1  settlement offer because he wanted to represent the class.
2  Is that something you discussed with him during your phone
3  call?
4        A.    I think I got that from the deposition.
5        Q.    Do you have any independent knowledge that there
6  was a settlement offer conveyed to Mr. Piekarski?
7        A.    No.
8        Q.    Now, I think you cite -- there's a footnote
9  citing through those deposition Pages 82 to 83, do you see
10 that --
11       A.    Oh, yes.
12       Q.    -- 14?
13       A.    Yeah.  I do.  Should have looked there first.
14       Q.    Okay.  Now, Mr. Piekarski testified that he
15 received a check refunding his dues --
16       A.    Yes.
17       Q.    -- from the time that he resigned membership in
18 the union and saw to revoke payroll deduction authorization.
19 Did you just infer that that was tendered as a settlement
20 offer as opposed to an unconditional payment to him, that he
21 would keep that money settle or no settlement?
22       A.    I interpret that as a settlement offer, yeah.
23       Q.    Okay, so you could be mistaken about that since
24 you're just interpreting his deposition?
25       A.    Yes.

David Macpherson - 9/27/2019

161

1    Q.    So, you have no personal knowledge one way or

2    another whether he was offered a settlement, correct?

3    A.    Correct.

4    Q.    And then you have a discussion of Mr. Eason.

5    Have you ever spoken with Mr. Eason?

6    A.    No, I have not.

7    Q.    You say on Page 15 in the second full paragraph,

8    "As to Mr. Eason, a class action case such as this is

9    highly..." -- well, let me go back a sentence.  The last

10   sentence of the previous paragraph says, "He," meaning

11   Piekarski, "Further indicated to me that Mr. Eason's

12   settling, which he became aware of after his deposition, had

13   no impact on his commitment to the lawsuit," are you with

14   me?

15   A.    Oh, yeah.  He was definitely -- that was

16   definitely the case.

17   Q.    Okay.  Going back now to that first sentence of

18   the next paragraph, "As to Mr. Eason, a class action case

19   such as this is highly susceptible to a pickoff move for a

20   class representative by the defense." There was no pickoff

21   move in this case, was there?

22   A.    I don't know.  I don't know why Mr. Eason

23   dropped.

24   Q.    For all you're aware, Mr. Eason may have reached

25   out to the other side, meaning my client, and said, "If you

David Macpherson - 9/27/2019

162

1  pay me my dues back, I'll drop my participation in the

2  case."

3      A.    I don't know.

4      Q.    So, you felt it appropriate to include a

5  paragraph in your expert report of speculation about what

6  may or may not have happened with respect to Mr. Eason?

7      A.    I was just pointing out that you can really

8  affect a class action lawsuit by paying off the class

9  representative, and that could really impair the class

10  action.

11      Q.    And you used Mr. Eason as an example of that even

12  though you had no idea either way whether Mr. Eason was

13  "picked off" or whether he reached out because he didn't

14  want to participate at a certain point.

15      A.    I don't know.

16      Q.    You didn't know either way what Mr. Eason was

17  thinking or what the circumstances were surrounding any

18  settlement between him and the union?

19      A.    That's correct, because I said settlement, settle

20  on terms unknown to me.

21      Q.    Not only on terms unknown to you, but under

22  circumstances unknown to you, correct?

23      A.    Correct.

24      Q.    On Page 16 you refer to discussions with Mr.

25  Franklin about the fee arrangements, correct?

1    A.    Yes.

2    Q.    Other than what you testified about this morning

3  when Ms. Leonard was questioning you, have you had any

4  conversations with Mr. Franklin about the substance of the

5  case or about any assumptions you were to make in preparing

6  your expert report?

7    A.    No, we discussed the issues, but I wrote the

8  report.

9    Q.    Okay.  All right.

10         MR. DAYAN:  I'm going to ask the court reporter

11       to mark another -- oh, shoot, I didn't make copies of

12       this one.

13         MR. FRANKLIN:  That's okay.  I --

14         MR. DAYAN:  We all know what it is.  This is --

15         MR. FRANKLIN:  I've seen it before.

16         MR. DAYAN:  Yeah, this is an invoice, and I'll

17       just ask the court reporter to mark it.  I'm not going

18       to ask too many questions about it.

19         (Thereupon, Macpherson's Exhibit 16 was marked

20  for identification.)

21  BY MR. DAYAN:

22    Q.    All right, so can you identify Exhibit 16?

23    A.    Yes.  It's the invoice for the work on the

24  Piekarski case.

25    Q.    And have you done any work other than preparing

```
 1    for this deposition that's not reflected in Exhibit 16?

 2         A.    No.

 3         Q.    Okay.

 4               MR. FRANKLIN:  I just want to --

 5               MR. DAYAN:  Take a look at it, absolutely.

 6               MR. FRANKLIN:  Oh, no, I just want a blank piece

 7          of paper.

 8               MR. DAYAN:  Oh.

 9               MR. FRANKLIN:  So I can write down all the names.

10               MR. DAYAN:  Can I take a short break, consult

11          with counsel?  I think I'm basically done, but I want

12          to --

13               MR. FRANKLIN:  Yeah, just --

14               COURT REPORTER:  Off the record at 2:26.

15          We're back on the record, 2:32.

16                          DIRECT EXAMINATION

17    BY MR. GRIFFIN:

18         Q.    Good afternoon, Dr. Macpherson.  My name is

19    Richard Griffin and I represent the defendant, Ohio

20    Association Of Public School Employees, OAPSE, in the

21    lawsuit filed by Christina Littler.  I'm handing you what

22    has been marked as Exhibit 17.

23               (Thereupon, Macpherson's Exhibit 17 was marked

24    for identification.)

25    BY MR. GRIFFIN:
```

1      Q.    Do you recognize this document?

2      A.    Yes.

3      Q.    Is Exhibit 17 the expert report you prepared for

4   the plaintiffs in the Littler case?

5      A.    Yes.

6      Q.    And on the cover of the report is the date,

7   September 6th, 2019.  Is that the date that you completed

8   the report?

9      A.    Yes.

10      Q.    Please turn to Page 19 to Appendix A.  Was this

11   resume current as of the time you attached it to this

12   report?

13      A.    Yes.

14      Q.    And this resume accurately describes your

15   educational and professional experience?

16      A.    Yes.

17      Q.    You have never worked at a public elementary

18   school or a public high school in Ohio in a non-teaching

19   position, have you?

20      A.    No.

21      Q.    And you haven't been a member of a union that

22   represents public elementary and high school employees in

23   Ohio, have you?

24      A.    No.

25      Q.    The testimony you are offering in this case is

1   not based on personal knowledge regarding the facts in this

2   case, is it?

3        A.   No.

4        Q.   Your offered testimony is entirely expert

5   testimony; is that incorrect?

6        A.   Yes.

7        Q.   Let's turn back to your report.  And I'm going to

8   ask you specifically about the Littler report.  The written

9   report contains all of the opinions you are offering in the

10  Littler case; am I correct?

11       A.   Yes.

12       Q.   There's no opinion that you intend to offer that

13  you have not put in this report, right?

14       A.   Yes.

15       Q.   You have not been asked to offer any opinions in

16  support of class certification in this case other than what

17  is presented in this report, correct?

18       A.   Correct.

19       Q.   And you do not intend to offer any opinions in

20  support of class certification other than what is presented

21  in this report, correct?

22       A.   Yes.

23       Q.   And you've set forth all of the basis for your

24  opinions in this report as well, right?

25       A.   Yes.

1      Q.     You didn't just state the opinions, you explained

2  the basis that you rely on for the opinions, is that

3  correct?

4      A.     Yes.

5      Q.     And there isn't any basis for these opinions

6  offered in this report that you intend to offer in this case

7  that you have not set forth in this report; is that right?

8      A.     That's right.

9      Q.     The opinions you are offering in this case are

10  based on your academic and professional training as an

11  economist; is that correct?

12      A.     That's right.

13      Q.     Okay.  Turn to Page 2 of the exhibit, please.

14  The second sentence in the first paragraph of the report

15  states quote, "I was asked to analyze whether this case

16  meets the requirements for class action qualification."

17  This is an accurate statement of the opinions that you were

18  asked to provide in the Littler case by plaintiff's counsel;

19  is that right?

20      A.     Yes.

21      Q.     And your opinions are set forth in section five

22  of the report; is that right?

23      A.     Yes.

24      Q.     And the records and other sources you reviewed in

25  preparing the report are listed sources set forth in section

 1    three of the report; is that correct?

 2         A.    Yes.

 3         Q.    So now turn to Page 4 of the exhibits, please.

 4         A.    Yes.

 5         Q.    Is this an accurate list -- under three sources,

 6    is this an accurate list of the sources you reviewed for

 7    purposes of preparing the opinions you offer in this report?

 8         A.    Yes.

 9         Q.    So this is everything you reviewed for the

10    report; is that correct?

11         A.    Yes.

12         Q.    There are no other sources on which based any of

13    the opinions you have offered in this report other than what

14    is listed here?

15         A.    Yes.

16         Q.    Yes, there are no other --

17         A.    Yes, there are no other sources.

18         Q.    Okay.  Thank you.  Did you have any staff who

19    assisted you with any of the analysis set out in this

20    report?

21         A.    No.

22         Q.    Did anyone else draft a portion of this report

23    and provide the draft to you?

24         A.    No.

25         Q.    How many hours did you work to produce the

David Macpherson - 9/27/2019

169

1    report?

2          A.    It's on my invoice.

3          Q.    Right.  So if I represent to you that the invoice

4    indicates that you worked four hours total on September 3rd,

5    September 4th, September 5th, and September 6th, would that

6    be accurate?

7          A.    Yes.

8          Q.    Okay.  And those hours are accurately reflected

9    in the bill that you submitted to plaintiff's counsel, the

10   invoice?

11         A.    Yes.

12         Q.    Okay.  Now can you look at the list of sources

13   there on Page 4 and tell me which of these did you receive

14   from plaintiffs' counsel and which did you provide on your

15   own?  And I'll grant you some license with respect to how to

16   pronounce Mr. Iafolla's name.

17         A.    And Mr. Iafolla and Unionstats I provided;

18   everything else came from counsel.

19         Q.    Okay, now look down on the list of sources, and

20   you see the third source that's listed there is Henderson,

21   Timothy deposition July 24th of 2019?

22         A.    Yes.

23         Q.    Who is Timothy Henderson?

24         A.    I'm thinking that's a typo.

25         Q.    Let me help you out a little.

1    A.    Yeah.

2    Q.    Isn't Timothy Henderson the Associate Director of

3 AFSCME Council 5 in Minnesota?

4    A.    Okay.  It could be.  That name -- that sounds

5 vaguely familiar.

6    Q.    Okay, and he wasn't deposed in the Littler case,

7 was he?

8    A.    Oh, that's a typo.

9    Q.    You mentioned in your testimony with Ms. Leonard

10 this morning that you piggybacked from the first report to

11 the second report.  And I take it -- I think you only

12 mentioned going from the first report to the second report,

13 but I'm thinking that perhaps you did the same thing going

14 from the second report to the third report.  And it's

15 possible that what you may have done, because Mr. Henderson

16 testified in the Prokes case, is in modifying your Prokes

17 report to produce the Littler report you had left Mr.

18 Henderson's name in there.  Does that sound like a plausible

19 explanation for how it ended up there?

20    A.    Very plausible.

21    Q.    And my assumption is an accurate one, isn't it?

22 That you, to a certain extent, did the Hoekman report first,

23 modified that to conform to the facts as you understood them

24 in the Prokes case, and then modified that modified report

25 to come up with the Littler report?

1    A.    That is correct.

2    Q.    And if I compared the number of hours that you

3  worked on the Hoekman report with the number of hours that

4  you worked on the Prokes report with the number of hours

5  that you worked on the Littler report, I might see a

6  decrease in number of hours on each one because of the

7  process that I just described; is that correct?

8    A.    That's correct.

9    Q.    So Mr. Henderson doesn't have anything to do with

10  the Littler case?

11    A.    That is correct.  He should be stricken.

12    Q.    Okay.  So inclusion of his deposition on this

13  list was a mistake arising from that process that I just

14  described?

15    A.    That is correct.

16    Q.    Okay.  Turn to Page 5.  In the first sentence on

17  Page 5 you cite the Abood decision of the Supreme court.

18  Did you read the Abood decision as one of the sources you

19  reviewed in preparing the report?

20    A.    Yeah.  Yes.  I guess I should've maybe listed

21  that as a source; I did.

22    Q.    So that's not listed in the sources you referred

23  to, but it is a document or a source that you reviewed in

24  preparing your report?

25    A.    Yes.

1      Q.     Now turn to Page 6 of the report.  At the top of

2  the report, you include a quote from Judge Smith's opinion

3  in the Kennedy v. United Healthcare of Ohio case.  And you

4  reviewed Judge Smith's opinion in that case in preparing

5  this report, didn't you?

6      A.     Yes.

7      Q.     And your list on Page 4 is inaccurate in that it

8  doesn't include Judge Smith's Kennedy opinion, isn't it?

9      A.     Yes, I listed it as a footnote.

10     Q.     But it's not listed as one of the sources that

11  you referred to in number three on Page 4?

12     A.     Yes, that is correct.

13     Q.     It's correct that it's not listed?

14     A.     It's correct; it's not listed.

15     Q.     And, similarly, if you turn to Page 7 in your

16  report, at the bottom of the page and the top of Page 8 and

17  you have a citation to Judge Spencer's opinion in the Fenley

18  vs. Wood Group Mustang, Inc. case.  And you reviewed Judge

19  Smith's opinion in that case as part of preparing your

20  report, didn't you?

21     A.     Yes.

22     Q.     So the fact that Judge Smith's report in Fenley

23  v. Wood Group Mustang, Inc. wasn't included in your list was

24  again in error; is that correct?

25     A.     Yes.

1    Q.    And then turn to Page 12, and toward the bottom

2    of the page there's a block quote from the Supreme Court's

3    opinion in Walmart Stores, Inc. v. Dukes.  Did you review

4    the opinion in Walmart Stores, Inc. v. Dukes in preparation

5    of this report?

6    A.    No.  I think it was included in the citation in

7    the judges in ï¿½13.

8    Q.    So you took that from Judge Smith's opinion and

9    didn't independently verify the quote or read Walmart

10   Stores, Inc. v. Duke?

11   A.    No.

12   Q.    So just to summarize, the list of sources on Page

13   4 should have included Judge Smith's opinion in the Kennedy

14   and Fenley cases, the Supreme court's decision in Abood, and

15   should not have included Timothy Henderson's deposition; is

16   that correct?

17   A.    That's correct.

18   Q.    Now go back to the list of sources on Page 4.

19   The seventh item mentioned in the list is plaintiff's class

20   action complaint, Christine Littler on Behalf of Herself and

21   Others Similarly Situated, the Ohio Association Of Public

22   School Employees, OAPSE, and Southwestern City School

23   District; is that correct?

24   A.    Yes.

25          MR. GRIFFIN:  Can you mark this?  I think this is

1        18.

2               (Thereupon, Macpherson's Exhibit 18 was marked

3    for identification.)

4        Q.     I'm handing you what has been marked as Exhibit

5    18.  Do you recognize that document?

6        A.     Yes.

7        Q.     And that is the complaint in this case filed on

8    December 19th, 2018?

9        A.     Yes.

10       Q.     And that complaint was provided to you by

11   Attorney Franklin's office in response to an email you sent

12   him on September 2nd, 2019?

13       A.     I don't remember the date, but that sounds right.

14       Q.     And Exhibit 18 was the only complaint in the

15   Littler case that you reviewed to prepare your report,

16   wasn't it?

17       A.     Yes.

18       Q.     You didn't review the first amended complaint

19   filed in this case on July 16th, 2019 as one of the sources

20   for your report, did you?

21       A.     I don't -- I looked at whatever was what Mr.

22   Franklin sent me.

23       Q.     So you don't know whether it was the original

24   complaint or the first amended complaint?

25       A.     That is correct.

1      Q.    Can you look at Page 14 of the complaint, the

2   demand for relief claim number one?

3      A.    Okay.

4      Q.    Can you turn to -- at the same time turn to Page

5   6 in your report?

6      A.    Yes.

7      Q.    And can you look at the classes that are listed

8   in paragraph 50-A on Page 14 of the complaint and compare

9   them to the classes listed on Page 7 of your report?

10     A.    Okay.

11     Q.    Does it appear that the classes that you opined

12  on in your report are the same classes as are listed here in

13  the original complaint?

14     A.    Yes.

15     Q.    Okay.

16          MR. GRIFFIN:  Mark that as exhibit 19.

17          (Thereupon, Macpherson's Exhibit 19 was marked

18  for identification.)

19  BY MR. GRIFFIN:

20     Q.    Do you recognize this document?

21     A.    I don't recall.

22     Q.    Well, can you at least read for the record how

23  this document is labeled on its face?

24     A.    Plaintiff's First Amended Class Action Complaint,

25  Jury Trial Demanded.

David Macpherson - 9/27/2019

176

1    Q.    And at the top does it indicate what date this
2  complaint was filed on?

3    A.    7/16/19.

4    Q.    Okay.  Now turn to Page 14 of this exhibit.
5  Exhibit 18 -- 19, excuse me, Exhibit 19, Page 14, Paragraph
6  50-A and review whether or not the classes, as described in
7  this complaint, are different from the classes as described
8  in Paragraph 50-A of the initial complaint.

9    A.    There's one difference.

10   Q.    Does that refresh your recollection as to which
11 document you reviewed when you were offering your opinion in
12 your expert report?

13   A.    I think I looked at the original one.

14   Q.    And you did not review the first amended
15 complaint?

16   A.    I don't recall seeing this.

17   Q.    And so with respect to the opinions that you are
18 offered, you didn't offer any opinions as to the classes as
19 they were modified in the first amended complaint?

20     MR. FRANKLIN:  Objection.

21   A.    I mean, it's the same for the first three.  It's
22 just there's a fourth group in the amended complaint.  And
23 the other public employee who was offered membership and
24 OAPSE while working in an agency shop.

25   Q.    So it's your testimony that your opinion does

1    not, in any way, make any expert judgments with respect to

2    that aspect of the amended complaint?  That as that being

3    the fourth paragraph in the classes?

4          A.    Many of the arguments we were making about the

5    other groups would also be equally applicable to the fourth

6    group.

7          Q.    But the fact of the matter is you did not review

8    the fourth group in preparing your expert opinion and,

9    therefore, you did not offer an opinion in your report with

10   respect to that class?

11         A.    That is correct.

12         Q.    Thank you.  Returning to your list of sources on

13   Page 4 of your report, one of the sources you listed is

14   Littler, Christina deposition.

15         A.    Oh, yes.

16         Q.    You did review Christina Littler's deposition

17   prior to drafting your report; is that correct?

18         A.    Yes.

19         Q.    Apart from reviewing her deposition, you didn't

20   interview Christina Littler, did you?

21         A.    No.

22         Q.    Turn to Page 14 of your report.  The second last

23   paragraph from the bottom of the page reads as follows, "The

24   plaintiff's complaint and Ms. Littler's deposition

25   demonstrates that she is motivated to provide every class

1   member a free and fair choice regarding union membership.

2   She appears to be a woman of conviction about making sure

3   that every union member is treated fairly and represented

4   equally."  Was there a specific paragraph in the complaint

5   or a specific page of the deposition that led you to reach

6   the conclusion that quote, "She appears to be a woman of

7   conviction about making sure that every union member is

8   treated fairly and represented equally"?

9        A.   I can't tell you off the top of my head a

10  specific page but --

11       Q.   There's no specific -- the answer to the question

12  is there's no specific page and no specific paragraph?

13            MR. FRANKLIN:  Objection.

14       A.   I would have to --

15            MR. GRIFFIN:  Just asking the question and

16        requesting that it be answered.

17       A.   I would have to review the deposition to come up

18  with an exact page number and paragraph, but there was many

19  times in that deposition where she kept emphasizing she

20  wanted people in the class to have a choice.

21       Q.   So your answer to my question is there isn't a

22  specific page or a specific paragraph, but rather the

23  entirety of the complaint and the entirety of the

24  deposition?

25       A.   No, not the entire -- I'd have to review the

1  deposition to come up with specific references which would

2  you be applicable to that statement.

3      Q.    Let me ask the question another way.  You don't

4  cite to in your report a specific paragraph or a specific

5  provision in either the deposition or the complaint that led

6  you to reach that conclusion?

7      A.    No, but my review of the deposition led me to

8  that conclusion.

9      Q.    Did you apply any particular motive economic

10 analysis to assist you in reaching the conclusion that

11 quote, "She appears to be a woman of conviction about making

12 sure that every union member is treated fairly and

13 represented equally"?

14     A.    Not economic analysis as much as reviewing her

15 statements in there.

16     Q.    So a non-economist non-expert could review those

17 and come to the same conclusion?

18     A.    Potentially.

19     Q.    Did you perform any analysis or calculations as

20 part of preparing your expert opinions offered here that you

21 chose not to include in this report?

22     A.    No.

23     Q.    Are any of the opinions set forth in this report

24 the subject of peer-reviewed journal publications that

25 you've authored?

180

1    A.    Say that one again.

2    Q.    Are any of the opinions set forth in this report

3  the subject of peer-reviewed journal publications that you

4  have authored?

5    A.    I'd have to ask you, so you mean I've published

6  articles --

7    Q.    Let me ask you the question in a different way

8  that might make it easier.  The opinions that you've set

9  forth in this report were all created specifically for this

10  litigation; is that correct?

11    A.    Yes.

12    Q.    None of the opinions you've included in this

13  report are the result of an independent research project

14  separate and apart from this litigation, correct?

15    A.    Correct.

16    Q.    And you're not engaged in any research, academic

17  or otherwise, regarding the impact of the Janus decision on

18  membership in the Ohio School Employees Union or on union

19  member attitudes toward membership prior to being retained

20  as a hired expert in this case; is that correct?

21    A.    Correct.

22    Q.    And for this report, as opposed to any of the

23  others that you've previously testified concerning, you have

24  not performed any survey of former fair share fee payers

25  informing your expert opinion for this report; is that

David Macpherson - 9/27/2019

181

1    correct?

2         A.    Correct.

3         Q.    You have not designed any survey of union members

4    and explained the validated design for survey of union

5    members in this report, correct?

6         A.    Correct.

7         Q.    Turn to Page 12 of the report, please.  At the

8    last line of the first full paragraph, you state, "Under

9    economic principles, if details such as reasons for

10   membership or lack thereof were important distinctions the

11   union would keep records and conduct surveys of this issue."

12   So if the union did conduct surveys about reasons for

13   membership or non-membership, those reasons would be

14   important distinctions; is that your position?

15        A.    Can you tell me what -- go ahead.  I'm not sure,

16   what page are you on again?

17        Q.    So Page 12 of your report.

18        A.    Oh, on Page 12, I see it.  I see it now.  Okay.

19   I need to read it again.  Okay.  Yes.  Okay, what's the

20   question?

21        Q.    So the question is if the union did conduct

22   surveys about reasons for membership or non-membership,

23   those reasons would be important distinctions; is that your

24   testimony?

25        A.    Yeah, that would be important.  If they really

1    cared about it, they'd ask about it.

2         Q.    Okay.  According to your list of sources on Page

3    4, you included the deposition of Gary Martin as one of the

4    records you reviewed in preparing this report; isn't that

5    correct?

6         A.    Yes.

7         Q.    Gary Martin is the Associate Director of OAPSE,

8    isn't he?

9         A.    Yes.

10        Q.    And you recall that Mr. Martin testified during

11   his deposition about a survey OAPSE had conducted in 2019 of

12   non-members; isn't that correct?

13        A.    I don't recall.

14             MR. GRIFFIN:  Is this number 20?

15             COURT REPORTER:  Twenty-one.

16             MR. GRIFFIN:  Twenty-one.  Okay, I'm sorry.

17        Twenty.  Okay, I'm sorry.  I meant 20.

18             (Thereupon, Macpherson's Exhibit 20 was marked

19   for identification.)

20   BY MR. GRIFFIN:

21        Q.    Handing you what has been marked as Exhibit 20.

22   Can you identify this document?

23        A.    Deposition of Gary Martin.

24        Q.    And is this the deposition that you reviewed in

25   preparation for drafting the report, among other records?

1      A.    Yes.

2      Q.    Please turn to Page 14 of the deposition.

3      A.    Yes.

4      Q.    So I'm going to read a section of the deposition

5  and ask if it refreshes your recollection.  This is the

6  question.  So you are -- and this is toward the bottom of

7  Page 14.  So you, "Are there any surveys that have been

8  conducted by the union respecting any employee's desire to

9  be a member, remain a member, or quit or resigned from being

10  a member?  Answer, "You said members?  Did you say members

11  or..." -- Question: "Yes."  Answer: "No that."  Question:

12  "Were there any -- well, let's start with this question.

13  Were there any surveys conducted by the union respecting any

14  employee's desire to be a member?"  Answer: "Yes."  "Okay.

15  How many of these surveys have been conducted?"  "One that I

16  am aware of."  Question: "What year was that conducted?"

17  "It would be this year, 2019."  Question: "Okay, Mr.

18  Franklin, can we mark this document Bate stamp 216 OAPSE

19  non-members survey top lines as exhibit 13, please?"

20      Does that testimonial exchange refresh your

21  recollection about whether there was a survey conducted by

22  OAPSE with respect to non-member desires of being in the

23  union or reasons for being in the union?

24           MR. FRANKLIN:  Objection.

25      A.    Yes.

David Macpherson - 9/27/2019

184

1      Q.    And when you reviewed Mr. Martin's deposition,

2  did you review the exhibits along with the deposition

3  transcript itself or did you just review the deposition?

4      A.    Just the deposition.

5      Q.    So you did not review the exhibits?

6      A.    I don't recall looking at those exhibits, except

7  in -- I don't recall looking at the exhibits for this one.

8      Q.    So you don't have any recollection of reviewing a

9  document called OAPSE Non-Member Survey Top-Lines?

10    A.    No.

11          MR. GRIFFIN:  Mark that as 21, please.

12          (Thereupon, Macpherson's Exhibit 21 was marked

13  for identification.)

14  BY MR. GRIFFIN:

15      Q.    Handing you what has been marked as Exhibit 21.

16  Have you seen this document before?

17    A.    I might have, yeah.

18      Q.    Do you have a clearer recollection looking at it

19  as opposed to you might have, that you actually saw it or

20  you didn't see it?

21    A.    I think I might've seen this.

22      Q.    You might've seen it but it doesn't appear to

23  have been referenced in your report; is that correct?

24    A.    Yes.

25          MR. FRANKLIN:  Objection.

1    Q.    Can you read me the last three bullet points in

2  this document?

3    A.    "Younger non-members are more likely to join

4  after hearing about HEP and the family fun day discounts,

5  older non-members are more likely to join after hearing

6  about our recent COLA battle with SERS.  Non-member players

7  of all ages and by a large percentage are more likely to

8  join after learning workers in similar jobs without union

9  representation make $4,000 less a year."

10    Q.    So the survey results indicated that there are

11  different reasons why non-members would want to join the

12  union, didn't they?

13    A.    There are some differences.

14    Q.    Turn to Page 7 of your report where you were

15  discussing counsel's plan for class certification and a

16  survey.  In the second paragraph on Page 7, the fourth

17  sentence states, "If necessary, the survey could take into

18  account that workers' opinions about the union could change

19  over time by restricting the follow-up to their state of

20  mind when they joined."  So you agree that workers' opinions

21  about the union may change over time, don't you?

22    A.    Yes.

23    Q.    Going to give you an example and see if you think

24  this is appropriate.  For example, you could have a bus

25  driver in the Southwestern City schools who didn't want to

1  join the union when hired and so became a fee payer.  Then

2  after six months on the job, his best friend at work decides

3  to run for union president so she can negotiate to get air-

4  conditioned buses, a position that is also very near and

5  dear to the fee payer's heart.  The fee payer joins the

6  union so he can vote for his friend for office and help push

7  the air-conditioned bus issue in collective bargaining.

8  That's an example, isn't it, of the type of reason our

9  workers' opinion about joining the union could change over

10  time?

11      A.    That's possible.

12      Q.    Turn to Page 16 in your report.  You're making

13  below the block quote four points relevant to these

14  additional requirements.  The second point reads, "I am not

15  aware of widespread numbers of lawsuits in Ohio related to

16  this issue." You didn't review any dockets of any of the

17  federal or state courts in Ohio in order to make this

18  statement, did you?

19      A.    No.

20      Q.    None of the sources listed on Page 4 of your

21  report lists the number of post Janus cases filed in Ohio

22  did seek return of dues to members or fees to non-member fee

23  payers, do they?

24      A.    No.

25      Q.    Are you aware of whether any post Janus cases

David Macpherson - 9/27/2019

187

1  filed in Ohio settled prior to any reported decisions in the

2  case?

3       A.   No.

4       Q.   So you don't know how many post-Janus lawsuits

5  had been filed in Ohio, do you?

6       A.   No.

7       Q.   And you don't know how many of the post-Janus

8  cases filed in Ohio are class actions, do you?

9       A.   No.

10      Q.   Okay.  Turn to Page 2 of your report.  Excuse me,

11  I'm sorry, it's Page 2 of the Appendix.  It's actually Page

12  21 in the Appendix.  I apologize.

13      A.   Right.  Page 21.

14      Q.   Page 21; it's in Appendix A.  There's a list of

15  teaching areas there in that first paragraph.  In any of the

16  classes that you're currently teaching, do you assign

17  materials for the students to review that specifically

18  discuss or address class action litigation?

19      A.   No.

20      Q.   In any class that you have previously taught, did

21  you assign any materials for the students to review that

22  specifically discuss or address class action litigation?

23      A.   I don't think so.

24      Q.   At Pages 21 to 28 of the report, you list books,

25  journal publications, and book chapters, journal

1   publications (real estate and insurance), working papers,

2   and papers in progress.  In any of those listed publications

3   did you discuss, analyze, or describe the legal standard for

4   class certification?

5        A.    I don't think so.

6        Q.    Now, if you can give me a little help identifying

7   --  I believe this is my last set of questions.  I have two

8   more questions, maybe only one.  Can you look at the

9   original complaint, which I believe is Exhibit 18?  It's the

10  complaint that was in the case that was December 19th.  Is

11  that Exhibit 18?

12       A.    Yes.

13       Q.    Okay.  Turn to -- you've previously testified

14  that on Page 14 the demand for relief claim number one,

15  paragraph 15-A that those three classes are the classes that

16  you reviewed and opined on with respect -- in your report;

17  is that correct?

18       A.    Yes.

19       Q.    Okay.  Now look at paragraph 52-A.  The classes

20  in the claim for relief number three.  And those classes are

21  different classes that are set out in paragraph 50-A; is

22  that correct?

23       A.    Yes.

24       Q.    And you did not opine in any way on those classes

25  as described there in the course of your report that you

David Macpherson - 9/27/2019

189

1   prepared for the Littler litigation, did you?

2      A.   That's correct.

3         MR. GRIFFIN:  I don't have any further questions

4      off the top of my head but let me check with my

5      colleagues.  Give us a few minutes and we may be done.

6         COURT REPORTER:  Off the record, 3:10.

7      Back on the record; 3:18.

8         MR. GRIFFIN:  On the record, Mr. Griffin for

9      defendant OAPSE in the Littler case has no further

10     questions.

11        MR. FRANKLIN:  This is Talcott Franklin for the

12     plaintiff.  I have a couple of questions for you.

13               CROSS-EXAMINATION

14 BY MR. FRANKLIN:

15      Q.   Will you look at exhibit 17, please?

16      A.   Yes.

17      Q.   Go to Page 7.  Read the top sentence there.

18      A.   As I understand from counsel, the plan for class

19 certification is initially certified class of all public

20 employees who are offered membership in OAPSC while working

21 at an agency shop.

22      Q.   Okay.  So you were aware of that plan at the time

23 you prepared your report?

24      A.   Yes.

25      Q.   And what does that sound -- does that sound

1  familiar to you in terms of the fourth class that was being

2  looked at in the amended complaint?

3       A.   Yes, it does.

4       Q.   Okay.  So your opinions reflect this plan; is

5  that true?

6       A.   Yes.

7       Q.   Okay.  You list as a source the Gary Martin

8  deposition; is that true?

9       A.   Yes.

10      Q.   Did the Gary Martin deposition, it has exhibits

11  attached to it, correct?

12      A.   Yes.

13      Q.   Okay.  And this was referenced as an exhibit; 21

14  was referenced as an exhibit specifically in the Gary Martin

15  deposition that you reviewed?

16      A.   Yes

17      Q.   Okay.

18           MR. FRANKLIN:  No more.

19           COURT REPORTER:  Off the record.  The time is

20       03:19.

21           Back on the record, 3:21.

22           MS. LEONARD:  This is Danielle Leonard, counsel

23       for the defendants in the Hoekman case. So with

24       respect to Exhibit Number 1, which is the expert

25       report of David Macpherson in the Hoekman case, that

1    exhibit has been marked as confidential pursuant to

2    the protective order in that case, in light of the

3    references and discussion of information that was

4    provided in a deposition that was similarly marked

5    confidential.  So we're going to ask that that exhibit

6    be marked confidential in the deposition transcript,

7    and we will reserve our right to review the deposition

8    transcript when we get it and designate any portions

9    of the testimony as confidential that we see fit.

10        MR. FRANKLIN:  We agree.  Thanks.

11        COURT REPORTER:  Off the record, 3:22.

12      (Whereupon the deposition was concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MINNESOTA
 2
    Randall C. Eason and Thomas    *
 3  P. Piekarski, on behalf of     *
    themselves and others          *
 4  similarly situated,            *
         Plaintiff,                *
 5                                 *   Case No.
         v.                        *   0:18-cv-2384-SRN-ECW
 6                                 *
    American Federation of State,  *
 7  County, and Municipal          *
    Employees, Council No. 5,      *
 8       Defendant.                *

 9

10              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MINNESOTA
11                   FOURTH DIVISION

12  Linda Hoekman, on behalf of    *
    Herself and all others         *
13  similarly situated;            *
    Deborah York, on behalf of     *
14  herself and all others         *
    similarly situated,            *
15       Plaintiff,                *
                                   *   Case No.
16       v.                        *   0:18-cv-01686-SRN-SER
                                   *
17  Education Minnesota; Anoka      *
    Hennepin Education Minnesota,  *
18  As representative of the       *
    class of all chapters and      *
19  affiliates of Education        *
    Minnesota; National Education  *
20  Association; American          *
    Federation of Teachers; Anoka  *
21  Hennepin School District, as   *
    representative of the class    *
22  of all school districts in     *
    Minnesota; Mark Dayton, in     *
23  his official capacity as       *
    governor of Minnesota; Lori    *
24  Swanson, in her official       *
    capacity as Attorney General   *
25  of Minnesota; Todd L.          *
```

```
1   Doncavage, in his official        *
    capacity as Commissioner of       *
2   the Minnesota Bureau of           *
    Mediation Service,                *
3        Defendant.                   *

4
                    UNITED STATES DISTRICT COURT
5              FOR THE SOUTHERN DISTRICT OF OHIO
                        COLUMBUS DIVISION
6
    Christina Littler, on behalf      *
7   of themselves and others          *
    similarly situated,               *
8        Plaintiff,                   *
                                      *      Case No.
9        v.                           *      2:18-cv-1745
                                      *
10  Ohio Association of Public        *
    School Employees;                 *
11  South-Western City School         *
    District,                         *
12       Defendant.                   *

13
                     REPORTER'S CERTIFICATE
14          DEPOSITION OF DAVID A. MACPHERSON, PhD
                   TAKEN ON SEPTEMBER 27, 2019
15
             I, Pasqual Perez, III, Notary Public in and
16  for the State of Texas, hereby certify to the following:

17           That the witness, DAVID A. MACPHERSON, PhD,
    was duly sworn by the officer and that the transcript of
18  the oral deposition is a true record of the testimony
    given by the witness;
19
             That the original deposition was delivered to
20  Leon Dayan.

21           That a copy of this certificate was served on
    all parties and/or the witness shown herein on
22  October 16, 2019.

23           I further certify that pursuant to FRCP Rule
    30(f)(I) that the signature of the deponent:
24
             was not requested by the deponent of a party
25  before the completion of the deposition.
```

David Macpherson - 9/27/2019

194

1

2          I further certify that I am neither counsel
for, related to, nor employed by any of the parties in
the action in which this proceeding was taken, and
3 further that I am not financially or otherwise interested
in the outcome of the action.

4

5          Sworn to by me this 16th day of October, 2011.

6

7

8     Pasqual Perez, III
Notary Public # 13063496-4
My Commission Expires 04-29-2020
9     Integrity Legal Support Solutions
PO Box 245
10    Manchaca, Texas 78652
(512) 320-8690

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25