# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Christina Littler,

      Plaintiff,                    :       Case No.  2:18-cv-1745

      v.                             Judge Sarah D. Morrison
                                         Magistrate Judge Chelsey M. Vascura

Ohio Association of Public School
Employees,                   :

      Defendant.

## OPINION AND ORDER

This matter is before the Court on Plaintiff Christina Littler's Motion for Class Certification (ECF No. 35) and on Defendant Ohio Association of Public School Employees' Motion to Exclude Report of David A. Macpherson (ECF No. 38). Defendant filed an Opposition to the Motion for Class Certification (ECF No. 37), and Plaintiff filed a Reply (ECF No. 43). Plaintiff filed a Response in Opposition to the Motion to Exclude (ECF No. 42), and Defendant filed a Reply (ECF No. 44). These matters are now ripe for consideration.

Ms. Littler has also requested oral argument on her Motion for Class Certification. (ECF No. 35, at 1.) After examining the briefs and the record, the Court has determined that oral argument is unnecessary. The parties have adequately presented their arguments and facts in the briefing, and oral argument would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); S.D. Ohio Loc. R. 7.1(a). Plaintiff's request for oral argument is **DENIED**.

## I.      BACKGROUND

Around 2001, Plaintiff Christina Littler began working for Upper Arlington City Schools as a bus driver. (Christina Littler Dep. 8:18–9:1, ECF No. 35-2, at 117–243.) On March 27, 2007, Ms. Littler signed an Ohio Association of Public School Employees ("OAPSE")

membership card, agreeing to join OAPSE and pay dues to the union. (Littler Dep. 44:20–45:10, 47:10–16.) OAPSE represents over 30,000 Ohio state employees, including nonteaching school employees. (Gary Martin Dep. 9:2–7, ECF No. 35-2, at 50–98.) Ms. Littler claims that she joined OAPSE because she thought that she was required to join the union as a part of her job. (Littler Dep. 45:23–46:14.)

In 2011, Ms. Littler began working for the South-Western City School District ("SWCSD") as a substitute bus driver. (*Id.* 8:6–14.) After making this career change, Ms. Littler was not initially an OAPSE member and instead paid agency fees to the union rather than full dues. (*Id.* 64:19–22.) She claims that she did so because she thought that substitute drivers could not join the union. (*Id.* 66:15–67:20.) On January 16, 2015, Ms. Littler signed a second OAPSE membership card. (*Id.* 50:4–16.) By this point, Ms. Littler had begun working full time for SWCSD, and she again thought she was required to join the union. (*Id.* 66:1–4, 67:21–68:2.)

Prior to June 2018, the OAPSE union contract required members of the bargaining unit who declined to join the union to pay agency fees. (Martin Dep. 12:12–18, 33:1–13.) On June 27, 2018, the Supreme Court voided mandatory agency fee provisions. *See Janus v. Am. Fed'n of State, Cty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2460 (2018). In response, OAPSE stopped collecting agency fees. (*See* Martin Dep. 12:16–18.)

On August 22, 2018, Ms. Littler notified OAPSE of her desire to withdraw from the union. (ECF No. 1-2.) This withdrawal attempt was not successful. (Littler Dep. 78:4–8.) However, at some point, her dues deductions ceased. (*Id.* 87:21–24.) She also received but has not cashed a check from OAPSE refunding all dues that she paid after August 22, 2018. (*Id.* 88:12–89:5.)

On December 19, 2018, Ms. Littler sued OAPSE[1] on behalf of herself and others similarly situated for previously requiring Ohio public school employees to either join the union or to pay agency fees, for continuing to deduct union fees post *Janus*, and for deducting union fees without securing "freely given consent." (Compl., ECF No. 1.) Ms. Littler asserts that she filed this lawsuit because she thought her constitutional rights were being violated and she "want[ed] people to have a choice of joining or not joining" the union. (Littler Dep. 80:16–21, 84:10–12.) Ms. Littler later filed an Amended Complaint with little substantive difference. (Amended Compl., ECF No. 27.)

On November 15, 2019, Ms. Littler filed a Motion for Class Certification. (Pl. Mot. for Class Cert., ECF No. 35.) She proposes a class consisting of "[e]very public employee who was offered membership in OAPSE or its affiliates while working in an agency shop." (*Id.* at 1.) This proposed class effectively includes every current member, as well as former members, of the seventy percent of OAPSE bargaining units that had agency fee provisions in their collective bargaining agreements. (*See* Martin Dep. 33:9–13.) The Court will refer to this putative class as the "OAPSE class" given that it would encompass a substantial number of former and current members of OAPSE's bargaining unit.

Ms. Littler, in an effort "to be flexible in the proposed class definitions[,]" (Pl. Reply to Mot. for Class Cert., at 3, ECF No. 43), has also proposed three sub-classes in lieu of the OAPSE class: 1) OAPSE agency fee payers (the "agency fee class"), 2) members of the bargaining unit "who opposed payments to the union but who reluctantly joined because they decided that the difference between the cost of full membership dues and the [agency fees] would not have been worth the loss of their voice and vote in collective-bargaining matters" (the "reluctant voting

---

[1] Ms. Littler also sued the SWCSD but subsequently agreed to its dismissal from the case. (ECF No. 30.)

member class"), and 3) members of the bargaining unit "who opposed payments to the union but who joined because they were never informed of their constitutional right to decline union membership and pay a reduced amount in" agency fees (the "reluctant uninformed member class"), (ECF No. 35, at 1 n.1). The Court refers to the second and third classes collectively as the "reluctant member class."

## II.     MOTION TO EXCLUDE

The Court first addresses OAPSE's Motion to Exclude Dr. David Macpherson's expert report.

### A.     The Report

In support of her Motion for Class Certification, Ms. Littler offers an expert report by an economist, David A. Macpherson, Ph.D. (Pl. Mot. for Class Cert. Ex. A ("Ex. A"), ECF No. 35-2, at 3–18.) Dr. Macpherson "was asked to analyze whether this case meets the requirements for class action qualification," and his report is similarly titled an "Analysis of Class Action Qualification[.]" (Ex. A at 2.) Dr. Macpherson offers ten general conclusions in his report. Each will be referred to by number for ease of reference.

Conclusion One: "The class definition appears to be met because the class is clearly defined, and the definition is a sensical means of identifying people with common claims." (*Id.* at 6.) Dr. Macpherson offers no methodology as to how he arrived at Conclusion One.

Conclusion Two: Each member of the OAPSE class can be surveyed "using standard survey techniques" to find out who is part of the reluctant member class. (*Id.* at 7, 16.) Dr. Macpherson contends that "[t]his means of surveying employees is readily accepted in the field of economics." (*Id.* at 7.) He does not, however, identify what such a survey would look like or offer any evidence to support the idea of a survey.

Conclusion Three: "[T]here is a healthy number of class members" in general. (*Id.* at 8.) With respect to the OAPSE class, Dr. Macpherson points to the 32,645 public employees that OAPSE represented in fiscal year 2018. (*Id.*) He also highlights the number of individuals who paid agency fees and the number of OAPSE members who withdrew from the union in various years, ostensibly in support of the contention that the agency fee and reluctant member classes are numerous. (*Id.*)

Conclusion Four: "[A] significant portion of union members" are part of the reluctant member class. (*Id.*) Dr. Macpherson relies on five sets of data in support of Conclusion Four: Michigan's decline in union membership and contract coverage in the public sector after it banned agency fees in 2013; two public sector unions—AFSCME and SEIU—lost well over ninety percent of their agency fee payers in 2018; unionization rates among teachers are twenty-four percent lower in states that prohibited agency fees before *Janus* than in states that permitted them; a high percentage of National Education Association members reported that they would stop paying dues if the union would still represent them; and documents produced by OAPSE in discovery show that a number of members have expressed a desire to resign their memberships. (*Id.* at 8–10.)

Conclusion Five: Damages awards for each individual plaintiff with a similar cause of action to Ms. Littler "may not be particularly large" and thus it may be "uneconomical for a plaintiff to pursue the claim." (*Id.* at 10.) Dr. Macpherson offers no methodology as to how he arrived at Conclusion Five.

Conclusion Six: Prior to *Janus*, "[m]any" members of the OAPSE bargaining unit, when deciding whether to join OAPSE, were "constrained in their choice by two different but not dissimilar options[,]" the belief that they had to join the union to keep their job and the reality

that they had to join the union or pay the agency fee. (*Id.* at 11–12.) Dr. Macpherson also concludes that "[u]nder the principles of economics, neither of these 'choices' was a free choice" and that each putative member of the OAPSE class "has this fact in common." (*Id.*) This lack of a free choice was "the predominant fact in the decision to become a union member or not." (*Id.*)

Conclusion Seven: Dr. Macpherson identifies five commonalities that he sees among the putative class members—the union's conduct because "[t]he union provides the same services across all of the occupations represented by the union"; the questions whether the union members could have resigned at any time, whether *Janus* has universal application, and whether the putative class members are entitled to repayment of their prior payments to the union; and the question of "how far back [the putative class members] can seek the return of" their payments to the union. (*Id.* at 12–13.) Dr. Macpherson concludes that "litigating these issues over and over in separate actions would be an enormous waste of the Court's time and resources as well as those of the parties." (*Id.* at 13.)

Conclusion Eight: "[T]he choices faced by the named plaintiff is [sic] typical of the choices of [sic] facing every public employee represented by OAPSE." (*Id.* at 14.) Dr. Macpherson offers no methodology as to how he arrived at Conclusion Eight.

Conclusion Nine: Ms. Littler "is motivated to provide every class member a free and fair choice regarding union membership. She appears to be a woman of conviction about making sure that every union member is treated fairly and represented equally." (*Id.* at 14.) Dr. Macpherson bases this on Ms. Littler's Complaint and on her deposition. (*Id.*)

Conclusion Ten: Proposed class counsel's incentives are aligned with the putative class members. (*Id.* at 15.) This conclusion is based on Dr. Macpherson's discussions with proposed class counsel regarding their fee arrangements. (*Id.*)

## B. Standard of Review

The Federal Rules of Evidence "grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" *Kumho Tire Co., LTD. v. Carmichael*, 526 U.S. 137, 148 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)). Part and parcel with this testimonial latitude is a trial judge's "special obligation" to ensure that any and all expert testimony "'is not only relevant, but reliable.'" *Id.* at 147 (quoting *Daubert*, 509 U.S. at 589). This gatekeeping requirement exists "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Rule 702 requires that expert opinions meet four requirements. Fed. R. Evid. 702. They must be "help[ful]" to the trier of fact in "understand[ing] the evidence" or "determin[ing] a fact in issue"; "based on sufficient facts or data"; and "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." *Id.* What matters is not the "reasonableness *in general*" of the particular methodology used by the expert but rather "the reasonableness of using such an approach, along with [the expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*." *Kumho Tire*, 526 U.S. at 153–54.

## C. Analysis

Ms. Littler is correct that even if Dr. Macpherson's report contains defects, the entire report should not necessarily be excluded merely because it has objectionable aspects. (Pl.

Response to Mot. to Exclude, at 2–3, ECF No. 42.) The Court thus analyzes each of Dr. Macpherson's ten conclusions to determine whether any meet the requirements of Rule 702. In doing so, the Court initially focuses on Dr. Macpherson's first eight conclusions and finds that they suffer from three main flaws— they are improper conclusions of law; they are not helpful in understanding the evidence or determining a fact in issue; and they are conclusory, speculative, reflect no expert methodology, and demonstrate a lack of scientific rigor.

### 1. Improper Legal Conclusions

"Expert testimony on the law is excluded because the trial judge does not need the judgment of witnesses." *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984). The Court's "special legal knowledge" renders such evidence superfluous. *Id.* Expert testimony that is so "carefully couched in the precise language used in case law" is "particularly suspect" because it indicates either "a keen awareness by [the expert] of the direction in which he had to head, or else careful coaching prior to his testimony." *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994).

Dr. Macpherson improperly renders legal conclusions in determining that the class is "clearly defined" (Conclusion One), identifying "common" legal questions among the putative class members (Conclusion Seven), and characterizing the choices of the putative class members as "typical" (Conclusion Eight). While these words have lay usages, they have legal meaning in the class certification context, and Dr. Macpherson's report makes clear that he inappropriately uses these words in their legal sense to draw legal conclusions. He acknowledges that this is precisely what he was hired to do—"to analyze whether this case meets the requirements for class action qualification." But that is the role of the Court, *see* Fed. R. Civ. P. 23(c)(1)(A), not Dr. Macpherson.

Ms. Littler contends that Dr. Macpherson is not opining on the legal question of class certification but is instead "weighing in on the factual questions that undergird the class-certification decision." (ECF No. 42, at 1.) The Court credits that this is sometimes the case, and aspects of his report do just that. Indeed, it is a fine line. But it is a line that Dr. Macpherson crosses in Conclusions One, Seven, and Eight. "The distinction, although subtle, is nonetheless important." *Berry*, 25 F.3d at 1353.

### 2.     Conclusions that do not assist the trier of fact

Evidence offered by an expert must "assist the trier of fact." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000). This means three things. First, "there must be a connection between the [information] being offered and the disputed factual issues in the case in which the expert will testify." *Id.* Second, expert testimony should not be admitted where the evidence merely parrots the testimony offered by fact witnesses. *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016). Third, expert testimony is improper where the testimony is "not beyond the ken" of a layperson. *Id.* (internal quotation marks omitted). Expert witnesses are granted special leeway to offer opinions based on their experience rather than on their personal observations. *Compare* Fed. R. Evid. 701, *with* Fed. R. Evid. 702, 703. Where an expert offers an opinion requiring no such expertise, that leeway recedes. *Cf. Kumho Tire*, 526 U.S. at 148. ("Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" (quoting *Daubert*, 509 U.S. at 592)).

Several of Dr. Macpherson's conclusions are not helpful because they do not observe anything beyond the abilities of a layperson. For example, Conclusions Three and Four are based on rudimentary arithmetic and observations of data that require no special expertise. (David

Macpherson Dep. 63:10–17, 65:2–11, 66:5–13, 68:11–15, 79:2–14, 81:11–21, ECF No. 38-1.) Conclusion Five is not helpful because it is common sense that litigation is costly and that individual plaintiffs may not pursue a claim when they do not anticipate their damages being particularly large. Conclusion Seven identifies supposed commonalities among OAPSE bargaining unit members, but such an unsophisticated observation requires no special expertise. None of these conclusions requires expertise, and they do not assist the Court in understanding the evidence or determining a fact in issue. Dr. Macpherson is not entitled to the testimonial latitude of an expert when he merely offers opinions requiring none of the knowledge and experience that warranted that latitude in the first place.

### 3.    Lack of Methodology

Rule 702 requires that expert opinions be the product of reliable principles and methods and that those principles and methods be reliably applied to the facts. It follows that when an expert's opinions are the product of *no* principles or methods, but instead are based on unsubstantiated conclusions and speculations, they cannot meet the rigors of Rule 702. It is true enough that "conclusions and methodology are not entirely distinct from one another [and that t]rained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "The trial court's gatekeeping function requires more than simply taking the expert's word for it." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) (internal quotation marks omitted).

Conclusions One and Eight are mere conclusory statements without any methodological basis for them. In Conclusion Two, Dr. Macpherson opines that the putative class members can be surveyed "using standard survey techniques" in a manner that "is readily accepted in the field of economics." These vague statements offer no methodological basis and thus no way for the Court to assess their reliability. Moreover, as is explained in greater detail in this Court's analysis of the Motion for Class Certification, the crucial question for implementing such a survey is its *legal* validity, not its economic validity. Neither Ms. Littler nor Dr. Macpherson ever explains why it is relevant that such a survey might be valid in the field of economics.

Nor does Dr. Macpherson identify what such a survey would look like. He acknowledges that he has not performed a survey of former agency fee payers, nor has he designed or proposed a methodology for conducting such a survey. (Macpherson Dep. 113:1–14, 114:6–13, 115:6–9, 180:22–181:6.) Indeed Dr. Macpherson also acknowledges that not just any survey would be "readily accepted in the field of economics." For example, economists usually do not analyze peoples' feelings because it is difficult to measure subjective attitudes. (*Id.* 50:9–15, 59:23–60:11.) Yet Dr. Macpherson contemplates a survey that would inquire into individuals' feelings about their decisions whether to join OAPSE. (Ex. A at 7.) The Court cannot credit Dr. Macpherson's ready acceptance of the idea of a survey with no identified parameters, particularly when the hypothetical survey to which he refers appears to violate his professional standards. This is not demonstrative of the intellectual rigor that characterizes the practice of an economist.

In Conclusion Four, Dr. Macpherson regurgitates information from various data sets and uses them to draw speculative conclusions. In doing so, he does not purport to use any specific methodology, nor does he account for other variables affecting his analysis. This too

demonstrates a lack of scientific rigor. For example, Dr. Macpherson concludes that the dramatic

drops in AFSCME and SEIU agency fee payers in 2018 "indicate[] that the agency-fee payers

did not believe that they were getting value from paying agency fees." (*Id.* at 9.) He bases this

conclusion on nothing more than the fact of the decline despite the competing conclusion that the

declines resulted from *Janus* rendering public sector agency fees unconstitutional in 2018.

(Macpherson Dep. 90:2–6, 91:22–92:4, 93:12–16.) And at the same time Dr. Macpherson

acknowledges that multiple factors can affect someone's opinion about union membership, that

those opinions differ by individual, and that it is difficult to study the causal effects of attitudes

on union membership because of the nature of the variables involved. (*Id.* 50:16–20, 51:11–19.)

Dr. Macpherson's conclusions about these data sets are based on speculation resulting from

correlation, not necessarily causation. Conclusions based on pure speculation or pure correlation

are not accepted in the field of economics, (*see, e.g.*, *id.* 16:24–17:14, 107:23–108:4), and they

are not accepted in the courtroom either, *cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 356

(2011) ("Even if [respondents' statistics] are taken at face value, these studies are insufficient to

establish that [their] theory can be proved on a classwide basis."). Dr. Macpherson's unfounded

extrapolations from the limited data sets that he cites are not reliable and are not admissible.

Conclusion Six purports to apply general, unidentified "principles of economics" to assert

that members of the putative class lacked a "free choice." Even taking these principles as

methodologically sound, Dr. Macpherson uses them to speculate that "[m]any" members of the

OAPSE lacked a free choice and that this free choice was "the predominant fact in the decision

to become a union member or not." There is too great an analytical gap between the information

on which Dr. Macpherson relies and his observations. While no member of OAPSE may have

made a "free choice" from the perspective of an economist, that says nothing about the *legal*

*effect* of that purported constraint on any individual member's decision. And it is an even greater logical leap to then conclude that "many" members were so constrained.

Ms. Littler asserts that these methodological flaws are a matter of weight and not admissibility. This overlooks the Court's gatekeeping responsibility under Rule 702. There are indeed circumstances in which an expert's opinion may be flawed but that those flaws are merely fodder for cross-examination rather than reasons to exclude the opinion. For example, "shaky" conclusions may be admissible, *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 392–93 (6th Cir. 2000), so long as they "rest[] upon a reliable foundation," *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008). But it is not proper to admit an opinion based on "unsupported speculation." *Id.*; *accord Jahn*, 233 F.3d at 392–93. "Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012); *see also United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) ("Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony . . . ."). Dr. Macpherson's conclusions rely on these exact red flags, and the bulk of his conclusions are not just questionable but unreliable.

### 4. Conclusions Nine and Ten

Having determined that Conclusions One through Eight are inadmissible, that leaves Dr. Macpherson's final two conclusions. Conclusion Nine is improper. "Experts may not testify about the credibility of other witnesses." *Smith v. Jones*, 721 F. App'x 419, 423 (6th Cir. 2018). Dr. Macpherson inappropriately opines on the credibility of Ms. Littler when it is not his role to do so.

Conclusion Ten, however, appears methodologically sound. Based on his conversations with proposed class counsel, Dr. Macpherson has used his economics experience to determine that counsel's incentives align with members of the putative class. The Court takes no issue with this conclusion and will not exclude it.

Accordingly, the Motion to Exclude is **GRANTED** with respect to Conclusions One through Nine and **DENIED** with respect to Conclusion Ten.

## III.    MOTION FOR CLASS CERTIFICATION

The Court next considers whether Ms. Littler's proposed class or any of her proposed subclasses can properly be certified.

### A.    Standard of Review

It is the plaintiff's burden to establish the Rule 23 prerequisites for class certification. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851 (6th Cir. 2013). And no class that fails to satisfy each Rule 23 prerequisite may be certified. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc). The plaintiff must prove that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

In addition to satisfying each of the requirements of Rule 23(a), "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Dukes*, 564 U.S. at 345. Ms. Littler has elected to proceed under Rule 23(b)(3) under which a class action may be maintained if "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). That is, Rule 23(b)(3) provides for two requirements on top of the Rule 23(a) prerequisites, predominance and superiority. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

"Rule 23(b)(3) classes must also meet an implied ascertainability requirement." *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017). The "class description must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012).

The Court must conduct a "'rigorous analysis'" to ensure that these prerequisites have been satisfied. *Dukes*, 564 U.S. at 350–51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* at 350. While the reviewing court should not "engage in free-ranging merits inquiries at the certification stage," merits questions still must be considered to the extent "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## B. Analysis

The Court focuses most acutely on the commonality, typicality, adequacy of representation, predominance, suitability, and ascertainability requirements. Given the Court's findings that Ms. Littler's proposed classes cannot clear these hurdles, the Court need not examine numerosity or adequacy of proposed class counsel.

### 1.　Rule 23(a) requirements – commonality, typicality, and adequacy of representation

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349–50 (quoting *Falcon*, 457 U.S. at 157). While "there need only be one question common to the class . . . [i]t is not every common question that will suffice . . . ." *Sprague*, 133 F.3d at 397. "[A]t a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." *Id.*; *accord Dukes*, 564 U.S. at 349 ("[A]ny competently crafted class complaint literally raises common questions." (internal quotation marks omitted)). What matters more than the existence of common questions is "'the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Dukes*, 564 U.S. at 350 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)).

The typicality element "is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims.'" *Whirlpool*, 722 F.3d at 852 (quoting *Sprague*, 133 F.3d at 399). "This requirement insures that the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members." *Id.* at 852–53. Similarly, the adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent," *Amchem*, 521 U.S. at 625, as well as intra-class conflicts, *Gilpin v. Am. Fed'n of State, Cty., & Mun. Emps., AFL-CIO*, 875 F.2d 1310, 1313 (7th Cir. 1989).

In practice, the commonality, typicality, and adequacy elements all tend to merge into a determination of whether "'maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members

will be fairly and adequately protected in their absence.'" *Whirlpool*, 722 F.3d at 853 (quoting

*Dukes*, 564 U.S. at 349 n.5).

The central problem with the OAPSE class is that it contains pro-union and anti-union

members who have fundamentally divergent interests in this litigation. *See Schlaud v. Snyder*,

785 F.3d 1119, 1125 (6th Cir. 2015) (per curiam) (noting conflict between those who support the

union and those who do not). This creates an intra-class conflict of interest within the OAPSE

class and prevents Ms. Littler from being able to advance both groups' interests—and thus

represent both groups—at the same time.[2]

This same intra-class conflict exists in the agency fee class. While all putative members

of that sub-class declined to join the union, that does not mean that they all did so out of

opposition to the union. Rather it is invariably the case that while some declined to join for

ideological reasons, others wanted to be represented by the union but sought to ride the coattails

of their dues-paying brethren. *See Gilpin*, 875 F.2d at 1313. These two groups "have potentially

divergent aims. The first wants to weaken and if possible destroy the union; the second, a free

rider, wants merely to shift as much of the cost of representation as possible to other workers,

i.e., union members." *Id.*; *Weaver v. Univ. of Cincinnati*, 970 F.2d 1523, 1530–31 (6th Cir.

1992). The evidence indicates that this tension exists within OAPSE and thus would exist within

the agency fee class if it were certified. When OAPSE conducted a 2019 survey of its bargaining

unit members who were not union members (many of whom had undoubtedly been agency fee

---

[2] OAPSE faults Ms. Littler for seeking to certify a class that includes members who were not harmed; however, this does not appear to be a bar to certification in the Sixth Circuit because it does not necessarily mean there is a conflict of interest or that common questions will not predominate among the members of the class. *See Whirlpool*, 772 F.3d at 855, 859 (finding that existence of satisfied customers did not preclude certification of products liability class action); *Daffin v. Ford Motor Co.*, 458 F.3d 549, 554 (6th Cir. 2006) ("The class members' claims do not differ based on whether there has been actual accelerator sticking because they all allege that Ford delivered a good that did not conform to Ford's written warranty.").

payers prior to *Janus*), twenty-five percent viewed themselves as pro-union and twenty-five percent thought they were members and/or wanted to join the union. (Miller Dep. Ex. 13, ECF No. 35-2, at 99.)

This conflict of interest is exacerbated where the putative class representative's motivations are not clear. *See Weaver*, 970 F.2d at 1531. That is the situation here. Ms. Littler claims that all she wants is for people to have a choice about whether to join OAPSE, (Littler Dep. 80:16–21), but she is also highly critical of the union, (*id.* 24:13–16, 25:21–26:7). Furthermore, Ms. Littler asserts in her Amended Complaint that she "reluctantly joined" OAPSE because the difference between the cost of the union dues and the agency fees was not worth the loss of her vote or influence in collective bargaining matters. (Amended Compl. ¶ 9.) Based on this assertion Ms. Littler should be a member of the reluctant voting member class. However, she disavowed this motivation in her deposition instead stating that she only joined the union because she thought it was a requirement. (Littler Dep. 66:1–4.) That position would instead place her in the reluctant uninformed member class. Ms. Littler also could not ever recall having voted in a union election or voting on a collective bargaining agreement. (*Id.* 56:4–10, 58:20–59:3.) It is thus unclear of which class she is even a member, which makes it difficult to assess which class she is able to represent. Regardless, it is clear that Ms. Littler does not want to pay money to the union. (*Id.* 82:7–14.) This creates a conflict of interest with members of the proposed class who want to support the union financially. *Schlaud*, 785 F.3d at 1127 ("The named plaintiffs here have brought suit because they do not want to pay union dues. But their proposed class includes individuals who want to pay union dues. That is a conflict of interest.").

Ms. Littler argues that *Gilpin* and *Weaver* are distinguishable because, unlike in those cases, she is not seeking repayment of fees for the putative class members who do not want

repayment. (ECF No. 43, at 10.) That is a distinction without a difference; while it might diminish the conflict of interest, it does not eliminate it. Any money paid out in a class action would come out of the coffers of OAPSE. So even if the pro-union members of the class are not themselves seeking damages, their interests are still harmed by their fellow class members' pursuit of an effort that, if successful, serves to diminish the union's finances. This creates a conflict not only because it financially weakens the union of which those pro-union class members are a part, but also because it may lead the union to take actions to counteract such a financial loss. For example, OAPSE may increase dues and/or reduce services, causing the remaining union members to bear the burden of their fellow class members' pursuits. It is thus actively against these pro-union individuals' interests to maintain this class action at all so long as damages remedies are on the table.

*J.D. v. Azar*, on which Ms. Littler relies, is not to the contrary. In that case, pregnant unaccompanied alien children ("UACs") in the government's custody who wanted an abortion sought to certify a class consisting of all pregnant UACs in custody. 925 F.3d 1291, 1300 (D.C. Cir. 2019) (per curiam). The defendants pointed to an intra-class conflict of interest in that the class representatives wanted abortions while other members of the putative class might have religious or ideological objections to abortion. 925 F.3d at 1316. The D.C. Circuit concluded that this did not create a conflict because even if the class members who wanted abortions were able to receive them, those abortions would have no effect on the pregnancies of other members of the class. *Id.* at 1318. ("The ability of minors who may sincerely oppose abortion to carry their pregnancies to term would not be compromised by the grant of relief securing another class member's ability to make a different choice."). That is not so here where the prospect of seeking damages from and thereby financially weakening OAPSE is the goal of the anti-union members

of the putative class while it is directly at odds with the desires of those members of the putative class who want OAPSE to thrive. Moreover, unlike in the case of the pregnant UACs, money expended by OAPSE in a class action will result in a financial shortfall that necessarily will have a negative effect on the remaining members of the union.

In any event, Ms. Littler contends that there does not exist a conflict of interest because each putative class member was purportedly harmed by being denied the choice to withhold financial support from the union. (ECF No. 43, at 9.) It is this asserted harm that she says she seeks to vindicate. There is reason to doubt that even this purported common harm can bind the OAPSE class together because of Ms. Littler's pursuit of punitive damages. (Amended Compl. ¶¶ 39, 51(h).) This "choice of remedy is arguably antagonistic to the wishes of other employees." *Weaver*, 970 F.2d at 1531. But her theory does not withstand scrutiny regardless because this is not a harm that was actually incurred by members of the reluctant member class or any other individuals who voluntarily joined OAPSE.

While an actual denial of choice may constitute a legally cognizable harm, those who voluntarily joined OAPSE have no standing to sue to preserve a choice that they voluntarily gave up. In order to have standing, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . traceable to the challenged action of the defendant . . . .'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). In other words, the injury must be the defendant's fault. Members of the OAPSE bargaining unit had the opportunity to choose to join the union and pay full dues or to decline to join the union and pay agency fees instead.[3] This was

---

[3] While Ms. Littler and the putative members of the reluctant uninformed voting member class may claim that they did not know they were free not to join the union, that does not change the calculus. The members of the bargaining unit were given dues check-off authorizations that specifically said that the individual was "apply[ing] . . . for membership in the" union and was agreeing to a "voluntary authorization of dues deductions . . . ." (Martin

a choice that was legally permissible at the time, and the individuals who chose to join the union did so voluntarily. *See Allen v. Ohio Civil Serv. Emps. Assoc. AFSCME, Local 11*, No. 2:19-cv-3709, 2020 WL 1322051, at *10 (S.D. Ohio Mar. 20, 2020). Just because they may not have liked "the two choices with which they were presented does not mean that they did not have the opportunity to choose freely between these two available alternatives." *Id.* The upshot is that for these voluntary members the "denial of choice" to pay the union stems from *their choices* to join the union. It is not "fairly traceable" to the conduct of OAPSE.

Ms. Littler again points to *J.D.* to support her position that a denial of choice is a cognizable harm because in *J.D.* "[t]he class members all assert[ed] a common entitlement to make [the abortion] choice on their own . . . ." 925 F.3d at 1314. But in *J.D.* the plaintiffs sought the right to make a *future choice*. That is wholly different from seeking to vindicate the regrets of past choices, which Ms. Littler claims is the common harm that the OAPSE class suffered. In *J.D.* the putative class members were united by the desire to choose whether to have an abortion. Here, on the other hand, the class members who joined OAPSE already voluntarily chose to join the union, so they have no standing to vindicate the right to alter a choice that they long ago made. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 n.6 (2016) ("'[E]ven named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'" (quoting *Simon*, 426 U.S. at 40 n.20)).

---

Dep. Ex. 17, at 6; *id.* 26:15–23, 27:10–28:6.) Ms. Littler in particular acknowledges that although she did not read the membership card, she signed it. (Littler Dep. 50:12–14, 54:11–13.) OAPSE is not responsible for an individual's failure to read the information that she was provided. *See Allen v. Ohio Civil Serv. Emps. Assoc. AFSCME, Local 11*, No. 2:19-cv-3709, 2020 WL 1322051, at *11 n.8 (S.D. Ohio Mar. 20, 2020). And there is no doubt that members of the bargaining unit were not actually required to join the union. *See id.* at *8. To the extent that union members believe that OAPSE misinformed them or otherwise "acted improperly, they are free to bring a claim under state . . . law." *Id.* at *10.

Only agency fee payers would have standing to pursue a class action premised on the harm of being denied a choice. They were indeed denied the ability to withhold financial support from the union because their choices were either to join the union and pay dues or to do nothing and to pay agency fees. But Ms. Littler is not an adequate representative for a class of agency fee payers because she voluntarily chose to join the union and thus did not suffer this asserted harm. *See Dukes*, 564 U.S. at 348–49 ("[A] class representative must . . . suffer the same injury as the class members." (internal quotation marks omitted)).[4]

In sum, neither the OAPSE class nor the agency fee class can be certified due to the presence of intra-class conflicts, and Ms. Littler is also not an adequate representative of the agency fee class.

### 2. Rule 23(b)(3) – predominance and superiority

Even assuming common questions of law or fact under Rule 23(a)(2), in a Rule 23(b)(3) class action, the reviewing court still must find that those common questions *predominate*. "If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Accordingly, the court must scrutinize "the relation between common and individual questions in [the] case." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof.'" *Id.* (quoting William B. Rubenstein, 2 Newberg on Class Actions § 4:50, pp. 196–97 (5th ed. 2012)). The common

---

[4] Although Ms. Littler was previously an agency fee payer, OAPSE contends that she has not paid agency fees within the presumptive statute of limitations and thus cannot represent the agency fee class. (Def. Opp. to Pl. Mot. for Class Cert., at 16, ECF No. 37.) Ms. Littler does not dispute this.

questions predominate when they are "at the heart of the litigation." *Powers v. Hamilton Cty. Pub. Defs. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007).

Similarly, "[i]n considering whether the superiority requirement of Rule 23(b)(3) is satisfied, courts consider 'the difficulties likely to be encountered in the management of a class action.'" *Young*, 693 F.3d at 545 (quoting *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 567 (6th Cir. 2007)). "Where many individual inquiries are necessary, a class action is not a superior form of adjudication." *Id.* Rather, the existence of a threshold issue common to all class members is what makes a class action an appropriate course for litigation. *Id.* "Cases alleging a single course of wrongful conduct are particularly well-suited to class certification." *Powers*, 501 F.3d at 619. Cases where there is no common cause of injury and factual and legal issues differ dramatically from individual to individual are not. *See In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1084 (6th Cir. 1996).

Here, proof as to each member of the reluctant class is excessively individualized, which causes individual questions to predominate. In addition, the necessity of individualized inquiry means that a class action is not a superior way to adjudicate these facts. In order to establish who qualifies as "reluctant," each putative class member would have to testify as to how he or she felt about the decision whether to join the union. These types of individualized answers cannot be answered by the general questions that a class action is designed to ask. *See id.* at 1081 ("[E]ach plaintiff's urologist would also be required to testify to determine what oral and written statements were made to the physician, and what he in turn told the patient, as well as to issues of reliance, causation and damages."). "In this situation, the economies of scale achieved by class treatment are more than offset by the individualization of numerous issues relevant only to a particular plaintiff." *Id.* at 1085.

There is also a second individual question that will predominate in the case of the reluctant uninformed member class. Because presentations to potential new OAPSE members occurred at the local level, (Martin Dep. 13:5–7, 29:7–11, 31:20–32:3.), there is no consistent record of what individual bargaining unit members were told at the time they made the decision whether to join the union. That means that there is no "single course of wrongful conduct" or common cause of injury. As with the reluctance inquiry, each putative class member would need to be asked whether he or she was informed of the right to decline to join the union. Setting aside the difficulty in asking this question to tens of thousands of people, as explained in greater detail below there are significant concerns about the ability to ensure reliable answers in response.[5] And this is precisely the type of variant threshold issue for which a class action is not well-suited.

This case is analogous to *Sandusky Wellness* where the Sixth Circuit found a class action to be untenable due to the presence of excessively individualized proof. There, after receiving an unsolicited fax advertisement from the defendant, the plaintiff sought to certify a class action consisting of all recipients of the fax. 863 F.3d at 462. However, there were two ways in which individualized issues impeded the ability to certify a class. First, only seventy-five percent of the defendant's intended recipients received the fax and there was no way to know *which* seventy-five percent had received it. *Id.* at 470. The district court concluded that this inability to identify the class members created a predominance and an ascertainability problem. *Id.* at 470. The Sixth Circuit affirmed[6], finding that, at the very least, the class action device was not "superior to other

<hr />

[5] While Ms. Littler herself insists that she thought she was required to join OAPSE, she cannot recall what she was told prior to joining the union in 2007 or even in 2015. (Littler Dep. 45:11–46:1, 51:4–9, 52:11–17.)

[6] The *Sandusky Wellness* court noted that other circuits have analyzed an inability to identify class members as impeding a proposed class action's ability to satisfy the predominance, ascertainability, or superiority elements, or some combination of the three. *Id.* at 471–72. However, the court declined to determine which

available methods due to the likely difficulties in managing a class action" because of the inability to weed out the twenty-five percent who were nonrecipients. *Id.* at 472 (internal quotation marks omitted).

Second, some of the fax recipients had consented to the receipt of the fax and thus had not been harmed under the governing statute. *Id.* at 468. This question of consent was individualized to each class member and predominated over any common questions. *Id.* That is, "[r]egardless of other questions that may be common to the class, identifying which individuals consented would undoubtedly be the driver of the litigation." *Id.* at 468. The court concluded that if a class were certified, the predominant issue of fact would be one of individual consent, and the district court would be left to filter out those members to whom the defendant was not liable (i.e., those who had consented to the fax). *Id.* at 468–69.

Here, as in *Sandusky Wellness*, there is no way to determine who is a member of the reluctant member class short of asking each of the tens of thousands of current and past members of the OAPSE bargaining unit their motivation and reasons for joining the union. Such a survey creates a host of problems that the Court discusses in greater detail in the next section because in the Court's view these problems primarily deal with the difficulty in ascertaining who is a member of the class. But the very need for the survey itself, as in *Sandusky Wellness*, demonstrates how individual issues predominate over the common ones. Ms. Littler concedes this point, and it is fatal to her ability to prove predominance. (ECF No. 43, at 12 (referring to the survey as an "individualized inquiry).)

Nevertheless, Ms. Littler contends that this admittedly "individualized inquiry" is not fatal to her claim because "there are many remaining common issues." (*Id.* (emphasis deleted).)

---

approach was correct, recognizing that an inability to identify class members created a problem for certification but not specifying which Rule 23 prerequisites were particularly hampered. *See id.*

But the only common issues she identifies are the legal questions that define the case—indeed, they are such broad questions that they are the legal questions that define virtually *all* the union dues litigation going on around the country.[7] As the Sixth Circuit has stated, at a high enough level of generality, virtually all litigation has common questions. *Sprague*, 133 F.3d at 397. This Court agrees that there exist some common questions of fact and certainly common questions of law. But the individualized question of each putative class member's motivation behind the decision whether to join the union will clearly predominate because it is the linchpin of whether an individual is a member of the reluctant member class.

Ms. Littler insists that "courts have repeatedly held that the need to ask a single question of individual class members does not defeat predominance." (ECF No. 43, at 13.) But the eight cases that she cites in support are distinguishable. Each of these cases queried the putative class members about financial information that could be objectively verified, and the courts generally concluded that such an inquiry was a manageable one.[8] For example, in *Wells v. McDonough*,

---

[7] These are also the same "common questions" that plaintiffs' counsel identifies in two proposed class actions in the District of Minnesota. (*See* Pl. Mem. of Law in Support of Mot. for Class Cert., at 14, *Prokes v. Am. Fed'n of State, Cty., & Mun. Emps., Council No. 5*, 0:18-cv-02384-SRN-ECW, ECF No. 60 (D. Minn. Oct. 18, 2019); Pl. Mem. of Law in Support of Mot. for Class Cert., at 15, *Hoekman v. Educ. Minn.*, 0:18-cv-01686-SRN-ECW, ECF No. 93 (D. Minn. Oct. 18, 2019).) But nobody would argue that the existence of these common questions means that all three cases could proceed as a unitary class action. That demonstrates that while these questions may be common to all putative class members, that commonality is not particularly important in the context of the class certification analysis.

[8] *See In re Paulsboro Derailment Cases*, No. 13-784 RBK/KMW, 2014 WL 4162790, at *6 (D.N.J. Aug. 20, 2014) ("[W]hether a putative class member incurred expenses or lost income due to obeying the evacuation and shelter orders is an objective inquiry . . . ."); *Spears v. First Am. eAppraiseIT*, No. 5-08-CV-00868-RMW, 2014 WL 4647679, at *19 (N.D. Cal. Sept. 16, 2014) (determining purpose of loan); *Butto v. Collecto Inc.*, 290 F.R.D. 372, 382 (E.D.N.Y. 2013) ("[I]t appears to the Court that the process of determining whether a debt is a consumer debt would be 'relatively straightforward.'"); *Edwards v. First Am. Corp.*, 289 F.R.D. 296, 305 (C.D. Cal. 2012) ("It therefore does not appear to the Court that determining the purpose of the class members' loans would be 'unmanageable.'"); *Tourgeman v. Collins v. Fin. Servs., Inc.*, No. 08-CV-1392 JLS (NLS), 2011 WL 5025152, at *7 (S.D. Cal. Oct. 21, 2011) (requiring determination of whether putative class member paid money or incurred expenses in response to a collection letter or lawsuit); *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 673 (N.D. Cal. 2011) (noting that class members were required to indicate the type of loan on the loan applications); *Wilkerson v. Bowman*, 200 F.R.D. 605, 610 (N.D. Ill. 2001) (determining whether debts involved were personal or business debt); *Wells v. McDonough*, 188 F.R.D. 277, 279 (N.D. Ill. 1999) (same).

the Northern District of Illinois sought to answer the question whether a putative class member's debt was a personal or business debt because only personal debtholders could be members of the class. 188 F.R.D. 277, 279 (N.D. Ill. 1999). In doing so, the court was able to rely on a presumption that checks from personal bank accounts were *prima facie* evidence that the money paid was a personal debt. *Id.* Thus, in answering the key question in that case, the court did not need to rely solely on the putative class members' self-serving statements. *See id.*

No similar objective evidence exists here that would allow the Court to evaluate the level of a bargaining unit member's eagerness or reluctance to join OAPSE. Dr. Macpherson has confirmed that there is no way to observe from a person's objective characteristics what his/her attitude may be about paying agency fees or the reasoning behind the person's decision whether to join a union. (Macpherson Dep. 61:5–13, 62:5–8, 95:21–96:12.) Ms. Littler claims that "[t]he survey results and expert analysis will provide the objective evidence of whether a class member would have joined and paid in [sic] the union in the absence of an agency shop." (ECF No. 43, at 21.) They will not, for they cannot. There is nothing objective about asking people to opine about what they think their feelings were at a particular point in time in the past. Rather, this demonstrates Ms. Littler's inability to point to objective evidence to allow the Court to filter the reliable survey results from the unreliable, a similar task that the Sixth Circuit agreed could not be completed by the district court in *Sandusky Wellness*.

Finally, Ms. Littler argues that it is not uncommon for courts to certify class definitions "that depend on a class member's subjective desires or beliefs." (*Id.* at 20.) This is wrong as a matter of law. "'For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria.'" *Young*, 693 F.3d at 538 (quoting 5 James W. Moore et al., *Moore's Fed.*

*Practice* § 23.21[3] (Matthew Bender 3d ed. 1997)). And the cases that Ms. Littler cites in support of this incorrect proposition are inapt. First, none involves the propriety of certifying a class. Second, none involves class members' remembered feelings about the past but only class members' feelings about the *desired outcome of the litigation*. Virtually any class could be characterized as a "subjective class" if framed in turns of feelings about the relief sought. And that is not the same as using feelings to define the harm that binds the class together. Subjective attitudes about relief are a function of litigation and would not impede the certification of a class. Defining a common harm using subjective feelings undermines the idea that individualized questions cannot predominate in a Rule 23(b)(3) class action.

### 3. Rule 23(b)(3) – ascertainability

"Courts generally deny certification when the putative class is defined by class members' state of mind." William B. Rubenstein, 1 Newberg on Class Actions § 3.5 (5th ed. 2019). This is because state of mind is subjective, leaving the determination of whether an individual is a member of the class to nothing more than that individual's "own desires and interests." *Id.* "So-called mental state classes may therefore frustrate fundamental due process tenets of class action litigation by making it difficult for a court to determine with any certainty who should receive notice, who will be bound by the judgment, and who should receive any relief obtained from the defendant." *Id.*

In response to each flaw that the union identifies, Ms. Littler's response is to point to the post-certification survey that Dr. Macpherson proposes and to insist that the survey will fix it. (ECF No. 43, at 9–10, 15–17, 19–21.) Indeed, Ms. Littler concedes that her motion rises and falls on this survey. (*Id.* at 12 ("Ms. Littler has acknowledged from the outset that the class members

will need to be asked whether they would have joined and paid the union in the absence of an agency shop.").)

She contends that "surveys are a commonly used device in class-action litigation." (*Id.* at 15.) In support of this proposition, she cites but one case, and it is a case in which a survey was used to identify an objective fact—the citizenship of the class members. (*Id.* (citing *Hood v. Gilster-Mary Lee Corp.*, 785 F.3d 263, 266 (8th Cir. 2015)).) It is no doubt feasible and practical to conduct a survey to gather such simple and objective information. But that is not what Dr. Macpherson proposes. Rather, Dr. Macpherson seeks to survey tens of thousands of individuals about their old (sometimes decades-old) opinions and feelings about their decision whether to join OAPSE. (Ex. A at 7.) The problem is that the proposed survey itself is fundamentally flawed in that it is unable to avoid problems stemming from memory, misinterpretation, or outright dishonesty. These flaws render the survey unreliable and leave the Court with no possible way to ascertain who is a member of the reluctant class.

First, beginning with memory, the Court does not believe that individuals will be able to recall accurately their particular feelings at the time that they were faced with the decision whether to join the union. Feelings are fleeting and difficult to remember, especially for moments that are insignificant in our lives. And our emotions tend to affect *how* we remember moments in our lives, too. *See, e.g.*, Signy Sheldon & Julia Donahue, *More than a feeling: Emotional cues impact the access and experience of autobiographical memories*, 45 Memory & Cognition 731, 732 (2017) ("A large body of work has indicated that emotional life events are recalled better than nonemotional events and that certain emotional characteristics affect remembering in different ways."). For example, some studies have suggested that positive events are remembered less specifically than negative ones, while others have reported an enhanced

ability to remember even peripheral details related to positive memories. *Id.* "Negative past experiences, on the other hand, tend to be recalled with more focus on the central event and are remembered with greater emotional intensity than positive memories." *Id.* (internal citation omitted).

The fact that the ability to remember feelings depends in part on the character and intensity of those feelings is itself a bias. It may be the case that only those unusually excited or unusually perturbed about joining OAPSE will accurately remember their feelings about their decision whether to join the union. And it may be the case that there are more people who fall into one category or the other, thus skewing the results of the proposed survey. Moreover, there is no way to ensure that individuals' memories from years and even decades ago will not have been polluted by subsequent events. For example, an individual who happily joined OAPSE twenty years ago may have had a falling-out with the union in the interim that may have subconsciously tainted that original decades-old memory. In short, individual memories are not sufficiently reliable to be able to sustain the certification of a class action. *See Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, No. 3:13CV2085, 2016 WL 75535, at *3 (N.D. Ohio Jan. 7, 2016) ("Given that the fax was sent in 2010, the 'recollection of a putative class member that he, she, or it had received a particular unsolicited fax would be somewhat suspect.'" (quoting *Brey Corp. v. LQ Mgmt. LLC*, No. JFM-11-718, 2014 WL 943445, at *1 (D. Md. Jan. 30, 2014))), *aff'd*, 863 F.3d 460 (6th Cir. 2017).

Second, it is difficult to ensure that survey participants will be able to report their feelings accurately even if they can accurately remember them because different people will interpret the survey questions differently. "Reluctance" is not an objective term, and it is not something that can be easily quantified. If someone is asked whether he/she was "reluctant" to join OAPSE,

how much reluctance qualifies? Must that person have been 100% reluctant? 50% reluctant? 20% reluctant? And if 20% reluctance is enough, can that be counterbalanced if the person was 20% reluctant but 80% enthusiastic? What about 20% reluctance and 80% tepid enthusiasm? These variances also raise commonality concerns. It is a difficult question to answer whether someone who is 100% reluctant is similarly situated to someone who was only 20% reluctant. And yet both might answer "yes" in response to a survey asking whether they were "reluctant" to join OAPSE.

Then there is the question of when this reluctance must have occurred. Must it have occurred at the moment of signing the dues check-off authorization? What if the reluctance occurred an hour beforehand but dissipated prior to signing? Or what if someone enthusiastically signed a dues check-off authorization and did not begin to feel reluctant until an hour later? Or a day later? All of these questions demonstrate the subjectivity of the inquiry as well as the individualized nature of these feelings.

Third, it cannot be ignored that survey respondents may be untruthful in their answers. They have a financial incentive to lie given that a particular answer carries with it the prospect of sharing in a monetary settlement or award. And for those ideologically opposed to OAPSE, there is an ideological incentive to lie in order to join a lawsuit that may result in weakening the union. Yet there is little way to verify the honesty of those responding to the survey. OAPSE could try to discredit their assertions by delving into the lives of the individual class members, but the prospect of rooting out the bad apples seems slim, not to mention burdensome. It is manifestly unfair to allow class members to become part of the class by merely checking a box while forcing OAPSE to engage in massive amounts of individualized discovery and investigation to try to verify the truthfulness of their statements. The Court would also be forced to undertake a

burdensome analysis in order to ascertain the composition of the class. Even if the Court insisted on individual affidavits rather than a survey, finding out which "individuals were being untruthful would require scrutinizing each affidavit and would undoubtedly be a difficult undertaking . . . and may not even be possible . . . ." *Sandusky Wellness*, 863 F.3d at 473. Such "[p]ractical concerns . . . underscore the inappropriateness of class certification." *Id.*

Finally, if a class were certified, the members of the reluctant class would need to prove as a component of liability that they did not voluntarily join the union, for OAPSE cannot be responsible for individuals' voluntary choices to join the union. *See Allen*, 2020 WL 1322051, at *7. That is, the plaintiffs cannot circumvent their burden of proof by relying on a survey that effectively asks each putative class member whether his/her decision was voluntary. That would raise serious due process concerns based on defendants' inability to challenge effectively the survey results. Instead, individualized proof would be required, which is not well-suited to a class action.

## IV.     CONCLUSION

For the reasons set forth above, Defendant's Motion to Exclude Report of David A. Macpherson is **GRANTED IN PART AND DENIED IN PART** and Plaintiff's Motion for Class Certification is **DENIED**.

**IT IS SO ORDERED**.


/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**